# EXHIBIT F

Page 1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ----------------------------------------X
   CHAD STANBRO,
4                              PLAINTIFF,

5
               -against-         Case No.:
6                                19-CV-10857

7

   WESTCHESTER COUNTY HEALTH CORPORATION,
8  WESTCHESTER MEDICAL CENTER, FRANK WEBER,
   AND JOHN FULL,

9

                               DEFENDANTS.
10 ----------------------------------------X
   CHAD STANBRO,
11                             PLAINTIFF,

12
               -against-         Case No.:
13                               20-cv-01591

14
   C.O. NADYA PALOU, C.O. RAYMOND DEAL, C.O.
15 KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
   CORRECTION NURSE GARY PAGLIARO, AND
16 CORRECTION SERGEANT ENRIQUE TORRES,
17                             DEFENDANTS.
   ----------------------------------------X
18
                   DATE: March 4, 2021
19                 TIME: 2:45 P.M.
20
            DEPOSITION of the Defendant,
21 ENRIQUE TORRES, taken by the respective
   parties, pursuant to an Order and to the
22 Federal Rules of Civil Procedure, held via
   videoconference, before Victoria Chumas, a
23 Notary Public of the State of New York.
24
25

Page 81

1                     E. TORRES

2        A.    Yes.

3        Q.    Anything else you wrote on that

4    report?

5        A.    No.

6        Q.    Now, going to item 10.

7        A.    Okay.

8        Q.    Do you see where it says

9    "employee remained on duty" and check off

10   of "yes?"

11       A.    Yes.

12       Q.    Did you check that off?

13       A.    No.

14       Q.    Next to that 11, where it says

15   "employee required medical attention" and

16   checked off "no."  Do you see that?

17       A.    Yes.  I see that.

18       Q.    Did you check that off?

19       A.    No.

20       Q.    Exhibit 30 is a three-page

21   report.  Is this a use of force report that

22   you filled out, Sergeant?

23       A.    Yes.

24       Q.    Now, why did you fill out a use

25   of force report?

Page 82

1                    E. TORRES

2         A.    The incident was reported to

3    me.

4         Q.    Okay.  As a supervisor, were

5    you required to fill out this report?

6         A.    Yes.

7         Q.    Now, going to page one of the

8    report, where it says, "on the above date

9    and approximate time, it was reported to me

10   an inmate, Mr. Stanbro..." and then you go

11   on.  By whom was that reported to you?

12        A.    This with specifically -- these

13   are different, so it depends on whose it

14   was here.  This one is -- this is the

15   general summary of the incident, so when we

16   say "it was reported to me," it's the

17   summarizing of what both officers have

18   reported in writing.

19        Q.    This is what Deal and Palou

20   were reporting to you, correct?

21        A.    Correct.

22        Q.    Let's go to page two and the

23   typewritten portion where it says,

24   "describe in detail the actual fore used."

25   Do you see that section?

```
 1                   E. TORRES
 2   anyone ever tell you that Mr. Stanbro,
 3   other than that incident where he stood up
 4   and attempted to strike someone, that Mr.
 5   Stanbro fell out of the dental chair, or
 6   threw himself to the floor from the dental
 7   chair, or rolled out of the dental chair
 8   onto the ground?
 9             MS. COLLINS:  Objection.  You
10        can answer.
11        A.   I don't recall that
12   specifically.
13        Q.   Do you recall it in a general
14   sense?
15        A.   Rolled out, fell out, no.
16        Q.   Okay.  Is this the first you
17   are hearing about that?
18             MS. COLLINS:  Objection.  You
19        can answer.
20        A.   Yes.
21        Q.   Okay.  Now, the mention of the
22   video in the revised memorandum, what video
23   were you talking about there?
24        A.   Video regarding of transport is
25   the actual handheld videocamera.  I could
```

```
 1                    E. TORRES
 2   have been more specific there.
 3        Q.    That's okay.
 4        A.    Yeah.  Handheld videocamera was
 5   authorized by, honestly, to tell you, I
 6   don't know who.  Maybe it was coming from
 7   the higher-ups because there was a serious
 8   use of force or a of use of force on the
 9   outside, the inmate was combative, as
10   reported, and assaulted -- they require the
11   transport thereafter to be recorded and
12   transported with the escort of a
13   supervisor.
14        Q.    Now, when you say "the
15   transport," are you talking about the
16   transport from the location where the use
17   of force took place or some other
18   transport?
19        A.    This specifically is from the
20   transport of the facility of the RMU.
21        Q.    Okay.  So the transport
22   bringing Mr. Stanbro out of the RMU by the
23   medics to the hospital, correct?
24        A.    Correct.
25        Q.    And what is your understanding
```

```
1                    E. TORRES
2  as to the nature of that video?  What
3  portion was videotaped?
4       A.    The recording should start when
5  they're in route or moving with the inmate.
6  As soon as they start to move with the
7  inmate, the recorder is supposed to come
8  on.
9       Q.    When you say "as soon as they
10 start to move with the inmate," do you mean
11 as soon as EMS takes possession of the
12 inmate?
13      A.    As they start to move with the
14 inmate, so anywhere that he is moved out of
15 the area, I don't recall if they started
16 recording immediately after they left the
17 emergency room or if they started recording
18 when they got outside to the front door.  I
19 don't remember what point, but I do
20 understand that the recording is supposed
21 to commence once the intimate is in
22 transport.
23      Q.    Okay.  I am just trying to nail
24 down what you mean by "in transport."  So
25 medics did come inside of the RMU, correct?
```

```
 1                    E. TORRES
 2      A.    Yes.
 3      Q.    And they took possession of Mr.
 4  Stanbro inside of the RMU, correct?
 5      A.    Yes.
 6      Q.    They placed him on a gurney or
 7  a stretcher in the RMU; is that correct?
 8      A.    Yes.
 9      Q.    And then they transported him
10  from inside of the RMU into their vehicle;
11  is that correct?
12      A.    Yes.
13      Q.    What is your understanding as
14  standard procedure as to when the videotape
15  is supposed to start?
16            MS. COLLINS:  Objection.  You
17       can answer.
18      A.    I understand -- it's as they
19  begin to move the inmate, as they begin the
20  transport as it becomes mobile, as they
21  start to move physically from area.
22      Q.    So are you saying as they begin
23  to move the intimate from floor up into the
24  stretcher or something else?
25      A.    Something else.  As they move
```

```
 1                     E. TORRES
 2   from on the stretcher mobiley [sic] moving
 3   him from that point out of the emergency
 4   room area, from that point on the recording
 5   is supposed to start.
 6        Q.   So once Mr. Stanbro is in the
 7   stretcher, on the stretcher inside of RMU
 8   and the EMS personnel begin to transport
 9   him outside of the RMU, that is when the
10   videotape is supposed to start, correct?
11        A.   If he starts to move right out
12   of the emergency room, they should start
13   recording.
14        Q.   At the point that they are
15   transporting him, they are actually pushing
16   or pulling that stretcher and he is in the
17   stretcher, is that the point that the
18   videotape is supposed to start, yes or no?
19             MS. COLLINS:  Objection.
20        A.   Yes.
21        Q.   And did you see anyone do a
22   handheld videotape of Mr. Stanbro that day?
23        A.   I don't -- I remember the
24   officers, I honestly don't remember what
25   point, at what point they started to
```

```
 1                    E.  TORRES
 2   record.
 3        Q.    But do you remember that at
 4   some point they started to record?
 5        A.    I honestly don't remember them
 6   starting to record.  I do remember that it
 7   was required.  I don't remember at what
 8   point they started.
 9        Q.    And as a matter of normal
10   procedure, when does the videotape end?
11   When do they stop videotaping?
12             MS. COLLINS:  Objection.  You
13         can answer.
14        A.    I'm not sure.
15        Q.    Well, let me ask you this, did
16   an officer or officers accompany Mr.
17   Stanbro from the RMU to Saint Luke's with
18   the EMS personnel?
19        A.    Yes.
20        Q.    That's standard procedure,
21   correct?
22        A.    Yes.
23        Q.    And would at least one officer
24   ride in the ambulance or the other EMS
25   vehicle with Mr. Stanbro?
```

1                    E. TORRES

2        A.    Yes.

3        Q.    And would the videotape

4   continue in route to the hospital?

5        A.    Yes.

6        Q.    Would it continue at any point

7   after the ambulance arrives at the

8   hospital?

9        A.    I'm not quite sure if they --

10  I'm trying to think.  I have never actually

11  transported to a hospital.  I have

12  transported to facilities, to correctional

13  facilities.  I've never transported to a

14  hospital, so I really don't know what they

15  did or when they stopped.

16       Q.    Okay.

17       A.    I really don't know.  I mean,

18  that is a good question for me to question.

19       Q.    On those occasions when you

20  have transported an inmate from a use of

21  force incident to another facility and it's

22  been videotaped, when does the videotape

23  typically end?  Is it when the inmate is

24  physically delivered into the new facility?

25       A.    Most occasions, yes.  Most

```
 1                    E. TORRES
 2   times, sometimes, you are not even -- you
 3   won't even go into the facility.  You drop
 4   them off right outside of the gate, and
 5   then they will take the inmate in.  You are
 6   not going to record going into the
 7   facility.  Most of the time, inmates that
 8   are being recorded are in the special
 9   housing unit, so everything is already on
10   camera.
11        Q.    That's fine.  Have you ever
12   seen the videotape that was taken of Mr.
13   Stanbro on that day?
14        A.    No.
15        Q.    Do you know if that videotape
16   still exists?
17        A.    I don't.
18        Q.    Do you know what the practice
19   and procedure was at Fishkill back in 2018
20   regarding the preservation of those types
21   of videotapes after use of force incident?
22        A.    It becomes part of the use of
23   force package.  It should have been
24   returned to watch commander's office and be
25   made a part of the whole incident.
```

```
 1                    E. TORRES
 2       Q.    And if there's an investigation
 3  ongoing, the videotape is preserved at
 4  least until the conclusion of the
 5  investigation; is that correct?
 6             MS. COLLINS:  Objection.
 7       A.    Yes.  It should be available,
 8  yes.
 9             MR. SIVIN:  Okay.  Thank you.
10       I don't have any questions.
11             MS. COLLINS:  Does anyone else
12       want to inquire?
13             MR. HEINZE:  I have a couple of
14       questions.
15             MS. COLLINS:  Go ahead, Mark.
16  EXAMINATION BY
17  MR. HEINZE
18       Q.    My name is Mark Heinze.  I
19  represent Raymond Deal.  How are you?
20       A.    Good.  Hi.  How are you?
21       Q.    Same instructions you heard
22  before apply to my questions as well.  I
23  just want to clear up a couple of things,
24  so I will be jumping around a little bit.
25  Were you assigned as the supervisor for
```

```
1                      E. TORRES
2    this use of force incident?
3         A.    Yes.
4         Q.    And maybe you said this, but
5    who gave you that assignment?
6         A.    I was the building sergeant, so
7    it was reported to me, so the incident was
8    reported to me by the officers.  I am the
9    RMU sergeant, so the incident becomes my
10   report.
11        Q.    So that was just automatic
12   because you were the sergeant on duty at
13   the RMU?
14        A.    Correct.
15        Q.    Was this still your case?
16             MS. COLLINS:  Objection.  You
17         can answer.
18        Q.    Well, are you still the
19   supervisor on this use of force?
20             MS. COLLINS:  Objection.  You
21         can answer.
22        A.    Well, I am still here.  Being
23   in this deposition, I'm a part of it.  My
24   name is on that paperwork forever, yeah.
25        Q.    I was not trying to be cleaver.
```

1             E. TORRES
2  directly involved if the situation and am
3  there when it actually takes place, and I
4  observed something and they write something
5  else, and I'm like, wait, this is not what
6  happened, this is not how it happened, then
7  that is different.
8       Q.    You can't do it?  Are you
9  saying your authority to ask for a rewrite
10 is just limited to typographical and
11 grammatical matters, or are you saying on
12 matters of substance you can also request a
13 rewrite?
14      A.    In this situation?
15      Q.    I'm referring to generally.
16 Just generally in terms of the practice.
17      A.    Generally, once it is reported
18 to the sergeant, I report it to, forward it
19 to the lieutenant , and then it either
20 stops there it, comes back to me to have
21 the officer rewrite, or it continues up the
22 chain of command and then they might get
23 trickled back from the dep of security back
24 to the captain, all of the way back down to
25 the supervisor.  But yeah, I don't see that

```
 1                    E. TORRES
 2   there is -- we as sergeants are not able to
 3   say to the officer that something needs to
 4   be rewritten and whatever the matter,
 5   whatever the case.
 6             MS. COLLINS:  I think we lost
 7        Mark.
 8             (Whereupon, a short recess was
 9        taken.)
10             MR. HEINZE:  Can you just read
11        back his answer?
12             (Whereupon, the referred to
13        answer was read back by the
14        Reporter.)
15        Q.    So Sergeant, are you saying
16   that if there were a request for a rewrite,
17   it wouldn't come from you, it would come
18   from higher up, but may pass down through
19   you to the C.O.s?
20        A.    Correct.
21        Q.    Got it.  Other than
22   typographical things?
23        A.    Correct.
24        Q.    I understand.
25             MR. HEINZE:  I don't have any
```