Page 1

```
 1
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     ------------------------------------------X
       CHAD STANBRO,
 4                                 PLAINTIFF,
 5
               -against-          Case No.:
 6                                19-CV-10857
 7
       WESTCHESTER COUNTY HEALTH CORPORATION,
 8     WESTCHESTER MEDICAL CENTER, FRANK WEBER,
       AND JOHN FULL,
 9
10                                DEFENDANTS.
       ------------------------------------------X
11     CHAD STANBRO,
                                  PLAINTIFF,
12
               -against-          Case No.:
13                                20-cv-01591
14
       C.O. NADYA PALOU, C.O. RAYMOND DEAL, C.O.
15     KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
       CORRECTION NURSE GARY PAGLIARO, AND
16     CORRECTION SERGEANT ENRIQUE TORRES,
17                                DEFENDANTS.
       ------------------------------------------X
18
                      DATE: March 4, 2021
19                    TIME: 10:00 A.M.
20
                      DEPOSITION of the Defendant,
21     RAYMOND DEAL, C.O., taken by the respective
       parties, pursuant to an Order and to the
22     Federal Rules of Civil Procedure, held via
       videoconference, before Victoria Chumas, a
23     Notary Public of the State of New York.
24
25
```

Page 2

```
 1
 2      A P P E A R A N C E S:
 3
        SIVIN, MILLER & ROCHE LLP
 4         Attorneys for the Plaintiff
           CHAD STANBRO
 5         20 Vesey Street, Suite 1400
           New York, New York 10007
 6         BY: EDWARD SIVIN, ESQ.
           esivin@sivinandmiller.com
 7
 8
        WILSON, BAVE, CONBOY, COZZA & COUZENS, P.C.
 9         ATTORNEYS FOR THE DEFENDANTS
           WESTCHESTER MEDICAL CENTER AND JOHN FULL
10         707 Westchester Avenue
           White Plains, New York 10604
11         BY: CLAUDINE L. WEIS, ESQ.
           cweis@wbccc.com
12
13
        RAWLE & HENDERSON, LLP
14         Attorneys for the Defendant
           FRANK WEBER
15         14 Wall Street, 27th Floor
           New York, New York 10005
16         BY: ROBERT A. FITCH, ESQ.
           rfitch@rawle.com
17
18
        NEW YORK STATE OFFICE OF THE ATTORNEY
19      GENERAL
           Attorneys for the Defendants
20         KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
           CORRECTION NURSE GARY PAGLIARO, AND
21         CORRECTION SERGEANT ENRIQUE TORRES
           28 Liberty Street, Floor 18
22         New York, New York 10005
           BY: DEANNA L. COLLINS, ESQ.
23         deanna.collins@ag.ny.gov
24
25
```

Page 3

```
 1
 2
      OFECK & HEINZE, LLP
 3       Attorneys for the Defendant
         C.O. Raymond Deal
 4       85 Main Street, Suite 204
         Hackensack, New Jersey 07601
 5       BY: MARK F. HEINZE, ESQ.
         markfheinze@gmail.com
 6
 7
 8    Also present:
 9    Glenn Miller
10    Jason Miller
11    Andrew Weiss
12
              *           *           *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2      F E D E R A L   S T I P U L A T I O N S
3
4
5      IT IS HEREBY STIPULATED AND AGREED by and
6  between the counsel for the respective
7  parties herein that the sealing, filing and
8  certification of the within deposition be
9  waived; that the original of the deposition
10 may be signed and sworn to by the witness
11 before anyone authorized to administer an
12 oath, with the same effect as if signed
13 before a Judge of the Court; that an
14 unsigned copy of the deposition may be used
15 with the same force and effect as if signed
16 by the witness, 30 days after service of
17 the original & 1 copy of same upon counsel
18 for the witness.
19
20     IT IS FURTHER STIPULATED AND AGREED that
21 all objections except as to form, are
22 reserved to the time of trial.
23
24          *      *      *      *
25
```

```
 1                    R. DEAL
 2    R A Y M O N D    D E A L, called as a
 3    witness, having been first duly sworn by a
 4    Notary Public of the State of New York, was
 5    examined and testified as follows:
 6    EXAMINATION BY
 7    MR. SIVIN:
 8               (Whereupon, PDF documents were
 9          deemed marked as Plaintiff's Exhibit
10          26-29 for identification as of this
11          date by the Reporter.)
12          Q.    Please state your name for the
13    record.
14          A.    Raymond Deal.
15          Q.    What is your address?
16          A.    18 Strack Drive, Beacon, New
17    York 12508.
18          Q.    Good morning, Officer Deal.
19          A.    Good morning.
20          Q.    My name is Ed Sivin.  I
21    represent the plaintiff in these lawsuits
22    whose name is Chad Stanbro.  I'm going to
23    ask you some questions relating to an
24    incident that took place at Westchester
25    Medical Center on August 31, 2018.  If for
```

1                    R. DEAL

2    any reason you don't understand a question,

3    or you don't hear it properly, or a

4    question is unclear to you for any reason,

5    don't answer the question.  Ask me to

6    repeat it or rephrase it and I will do so,

7    okay?

8         A.     Okay.

9         Q.     And please make sure all of

10   your answers are verbal because the court

11   stenographer can't take down hand gestures

12   or head gestures, okay?

13        A.     Okay.

14        Q.     Other than the tech support

15   person, is there anyone else in the room

16   that you are in now?

17        A.     No.

18        Q.     Are you currently employed by

19   the Department of Corrections and Community

20   Supervision?

21        A.     Yes.

22        Q.     What is your job title?

23        A.     Correction officer.

24        Q.     What facility are you at?

25        A.     Fishkill Correctional Facility.

1                    R. DEAL

2          Q.      When did you graduate the

3    academy?

4          A.      December 2012.

5          Q.      Please take me through your

6    assignments with DOCCS from when you

7    graduated in 2012 until the present?

8          A.      My assignments from 2012, when

9    I graduated the academy, I went to do

10   on-the-job training at Sing Sing

11   Correctional Facility.  From there, I went

12   to Green Haven Correctional Facility.  I

13   was a resource officer there.  Meaning, I

14   didn't have a specific job.  They put me

15   where they needed me.  I then came to

16   Fishkill in 2013, and I have been working

17   there, I had various positions in Fishkill.

18         Q.      How long were you at Sing Sing?

19         A.      Two weeks.

20         Q.      How long were you at Green

21   Haven?

22         A.      Maybe two months.

23         Q.      Other than Sing Sing, Green

24   Haven, and Fishkill have you worked at any

25   other New York State Correctional

Page 52

1                    R. DEAL
2        Q.     Did Officer Palou tell you that
3    Officer Leonardo had trained or supervised
4    her at Greene Correction Facility?
5        A.     I don't remember her saying
6    that.  I remember her saying that they
7    worked together at some point.
8        Q.     So I want you to describe all
9    of the force that you recall being used
10   between the time that Mr. Stanbro swung his
11   arm in your direction and yeah -- after
12   that, all of the force you recall being
13   used.
14            MR. HEINZE:  Objection to form.
15        Are you asking the witness -- it also
16        dropped out on me.  Are you asking
17        just what Officer Deal did or all of
18        the force that everybody used?
19            MR. SIVIN:  Let me clarify
20        that.
21       Q.     I would like you to describe
22   all of the force you recall being used on
23   Mr. Stanbro by yourself, Officer Deal,
24   Officer Leonardo, and anyone else.
25       A.     I remember when he swung at me,

Page 53

1                          R. DEAL
2     like I said, I backed up.   I remember
3     Officer Leonardo and Palou grabbing his
4     upper body, like around his chest area, and
5     putting him back onto the chair.   And I
6     grabbed his legs because he was swinging
7     his legs, and I grabbed his legs to try to
8     get control of him.
9          Q.     What other force, if any, did
10    you observe?
11         A.     Other than that, no other
12    force.
13         Q.     Describe the manner in which
14    Officer Palou grabbed Mr. Stanbro's upper
15    body.
16         A.     I was not really paying
17    attention to what they were doing, but I
18    believe she grabbed his arm, his right arm.
19         Q.     Well, when you say you weren't
20    paying attention, does that mean because
21    you were focused more on the legs?
22         A.     On the legs, yes.
23         Q.     Would it be fair to say that
24    when Officer Leonardo and Officer Palou
25    were using force against Mr. Stanbro that

Page 54

```
 1                    R. DEAL
 2   you were looking at Mr. Stanbro's legs?
 3         A.     Yes.
 4         Q.     So when you were looking at Mr.
 5   Stanbro's legs, did you physically see what
 6   Officer Leonardo and Officer Palou were
 7   doing?
 8         A.     I may have glanced up, but I
 9   did not really pay attention to what they
10   were doing.  I was focused on trying to
11   hold the legs from going all over.
12         Q.     So did you actually see how Mr.
13   Stanbro got back into the chair, or were
14   you focused elsewhere at that point, or
15   something else?
16         A.     I was focused elsewhere.
17         Q.     So when you say that they
18   grabbed his upper body, is this something
19   that you observed after Mr. Stanbro was
20   already back in the chair?
21         A.     Yes.
22         Q.     So you don't know what type of
23   force or maneuver was used by Officer
24   Leonardo or Officer Palou to get Mr.
25   Stanbro back in the chair; is that correct?
```

Page 55

1                          R. DEAL

2          A.      Correct.

3          Q.      But at the point that the other

4   officers had already placed Mr. Stanbro

5   back in the chair, at that point, did you

6   observe Palou and Leonardo restraining Mr.

7   Stanbro in some manner?

8          A.      Can you repeat that?

9          Q.      Yeah.  So I know you didn't see

10  what type of force was used to get Mr.

11  Stanbro back in the chair, but you say at

12  some point you observed Palou and Leonardo

13  restrain, in some manner, Mr. Stanbro's

14  upper body, correct?

15         A.      Yes.

16         Q.      Describe the manner in which

17  you observed Leonardo and Palou restrain

18  Mr. Stanbro's upper body at that point.

19         A.      Officer Palou had his arm and

20  the other, Officer Leonardo, was -- he had

21  the other side of his body, like around his

22  chest area.

23         Q.      When you say "Officer Palou had

24  his arm," describe physically what she was

25  doing.  And which arm you are referring to.

Page 56

R. DEAL

1

2      A.     It was his right arm, and she
3   was like holding it down to where he could
4   not continue swinging or using his hands to
5   do anything.
6          Q.     Was Palou holding down his
7   right arm with both of her hands?
8          A.     I don't remember.  I believe
9   so, but I don't remember.
10         Q.     Which portion of Mr. Stanbro's
11  right arm was Officer Palou retraining?
12  Was it closer to the shoulder, closer to
13  the wrist, the elbow, something else, a
14  combination?
15         A.     Around I guess the bicep area.
16         Q.     And now Officer Leonardo,
17  describe for me -- at the point when you
18  saw him restraining Mr. Stanbro, describe
19  for me what parts of his body he had on
20  what parts of Mr. Stanbro's body?
21         A.     I don't remember exactly how
22  Officer Leonardo had him, but it was -- I
23  believe it was his chest area, like on the
24  opposite side, on the left side.
25         Q.     Meaning, Mr. Stanbro's left

Page 57

1                    R. DEAL
2    side, correct?
3         A.    Yes.
4         Q.    What part -- what was Officer
5    Leonardo using to restrain that part of Mr.
6    Stanbro's body?  Was it his arm, his leg,
7    his forearms, his hands, something else?
8         A.    His hands.  It was his arms,
9    his hands.
10        Q.    Now, during this time when you
11   saw Stanbro [sic] and Palou restraining Mr.
12   Stanbro, were you sill involved in
13   restraining Mr. Stanbro's ankles?
14        A.    Yes.
15        Q.    Would it be fair to say at that
16   point the focus of your attention was still
17   on Mr. Stanbro's ankles?
18        A.    Yes.
19        Q.    What is the next thing you
20   recall after you were restraining Mr.
21   Stanbro's ankles and Palou and Leonardo
22   were restraining the upper portion of Mr.
23   Stanbro?
24        A.    I remember I had the waist
25   chain things on my waist.  I kind of

Page 58

```
1                    R. DEAL
2    clipped them on my belt, so we had to put
3    the waist chains back on.  But right
4    before, I got shoved by his legs into
5    something that was on the wall.  It was a
6    case there that was on the wall, so I kind
7    of -- my back hit the wall.  I came back
8    and that is when we started to put the
9    waist chains and everything back on him.
10        Q.    When you say you were "shoved"
11   into the wall, how were you shoved into the
12   wall?
13        A.    He pushed me with his feet.
14        Q.    Now, at that point, his feet
15   were still in those shackles, correct?
16        A.    Yes.
17        Q.    And were you still holding onto
18   his feet at that point?
19        A.    At that point, yes, I was.
20        Q.    And you are saying his feet
21   made contact with your body?
22        A.    Yes.
23        Q.    What portion of your body?
24        A.    My stomach area.
25        Q.    When you were applying --
```

1                          R.  DEAL

2    did  he  appear  to  you  to  be  in  any  physical

3    condition  different  than  the  way  he  was

4    before  he  was  wheeled  out  to  the  van?

5              MR.  HEINZE:   Objection  to  the

6         form.

7         Q.    You  can  answer.

8              MR.  HEINZE:   I  think  he  is  just

9         unclear.   Are  you  referring  to

10        earlier  that  day?

11             MR.  SIVIN:   Let  me  rephrase  it.

12        Q.        Did  you  observe  any  change  in

13   Mr.  Stanbro's  physical  condition?   By  that

14   I  mean,  his  ability  to  move,  whether  he  was

15   injured  or  not,  or  appeared  to  be  injured

16   at  any  time  between  the  point  you  brought

17   him  into  the  procedure  room  and  the  point

18   that  you  wheeled  him  out  of  the  procedure

19   room?

20             MS.  COLLINS:   Objection  as  to

21        form.

22             MR.  HEINZE:   You  can  answer.

23        A.    When  we  bought  him  in,  he

24   walked  in,  but  then  after  the  situation  we

25   went  through  with  him,  like  I  said

1                          R. DEAL
2   breathing hard and things, he -- I'm not a
3   medical at all, but he just seemed to be
4   uncooperative.  I didn't think he was hurt,
5   but I am not anything medical, so I don't
6   know what his medical condition might have
7   been.
8          Q.     Okay.  Well, again, when you
9   say he became "uncooperative," are you
10  referring to anything other than those
11  three events where he stood up and took a
12  swing, and then the two other events where
13  he fell or threw himself to the ground, is
14  that what you are referring to by
15  uncooperative?
16         A.     Yes, yes.
17         Q.     But when you wheeled him out,
18  were you under the impression that he was
19  -- strike that.  When you wheeled him out,
20  did you believe he was able to walk on his
21  own at that point if he wanted to?
22         A.     If he wanted to, yeah.  I do
23  believe so, yeah.
24         Q.     So essentially, you wheeled him
25  out because you thought he was being

```
1                    R. DEAL
2   uncooperative, correct?
3        A.     Yes.
4        Q.     Did Mr. Stanbro say anything
5   during the trip in the wheelchair from the
6   procedure room to the van?
7        A.     While we were still in the
8   procedure -- not in the procedure room, in
9   the dental clinic, he said that his neck
10  bothered him.
11       Q.     So this is while you were
12  wheeling him through the clinic en route to
13  the exit door?
14       A.     Yes.
15       Q.     And who else was present when
16  he said that his neck hurt?
17       A.     My partner, Officer Palou, and
18  other people that were in the clinic.   I
19  don't know anybody else.
20       Q.     Other than saying his neck
21  hurt, did Mr. Stanbro say anything else
22  during the period that you wheeled him from
23  the procedure room to the van?
24           MR. FITCH:   Objection to the
25      form.   He said his neck bothered him.
```

1                    R. DEAL

2               MS. WEIS:  Same objection.

3          Q.     Other than by saying that his

4     neck bothered him, did Mr. Stanbro say

5     anything else during the time that you

6     wheeled him from the procedure room to the

7     van?

8          A.     No.

9          Q.     When he told you his neck

10    bother him, did you follow up with this?

11    Ask him any questions?  You know, how is it

12    bothering you?  Anything to that effect?

13         A.     I remember my partner, once

14    again Officer Palou, going back to the

15    phone to call the jail once again to let

16    them know what he said.  I believe the

17    doctor was still present.  I can't remember

18    exactly who was around us at the time.

19         Q.     Well, which doctor was that?

20    Are you talking about Dr. Weber, the

21    dentist?

22         A.     I can't say it was Dr. Weber or

23    one of the staff.  I don't know which each

24    one of those job descriptions is, so I

25    can't say exactly who it was.

1                       R. DEAL
2          Q.      But you say Officer Palou went
3     back into the facility; is that correct?
4          A.      No.   We never left.   We were
5     still inside of the dental clinic.   We were
6     like right outside of the door of the room.
7          Q.      So you're saying that after Mr.
8     Stanbro complained about his neck inside of
9     the facility, Officer Palou made a
10    telephone call?
11         A.      Yes.
12         Q.      Did you see her make that call?
13         A.      No.   She walked off to another
14    area to make the phone call.
15         Q.      Did she have a cell phone?
16         A.      No.
17         Q.      Did you have a cell phone?
18         A.      No.
19         Q.      Any reason why not?
20         A.      We don't carry phones on duty.
21         Q.      Are you prohibited from
22    carrying phones on duty?
23         A.      Yes.
24         Q.      Do you know where Officer Palou
25    went to make that telephone call?

```
 1                    R. DEAL
 2        A.    I don't know what area she went
 3   to.
 4        Q.    And you didn't overhear that
 5   phone call, correct?
 6        A.    No.
 7        Q.    Did she tell you what took
 8   place during that phone call?
 9        A.    When she came back, she said
10   that we were told, once again, just to
11   bring him back to the facility, the
12   corrections facility.
13        Q.    Did Officer Palou tell you that
14   she told the watch commander that Mr.
15   Stanbro was complaining of a problem with
16   his neck?
17             MS. COLLINS:   Objection.
18        A.    She didn't tell me what the
19   conversation was.
20        Q.    After Officer Palou made the
21   telephone call, did the two of you then
22   bring Mr. Stanbro out of the hospital in
23   the wheelchair?
24        A.    Yes.
25        Q.    Did you then go directly to the
```

Page 105

1                    R. DEAL

2    van?

3         A.      Yes.

4         Q.      What happened after you arrived

5    at the van?

6         A.      We helped Mr. Stanbro into the

7    van, and I don't remember which one of us,

8    we needed -- because of the incident, we

9    needed the doctor's report of the incident.

10   So we went back inside to get the report,

11   outside of his medical report, a separate

12   report that the doctor wrote describing the

13   incident.

14        Q.      Who told you you needed to get

15   that type of report?

16        A.      Nobody told us, but because it

17   was an incident that happened, it wasn't

18   just a standard visit after the incident,

19   we figured we needed something from the

20   doctor stating what went on, so we went

21   back in and he wrote the report up.

22        Q.      I assume you didn't both go

23   back in at the same time, correct?

24        A.      No.  We both didn't go.  I

25   don't remember which, but one stayed with

1                    R. DEAL
2    the van and the inmate, and the other one
3    went back inside.
4         Q.    Well, do you recall ever going
5    back into the hospital at any point after
6    you brought Mr. Stanbro to the van?
7         A.    I don't remember which one of
8    us went back inside.
9         Q.    Other than that one occasion
10   where one of you went back into the
11   hospital after bringing Mr. Stanbro to the
12   van, did either of you go back to the
13   hospital after bring Mr. Stanbro to the
14   van?
15        A.    Outside of getting the report?
16        Q.    Outside of that one occasion
17   where one of you went back.
18        A.    No.  We didn't after that.
19        Q.    So is it fair to say that after
20   the two of you brought Mr. Stanbro to the
21   van, only one of you went back to the
22   hospital; is that correct?
23        A.    Yes.
24        Q.    Describe how you physically got
25   Mr. Stanbro into the van.

1                    R. DEAL

2          A.     We helped him up into the van.

3          Q.       Tell me what he did and what

4    you did.

5          A.     I don't remember exactly how

6    the whole procedure went, but I remember us

7    helping him, once again, grabbing his arm,

8    assisting him getting into the van.

9          Q.     Again, was he deadweight at

10   that point?  Was he able to stand up on his

11   own?  Did he walk at all?  Tell me exactly

12   what you recall.

13         A.     I don't recall exactly what

14   went on, but we helped him.  I believe we

15   grabbed his arm or helped him get into the

16   van.

17         Q.     Again, your use of the word

18   "helped" makes me conclude that you mean he

19   participated to some extent.  If that's

20   incorrect, tell me.  Did he share or assist

21   in getting himself into the van as well?

22         A.     I don't remember.

23         Q.     Now, the manner in which you

24   grabbed ahold of him and placed him in the

25   van, did that differ in any manner from the

R. DEAL

2    way he was brought from the floor in the

3    dental clinic back into the chair?

4              MS. COLLINS:   Objection.   He

5         testified several times he can't

6         remember.

7              MR. SIVIN:   Well, no.   He can't

8         remember what Mr. Stanbro did.

9         Q.    I am talking about what you

10   did.   Was it essentially the same thing?

11        A.    I don't remember.

12        Q.    Was Mr. Stanbro in the van, at

13   that point, was he still in the handcuffs

14   and leg shackles with the black box?

15        A.    Yes.

16        Q.    Were there any type of

17   seatbelts or shoulder harnesses or anything

18   inside of the van?

19        A.    Yes.   There are seatbelts in

20   the van.

21        Q.    Which row in the van was he

22   placed?

23        A.    I don't remember.

24        Q.    Tell me how, if at all, he was

25   secured inside of the van, vis-à-vis, any

Page 109

1                    R. DEAL
2     seatbelts or restraints?
3          A.      When we put him in the van,
4     they usually put their own seatbelt on.  So
5     I don't remember.  I don't think we put a
6     seatbelt on him because they usually put
7     their own seatbelts on.
8          Q.      So you believe Mr. Stanbro put
9     his own seatbelt on?
10         A.      Yes.
11         Q.      Okay.  And what type of
12    seatbelt?  Is that just one that goes
13    horizontally across the waist?
14         A.      I don't know that.
15         Q.      Well, generally in those vans,
16    describe the type of seatbelts that are
17    there.  Are they just the waist band, or is
18    there also a shoulder strap, or something
19    else?
20         A.      I believe they're on the waist,
21    coming around the waist.
22         Q.      Who drove back to Westchester?
23    I'm sorry.  Who drove back to Fishkill?
24         A.      I believe I started to drive,
25    then we switched and she drove.

Page 110

1                     R. DEAL

2        Q.      Who drove to Westchester from

3   Fishkill earlier that day?

4        A.      I drove down.

5        Q.      Now, why did you guys switch on

6   the trip back?

7        A.      Because if I needed to get out

8   to assist him in any kind of way, meaning

9   if he started to act up in any other way, I

10  needed to be the one that could get to him

11  as opposed to -- remember, she has the

12  weapon on, so she can't go to the back and

13  help him.

14       Q.      So who is the one who initiated

15  the driving?

16       A.      I did.

17       Q.      And why did you do that if it

18  was Palou who had the weapon?

19       A.      Because I think I started to

20  drive back because I had the van keys

21  because I was the one who drove down, so

22  when we thought about it, I said maybe we

23  should switch, so that if we need to pull

24  over, I can get right out and get to him,

25  as opposed to if I am driving, I have to

Page 111

1                          R. DEAL
2    worry about the vehicle as well.
3         Q.      Is that the only reason you
4    switched?
5         A.      Yes.
6         Q.      And when you switched, I
7    assumed you stopped the van in order to
8    make the switch?
9         A.      Yes.
10        Q.      Did you make any other stops
11   along the way other than when you and Palou
12   switched as passenger and driver?
13        A.      No.
14        Q.      When you guys switched, did you
15   check up on Mr. Stanbro?
16        A.      Yes.
17        Q.      And how did you do that?
18        A.      Opened the side door and looked
19   in at him.
20        Q.      Who opened the side door?
21        A.      I did.
22        Q.      Was there any reason why you
23   checked up on him at that point?
24        A.      Just making sure he was okay.
25        Q.      And was he okay?

1                    R. DEAL
2         A.      I believe he was.
3         Q.      Okay.  Well, tell me how he
4    looked when you checked up on him when he
5    was in the van.
6         A.      I don't remember exactly what I
7    saw, but I can't say how he was.  I don't
8    remember that.
9         Q.      Well, did he appear injured in
10   any manner?
11        A.      No.
12        Q.      Was he sitting straight up?
13        A.      In the van, yeah.  I believe he
14   was.  Like I said, I don't remember what he
15   looked like.
16        Q.      As part of checking up on him,
17   did you ask anything of him like how are
18   you doing, how is the neck, or anything
19   like that?
20        A.      I believe I asked him if he was
21   okay, and he didn't answer.
22        Q.      Now, how did you interpret his
23   not answering?  Did you think he was being
24   stubborn, or that he couldn't answer, or
25   anything else?

1                    R. DEAL

2          A.     I don't remember that day --

3    exactly what my thoughts were that day.

4          Q.     But he was sitting upright,

5    basically, when you saw him, correct?

6          A.     Yes.

7          Q.     At any time during the trip did

8    you observe Mr. Stanbro in any other

9    position other than sitting upright?

10         A.     No.

11         Q.     He never slid off the bench in

12   any manner?

13         A.     I don't remember seeing him

14   slide off any bench, no.

15         Q.     Was he being uncooperative in

16   any manner on the way back?

17         A.     He didn't speak to us on the

18   way back.

19         Q.     Other than that one occasion

20   where you opened the door to see how he

21   was, did you or Palou attempt to speak to

22   him or say anything to him?

23         A.     As a normal procedure, when we

24   are driving transportation, we speak to the

25   inmates to make sure they are okay in the

1                    R. DEAL
2    back.  Most of the time, they will answer
3    us and say they are okay, and if they're
4    not, they will tell us if they're not, but
5    Mr. Stanbro didn't answer.
6         Q.     So this is something you
7    usually do on regular intervals every five
8    minutes or 10 minutes?
9         A.     Yeah, maybe a little longer,
10   but yes.
11        Q.     And that's basically just to
12   monitor the inmate, correct?
13        A.     Yes.
14        Q.     And on the trip back to
15   Fishkill, approximately how many occasions
16   did you inquire of Mr. Stanbro back there,
17   you know, to see how is he doing?
18        A.     I don't remember that.
19        Q.     But on each of those occasions
20   he just didn't respond, correct?
21        A.     Correct.
22        Q.     Now, between the time that Mr.
23   Stanbro, you say, took a swing at you and
24   the time you got him back to Fishkill, did
25   you ever question him as to what that was

```
 1                      R. DEAL
 2        Q.     After Mr. Stanbro threw himself
 3   onto the floor and you got him back into
 4   the chair, did he make any statements or
 5   comments to you?
 6        A.     No.  He did not.
 7        Q.     He didn't make any comments or
 8   statements at any point in time after he
 9   had thrown himself onto the floor and you
10   put him back into the chair?
11        A.     No.  In the hallway, he said
12   his neck hurt, but putting him in the
13   chair, he had nothing to say.
14               MR. SIVIN:  Late objection to
15          form to that last question.  I'm
16          sorry.
17        Q.     At the time that he was in the
18   procedure room with you, did he make any
19   complaints of pain?
20        A.     No.
21        Q.     Did you observe any injuries
22   before you exited the procedure room?
23        A.     No.
24        Q.     If you felt that Mr. Stanbro
25   needed medical attention prior to leaving
```

```
1                    R. DEAL
2    the dental clinic, were you able to request
3    it?  Meaning, would you be able to say, hey
4    DOCCS, I think something is wrong with my
5    intimate, could you take a look at him?
6         A.    I guess we could, yeah.
7         Q.    Did you, at that time, feel
8    there was any need to request medical
9    attention for Mr. Stanbro before you left
10   the dental clinic?
11        A.    No.
12        Q.    Do you recall who requested the
13   wheelchair?
14        A.    No.  I don't.
15        Q.    Going back to the procedure
16   that you spoke about for medical clearance
17   before leaving the medical facility, is
18   this a procedure where a physician has to
19   look at an inmate before you can take him
20   away, or is it literally just your
21   paperwork procedure, or something else?
22             MR. HEINZE:  Objection to form.
23        You can answer.
24        A.    On a regular visit, the doctor
25   -- we are there, the doctor examines him
```

Page 188

1                          R. DEAL
2                  C E R T I F I C A T E
3
4   STATE OF NEW YORK           )
                                :   SS.:
5   COUNTY OF ORANGE            )
6
7        I, VICTORIA CHUMAS, a Notary Public
8   for and within the State of New York, do
9   hereby certify:
10       That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14       I further certify that I am not
15  related to any of the parties to this
16  action by blood or by marriage and that I
17  am in no way interested in the outcome of
18  this matter.
19       IN WITNESS WHEREOF, I have hereunto
20  set my hand this 24th day of March 2021.
21
22
23
                    VICTORIA CHUMAS
24
25