Page 1

1
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
    CHAD STANBRO,
4                                           PLAINTIFF,
5
            -against-              Case No.:
6                                  19-CV-10857
7
    WESTCHESTER COUNTY HEALTH CORPORATION,
8   WESTCHESTER MEDICAL CENTER, FRANK WEBER,
    AND JOHN FULL,
9
                                   DEFENDANTS.
10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
    CHAD STANBRO,
11                                          PLAINTIFF,
12
            -against-              Case No.:
13                                 19-CV-10857
14
    C.O. NADYA PALOU, C.O. RAYMOND DEAL, C.O.
15  KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
    CORRECTION NURSE GARY PAGLIARO, AND
16  CORRECTION SERGEANT ENRIQUE TORRES,
17                                 DEFENDANTS.
    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
18
                DATE: March 2, 2021
19              TIME: 10:00 A.M.
20
                DEPOSITION of the Defendant,
21  KRISTOPHER LEONARDO, taken by the
    respective parties, pursuant to an Order
22  and to the Federal Rules of Civil
    Procedure, held via videoconference, before
23  Victoria Chumas, a Notary Public of the
    State of New York.
24
25

```
 1
 2      A P P E A R A N C E S:
 3
        SIVIN, MILLER & ROCHE LLP
 4        Attorneys for the Plaintiff
          CHAD STANBRO
 5        20 Vesey Street, #1400
          New York, New York 10007
 6        BY: EDWARD SIVIN, ESQ.
          esivin@sivinandmiller.com
 7
 8
        WILSON BAVE CONBOY COZZA, P.C.
 9        ATTORNEYS FOR THE DEFENDANTS
          WESTCHESTER MEDICAL CENTER AND JOHN FULL
10        707 Westchester Avenue
          White Plains, New York 10604
11        BY: CLAUDINE L. WEIS, ESQ.
          cweis@wbccc.com
12
13
        RAWLE & HENDERSON, LLP
14        Attorneys for the Defendant
          FRANK WEBER
15        14 Wall Street, 27th Floor
          New York, New York 10005
16        BY: ROBERT A. FITCH, ESQ.
          rfitch@rawle.com
17
18
        NEW YORK STATE OFFICE OF THE ATTORNEY
19      GENERAL
          Attorneys for the Defendants
20        KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
          CORRECTION NURSE GARY PAGLIARO, AND
21        CORRECTION SERGEANT ENRIQUE TORRES
          28 Liberty Street, Floor 18
22        New York, New York 10005
          BY: DEANNA L. COLLINS, ESQ.
23        deanna.collins@ag.ny.gov
24
25
```

Page 3

1
2

OFECK & HEINZE, LLP
3    Attorneys for the Defendant
     C.O. Raymond Deal
4    85 Main Street, Suite 204
     Hackensack, New Jersey 07601
5    BY: MARK F. HEINZE, ESQ.
     markfheinze@gmail.com
6
7
8   Also present:
9   Glenn Miller
10  Jason Miller
11  Andrew Weiss
12                *              *              *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1

2     F E D E R A L   S T I P U L A T I O N S

3

4

5     IT IS HEREBY STIPULATED AND AGREED by and

6     between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an

14    unsigned copy of the deposition may be used

15    with the same force and effect as if signed

16    by the witness, 30 days after service of

17    the original & 1 copy of same upon counsel

18    for the witness.

19

20    IT IS FURTHER STIPULATED AND AGREED that

21    all objections except as to form, are

22    reserved to the time of trial.

23

24              *       *       *       *

25

1                          K. LEONARDO

2      K R I S T O P H E R    L E O N A R D O,

3      called as a witness, having been first duly

4      sworn by a Notary Public of the State of

5      New York, was examined and testified as

6      follows:

7      EXAMINATION BY

8      MR. SIVIN:

9                  (Whereupon, PDF document was

10             deemed marked as Plaintiff's Exhibit

11             24 for identification as of this date

12             by the Reporter.)

13         Q.     Please state your name for the

14     record.

15         A.     Kristopher Leonardo.

16         Q.     What is your address?

17         A.     165 Plank Road, Coxsackie, New

18     York 12051.

19         Q.     Good morning, Officer.

20         A.     Good morning.

21         Q.     My name is Edward Sivin.   I

22     represent the plaintiff in these

23     consolidated actions.   I'm going to ask you

24     some questions relating to an incident that

25     took place at Westchester Medical Center on

Page 6

K. LEONARDO

1
2      August 31, 2018.  If for any reason you
3      don't understand a question, or you don't
4      hear a question well, or a question is
5      unclear to you, don't answer the question.
6      Ask me to repeat or rephrase it, and I will
7      do so, okay?
8          A.      Sure.  Thank you.
9          Q.      And please make sure all of
10     your answers are verbal because the
11     stenographer can't take down hand gestures
12     or head gestures, okay?
13         A.      Yes.
14         Q.      Are you currently a correction
15     officer with the Department of Corrections
16     and Community Supervision?
17         A.      I am.
18         Q.      And your rank is correction
19     officer?
20         A.      Correct.
21         Q.      When did you graduate the
22     academy?
23         A.      I'm not exactly sure of my
24     graduation date, but my start date was
25     May 21st of 2005.

Page 7

1                    K. LEONARDO

2        Q.      Actually, let's back up.

3        A.      I know --

4        Q.      Go ahead.

5        A.      I know it's an eight-week

6   academy, so eight weeks after that would

7   have been my graduation date.

8        Q.      What is your highest level of

9   education?

10        A.      I have some college.

11        Q.      Where did you go to college?

12        A.      I went to SUNY Oswego right

13   after high school, and then I transferred

14   to Hudson Valley.

15        Q.      Do you know the full name of

16   Hudson Valley?

17        A.      Hudson Valley Community

18   College.

19        Q.      What did you study at Oswego?

20        A.      Early childhood education.

21        Q.      And how about at Hudson Valley

22   Community College?

23        A.      Same major.

24        Q.      Did you obtain a degree from

25   either?

Page 8

1                      K. LEONARDO

2        A.     I did not.

3        Q.     When did you last attend Hudson

4   Valley Community College?

5        A.     I don't know.  I'm not sure of

6   the exact date.

7        Q.     Give me your best

8   approximation.

9        A.     I would say, I can give you a

10  year.  Probably 2003.

11       Q.     Were you employed at all

12  between 2003 and May of 2005 when you began

13  working for DOCCS?

14       A.     Yes.

15       Q.     Where were you employed during

16  that period?

17       A.     Vanguard Roofing.

18       Q.     Were you employed anywhere else

19  during that period?

20       A.     No.

21       Q.     Where was Vanguard Roofing

22  company located?

23       A.     It's in Selkirk, New York.

24       Q.     How old are you, Officer?

25       A.     38.

Page 9

```
 1                    K. LEONARDO
 2        Q.      How tall are you?
 3        A.      About 5'7".
 4        Q.      And in August of 2018,
 5   approximately how much did you weigh?
 6        A.      Maybe 190 pounds.
 7        Q.      Did you play any sports growing
 8   up?
 9        A.      I did.
10        Q.      What type of sports?
11        A.      Baseball, little league, and
12   football.
13        Q.      Did you play any varsity sports
14   in high school?
15        A.      Football.
16        Q.      Anything else in high school?
17        A.      Nope.
18        Q.      How about in college?
19        A.      Nothing in college.
20        Q.      What position did you play in
21   varsity football?
22        A.      Full back and linebacker.
23        Q.      Do you have any martial arts
24   training?
25        A.      Nothing currently.  I think
```

1          K. LEONARDO

2    when I was maybe eight or nine years old I

3    did about a month in karate.

4          Q.    How about any boxing?

5          A.    No.

6          Q.    Do you have lift weights?

7          A.    I exercise.

8          Q.    And what does that exercise

9    consist of?

10         A.    Light weight training, cardio,

11   treadmill, spin class.

12         Q.    Did you also lift weights in

13   August of 2018?

14         A.    I did.

15         Q.    For how long a period of time

16   prior to August of 2018 would you say you

17   lifted weights?

18         A.    I don't really have a time.  I

19   have been physically active my whole life.

20   I try to stay in shape just to be healthy,

21   so probably since I was a kid.  I played

22   sports in high school.  I pretty much

23   always maintained a healthy lifestyle.

24         Q.    I would like you to take me

25   through your assignments from when you

K. LEONARDO

graduated the academy up into the present
in the following format:  From May of 2005
I was at such and such a facility until
such and such a date, okay?

     A.    I will do my best.

     Q.    Okay.  Thank you.

     A.    From May, like I said, I
started the academy, so I was at the Albany
training academy for approximately eight
weeks.  I graduated.  I think we had a week
in between where we were able to go home
and see our families.  Then, I went to
Green Haven.  That was my first assignment,
Green Haven Correctional Facility.  I was
there approximately four months, and then I
transferred here to Greene, and I have been
here ever since.

     Q.    And August of 2018, did you
have a bid job at Greene?

     A.    I did.

     Q.    And what is a bid job?

     A.    A bid job is where that's your
job every day basically.  You are not
resource.  Resource, every day, you get a

1                    K. LEONARDO

2        A.     I'm sorry.

3        Q.     It's alright.  Is Officer

4   Landry still employed at Greene?

5        A.     Yes.

6        Q.     Is he a friend of yours?

7        A.     I would consider him a friend.

8   We don't hang out outside of work, but at

9   work I would consider him a friend, yeah.

10       Q.     Had you ever socialized with

11  Officer Landry outside of work?

12       A.     Via text message.

13       Q.     Can you explain that?

14       A.     Just I text him, he'd text me.

15       Q.     And this would be outside of

16  work hours?

17       A.     I'm sorry?

18       Q.     And this would be outside of

19  work hours?

20       A.     Yeah.  We are not allowed to

21  have phones at work, so yes.  Outside of

22  work.

23       Q.     Other than texting each other,

24  have you socialized in any manner with

25  Officer Landry outside of work?

Page 21

                    K. LEONARDO

1

2       A.      Yes.  I believe we had gotten

3   together one time for like a lunch meeting

4   outside of work once, yes.

5       Q.      Approximately, when was that?

6       A.      I don't recall enough to give

7   an accurate answer.

8       Q.      Was this before or after the

9   incident involving this case which was

10  August 31, 2018?

11      A.      It was after.

12      Q.      Now, you characterized it as a

13  lunch meeting.  Can you tell me what this

14  actually was?

15      A.      Yeah.  We got together, we had

16  lunch.  We had inquired through our union

17  to perhaps get a lawyer for the current

18  case.  So we had spoken to a lawyer

19  briefly.  I think we maybe hung out for

20  another five or 10 minutes afterwards, and

21  then we left.  We parted ways, and that was

22  it.

23      Q.      So this was a meeting

24  specifically to discuss this case?

25      A.      Well, we were going to go

Page 22

K. LEONARDO

1
2  acquire the same lawyer through our union,
3  so yeah.  We didn't ride up together, but
4  we met up together at this place, and we
5  had lunch while we were out, went and spoke
6  to the lawyer and then left.
7       Q.    Before the two of you met with
8  the lawyer, did you and Officer Landry
9  discuss the incident that underlies this
10 case?
11      A.    Yeah.  No specifics, but just
12 obviously we were nervous or curious on
13 what was going on, so yeah.  I'm sure we
14 have texted once or twice about the case.
15      Q.    Do you still have those text
16 messages?
17      A.    I do not.
18      Q.    Why is that?
19      A.    I have an Apple iPhone 6.
20 There is not a lot of storage.  I do not
21 really save anything on it.  I delete all
22 of my texts, all of my emails I don't need
23 just to keep space on the phone.
24      Q.    So any text messages you've had
25 with Officer Landry regarding this case you

Page 23

1                    K. LEONARDO

2    have since deleted; is that correct?

3         A.    Correct.

4         Q.    Okay.  Other than that lunch

5    meeting that you had, was there any

6    occasion where you discussed the underlying

7    incident or this case at all with Officer

8    Landry?

9         A.    No.  Just the few times I

10   already mentioned.

11        Q.    Those few times you mean by

12   text, correct?

13        A.    Correct.

14        Q.    On August 31, 2018, what was

15   your understanding of your role at

16   Westchester Medical Center in connection

17   with the inmates who you escorted there?

18        A.    Care, custody, control of the

19   inmates, my environment, everyone in the

20   environment, myself, my fellow officers.

21   Make sure everybody is safe.  Make sure

22   that the inmates are safe, that the

23   procedures they went there to get done were

24   either performed or if they denied them,

25   then they were just denied by them, and to

1                    K. LEONARDO

2        Q.      When you say "maybe in the

3   doorway area," did you see Dr. Weber in the

4   doorway area when you saw Mr. Stanbro

5   stand up?

6        A.      I saw him -- the room is very

7   small, so I say doorway area because he may

8   have even been under the door.  So I don't

9   want to say he was in the room if he was

10  under the door jam, but he was definitely

11  right next to inmate Stanbro.

12       Q.      And tell me what happened as

13  soon as you entered the room?

14       A.      I entered the room, again, I am

15  paid to observe, so I am kind of taking

16  everything in as quick as I can and still

17  be focused on inmate Stanbro.  I get in

18  between him.  I notice that there is a tray

19  of class A and B weapons as far as we would

20  consider them in a facility.  In a dental

21  facility, I guess they are just utensils,

22  but there was a tray or something of

23  utensils.  I noticed that, and I am just

24  thinking this could go bad very quickly.

25  I just at first tried to verbally calm the

```
 1                    K.  LEONARDO
 2   situation, if I can.  I don't recall
 3   exactly what I was saying to inmate
 4   Stanbro.  I was telling him to calm down.
 5   It will be all right.  Relax, relax.  I
 6   believe things of that nature.  At that
 7   time, Stanbro took a swing at Dr. Weber,
 8   who was still relatively close to me over
 9   my left shoulder.  "My" meaning like the
10   way I feel it, not the way you would look
11   at me.  So my left shoulder, he took a
12   swing over.  I assumed at that point that
13   he had punched him.  From my vantage point,
14   it looked like he had hit the doctor.
15   Then, at this point, it's all happening
16   very quickly.  In the midst of all that,
17   Officer Deal is now getting up.  He is
18   making his way to the scene, and the inmate
19   now punches over my right shoulder and
20   connects with Officer Deal knocking him
21   backwards.  At that moment, I take my arms
22   and I want to now obviously stop what's
23   going on because I don't want to be next.
24   I don't want to be a victim as well.  So I
25   put my arms over top of inmate Mr.
```

K. LEONARDO

Stanbro's arms and in like half a bear hug.
I say "half" because I know I did not
clinch behind him.  I didn't want to get
that close to him for a headbutt or
something like that.  I just kind of
squeezed his arms with my arms down to his
side, laid him back in the dental chair,
crossed over to the left side of him, and I
held down his left arm until the other
officers could assist in holding him down
until we could get him restrained.

Q.    Other than put Mr. Stanbro in
that half bear hug as you characterized it
and placing him down in the dental chair,
did you use any other force against Mr.
Stanbro?

A.    No.  Other than that I held him
in the chair by his left arm until the
other officers could assist to restrain
him.

Q.    I would like you to detail for
me what parts of your body were in contact
with what parts of Mr. Stanbro's body
during your use of force against him?

Page 50

K. LEONARDO

1

2     A.      To the best of my knowledge --

3  it is a very broad question.  I would say

4  to the best of my knowledge, both of my

5  arms were on both of his arms.  I had my

6  one or both of my hands were on his

7  shoulder area, his left arm.  That's really

8  all I can remember.

9     Q.      What portions of your arms were

10  against his arms?

11     A.      I would say between the elbow

12  and wrist forearm area.

13     Q.      And when you were holding down

14  his arm, were you holding it down with your

15  hands, with your forearm, or something

16  else?

17     A.      I believe I had my left arm

18  somewhere on his actual arm, maybe bicep,

19  to hold it down.  And then, I think I had

20  my right arm maybe on his upper shoulder

21  area of the same arm, his left arm.

22     Q.      Now, were there two parts of

23  this dental chair, like an upper part

24  against which the patient's back is

25  situated and a lower part against which the

1                    K. LEONARDO

2    patient's legs are situated?

3         A.    I don't know if there's two

4    separate parts, but yeah. It inclines and

5    declines like a general dental chair would.

6    I don't know if it's a two-part chair or

7    not. It could be one part.

8         Q.    But the entire structure is

9    angled in some manner, correct?

10        A.    Yes. It goes up and down.

11        Q.    When you first saw Mr. Stanbro

12   in that dental chair, describe for me as

13   best you can, the nature of the angle. Was

14   it a 90-degree? Was it completely flat?

15   Somewhere in between? Something else?

16        A.    Very broadly I could say a

17   45-degree angle. Could have been 50.

18   Could have been 60. Wasn't straight up.

19   Wasn't straight back.

20        Q.    When you placed Mr. Stanbro

21   back down into the chair, did you place him

22   in the same position he was in before he

23   got out of the chair or in some different

24   position?

25        A.    I don't want to assume. I

Page 52

1                    K.  LEONARDO
2  can't answer that accurately.  I was not in
3  the room while he was laying down.  I was
4  in the room when he stood up, so I don't
5  know.
6        Q.      Well, when you placed him back
7  in the chair, did you place him facing up?
8        A.      Facing up.
9        Q.      And was he at that point
10 sitting in the chair, was he lying in the
11 chair, or something else?
12       A.      He was sitting in the chair the
13 way that he would sit in a chair if you
14 voluntarily got in the chair.
15       Q.      How much time elapsed between
16 the time you entered room and the time you
17 got Mr. Stanbro back into his chair?
18       A.      I can't say accurately.  If I
19 had to say -- I really can't say
20 accurately.  A couple of minutes.  What
21 felt like to me a couple of minutes.  Like
22 maybe a minute.
23       Q.      When you use the term --
24       A.      Not very long.
25       Q.      -- are you indicating that

Page 53

1               K. LEONARDO
2    under these circumstances that time might
3    seem a little longer than it actually was?
4            MS. COLLINS:   Objection. You
5        can answer.
6        A.     I would not say longer or
7    shorter. I would say time isn't of the
8    essence when you are in the middle of
9    something like that.
10       Q.     Other than swinging at officer
11   Dr. Weber -- I'm sorry. Other than
12   swinging at Dr. Weber and swinging at
13   Office Deal, did you see Mr. Stanbro doing
14   anything else between the time that you
15   entered the room and the time you got him
16   back into the chair?
17       A.     No.
18       Q.     Now, did you actually see Mr.
19   Stanbro make physical contact with Dr.
20   Weber?
21       A.     No.
22       Q.     Did you actually see Mr.
23   Stanbro make physical contact with Officer
24   Deal?
25       A.     Yes.

Page 54

K. LEONARDO

1

2      Q.      Where was Officer Deal when Mr.

3  Stanbro made physical contact with him?

4      A.      He would have been behind, to

5  my right side, either slightly behind me or

6  directly next to me on the side.

7      Q.      And describe the nature of the

8  contact that Mr. Stanbro made with Officer

9  Deal at this point.

10     A.      He just threw a punch over my

11  shoulder, my right shoulder, and he

12  connected with Officer Deal.

13     Q.      What part of Officer Deal did

14  Mr. Stanbro strike?

15     A.      I would call it collarbone,

16  face/neck area.  Enough to throw Officer

17  Deal backwards into the wall.

18     Q.      Is that the left side of

19  Officer Deal, right side, middle, or

20  something else?

21     A.      To the detail of the strike, I

22  can't really specify.

23     Q.      Did you see Mr. Stanbro kick

24  anybody at any point?

25     A.      I didn't witness a kick, no.

Page 55

K. LEONARDO

1

2      Q.      When you placed Mr. Stanbro

3  back into the chair, where were you in

4  relation to the chair?   Just describe that

5  for me.

6      A.      I was on the left side of the

7  chair as if you were sitting in it, and

8  probably more toward the headrest than I

9  was toward the feet, so maybe right in the

10  middle, slightly backwards from the middle

11  of the chair toward the headrest.   A little

12  more than toward the feet.

13      Q.      Just so I'm clear on this, from

14  the perspective of somebody looking in the

15  room, the head of the chair would be closer

16  to the door, and the foot would be closer

17  to the side of the room opposite the door,

18  correct?

19      A.      Correct.

20      Q.      So when you entered the room,

21  which portion of the chair did you first

22  approach?

23      A.      It would be the right side of

24  the chair if you were sitting in it.

25      Q.      Okay.   Is that the same

Page 56

K. LEONARDO

1
2    position you were in when you placed Mr.
3    Stanbro in the chair?
4        A.    Yes.
5        Q.    Now, you say when you first
6    entered the room, you got in between Mr.
7    Stanbro and Dr. Weber.  At that point, were
8    you facing Mr. Stanbro?
9        A.    Yes.
10       Q.    Was Dr. Weber behind you kind
11   of facing your back?
12       A.    Yes.
13       Q.    And the tray in which you saw
14   items that you characterized as equivalent
15   to weapons, where was that tray situated?
16       A.    I don't recall accurately.  I
17   just remember seeing it in the room.  It
18   caught my eye.  I just remember scanning
19   the room and seeing a tray with tools on
20   it, utensils, weapons, whatever you want to
21   refer to them as, dental equipment.
22       Q.    Did there come a time after you
23   entered the room when Mr. Stanbro no longer
24   appeared agitated?
25       A.    Not until we got him back into

Page 57

1                        K. LEONARDO
2    the chair.  Once I got him back into the
3    chair, he was not really being forceful,
4    but he still seemed agitated based off he
5    was grunting, kind of making the hulking up
6    kind of motion.  He was irritated or
7    agitated.
8            Q.    Now, you say "hulking" up?
9            A.    Hulking.  Like, (Indicating)
10   almost like you are preparing for
11   something.  I guess it would be like you
12   are about to lift heavy weights, and you
13   are (Indicating) hulking yourself up.
14   That type of sound.
15           Q.    And for how long a period of
16   time did Mr. Stanbro remain in the chair
17   hulking up as you characterized it?
18           A.    For the remainder of the time I
19   was in there.  He never stopped making that
20   noise.
21           Q.    For how long a period did you
22   hold down Mr. Stanbro?
23           A.    Again, I can't accurately
24   answer.  I would say until he was
25   mechanically restrained.  However long that

Page 58

K. LEONARDO

1
2  took to get the waist chain on him and the
3  handcuffs.
4      Q.    Can you give me your best
5  approximation as to the amount of time that
6  elapsed between the point you put him down
7  in the chair and the time he was restrained
8  with handcuffs?
9      A.    Again, I would say what felt to
10  me like about four minutes, three to
11  four minutes.  I know there was a period of
12  time where, again, you asked me if I
13  witnessed a kick.  I did not witness a
14  kick, but there was a period of time where
15  Officer Deal was trying to get restraints
16  and was knocked back into the wall.
17      Q.    Did you see that?
18      A.    I saw him fall back into the
19  wall, yes.  Because it made a noise, I
20  looked, and saw him fall back into the
21  wall.
22      Q.    But you did not see what caused
23  him fall to fall back; is that correct?
24      A.    I can't answer accurately of
25  what caused the fall, correct.

Page 59

K. LEONARDO

1

2      Q.     Describe all force that you
3  observed being used on Mr. Stanbro other
4  than the force that you used.
5           MS. COLLINS:  Objection to the
6      form of the question with respect to
7      when.
8      Q.     At any time inside of that
9  dental office, did you see anybody else use
10  force against Mr. Stanbro?
11      A.     Yeah.  I mean, even applying
12  mechanical restraints in a situation like
13  that is technically considered force, so
14  yeah.  I remember watching, talking Officer
15  Deal through putting the waist chain around
16  him, putting the handcuffs on him, and
17  applying the lock to the waist chain from
18  the handcuffs.  That force, if it would be
19  considered force, I did witness.  Other
20  than that, I can't give accurately whether
21  I saw somebody else specifically using any
22  type of force or not.
23      Q.     Do you recall anyone placing
24  their hands on Mr. Stanbro other than you
25  and other than in connection with putting

1                    K.  LEONARDO
2   on his handcuffs, and his waist chain, and
3   his leg restraints?
4        A.      All of my answers would be
5   speculative.  I can assume.  I did not
6   physically see somebody's hands in a
7   certain position, but I can assume.  I
8   remember Officer Palou coming in, probably
9   restraining his other arm.  Again, I don't
10  know where her hands were or whatever.  I
11  know Officer Deal at one point had a hold
12  of Stanbro's leg irons or his feet at some
13  point to restrain them.  But to actually
14  witness it or to see the actual point of
15  contact, no.
16       Q.      Did Officer Landry enter the
17  room at some point?
18       A.      He did.
19       Q.      Did you see Officer Landry
20  touch Mr. Stanbro in any manner?
21       A.      Again, I can't answer
22  accurately to that.
23       Q.      Did you see Officer Deal touch
24  Mr. Stanbro in any manner other than when
25  he was applying the restraint?

Page 61

1                    K. LEONARDO

2        A.     Again, I can't answer

3   accurately.

4        Q.     Did you see Officer Palou touch

5   Mr. Stanbro in any manner?

6        A.     Again, same answer.  I can't

7   answer accurately.

8        Q.     After Mr. Stanbro first became

9   agitated, did you see anyone else touch Mr.

10  Stanbro in any manner?

11       A.     Again, I can't answer

12  accurately to who or if somebody did.  I

13  don't know.

14       Q.     Did you ever place your knee or

15  leg against any portion of Mr. Stanbro's

16  body?

17       A.     No.

18       Q.     Did you ever place your forearm

19  or elbow against Mr. Stanbro's neck?

20       A.     No.

21       Q.     Did you ever place your hand

22  against Mr. Stanbro's neck?

23       A.     No.

24       Q.     Did you touch Mr. Stanbro's

25  neck at any point with any part of your

Page 62

```
 1                    K. LEONARDO
 2   body?
 3        A.     No.  Not to my knowledge, no.
 4        Q.     Did you see anyone else touch
 5   Mr. Stanbro's neck with any portion of
 6   their body?
 7        A.     No.
 8        Q.     Based upon what you saw that
 9   day, do you believe it was necessary to
10   restrain Mr. Stanbro by the neck?
11             MS. COLLINS:  Objection.  You
12        can answer.
13        A.     I don't really understand the
14   question.  No.  We did not need to, so
15   there would be no reason to.
16        Q.     Based upon all of the
17   circumstances and Mr. Stanbro's conduct,
18   would it have been appropriate for you to
19   have restrained Mr. Stanbro by his neck?
20        A.     No.
21        Q.     Would it have been appropriate
22   for anyone in the room to have restrained
23   Mr. Stanbro by his neck?
24        A.     Given the circumstances that we
25   were in, no.  We didn't need to, no.
```

Page 63

1                    K.  LEONARDO
2           MR.  SIVIN:   Deanna,  I  think  you
3      are  kind  of  frozen  right  now.
4                (Whereupon,  a  short  recess  was
5      taken.)
6                (Whereupon,  the  referred  to
7      testimony  was  read  back  by  the
8      Reporter.)
9           Q.    Officer  Leonardo,  at  the  point
10   that  you  left  the  dental  room,  Mr.  Stanbro
11   was  in  the  dental  chair,  fully  restrained,
12   handcuffs,  and  leg  irons,  correct?
13           A.    I  don't  know  if  that's  how  he
14   was  situated  at  the  time  that  I  had  left
15   the  room.   I  don't  know  how  much  time  had
16   elapsed  because  I  remember  I  was  talking  to
17   everyone  in  the  room,  making  sure  everyone
18   was  okay.   I  don't  know  if  I  re-looked  at
19   him  before  I  left.   I  don't  know  his  exact
20   positioning,  but  I  remember  him  being  in
21   the  chair.
22           Q.    There  came  a  time  when  you  took
23   your  hands  off  Mr.  Stanbro  and  you  were  no
24   longer  holding  down  his  arms,  correct?
25           A.    Yes.

K. LEONARDO

1

2       Q.      And was that after the
3   handcuffs and leg irons had been applied?
4       A.      Correct.
5       Q.      Describe how Mr. Stanbro
6   appeared to you at that point.
7       A.      The same.  Like I said, once he
8   was laid back in the chair, his demeanor
9   really did not change the entire time.  He
10  just --
11      Q.      So describe -- I'm sorry.
12  Continue.
13      A.      He just stayed -- I wish I had
14  a better term for it -- hulking, kind of
15  grunting, you know, deep breath kind of
16  grinding your teeth, kind of upset with the
17  situation kind of attitude?
18      Q.      At the point that you no longer
19  were holding him down, did he appear
20  conscious to you?
21      A.      Yes.
22      Q.      Were his eyes open?
23      A.      Yes.
24      Q.      Was he speaking?
25      A.      Again, not really speaking

Page 65

K. LEONARDO

1
2  words per se, but just heavy breathing.
3      Q.    Did he appear to be in the same
4  physical condition as he had been before
5  you entered the room?
6      A.    Yes.
7      Q.    Was he moving at all at that
8  point?
9      A.    He was restrained at that
10  point, sitting down, but yeah.  He was not
11  100 percent still.  He was moving his head,
12  and he was moving.  There was motion.  He
13  wasn't dancing, but he was moving.
14      Q.    To the extent that he could in
15  restraints, he was moving his arms, and his
16  legs, and his body as well?
17      A.    I can't accurately answer what
18  particular limb he was moving, but he was
19  moving.
20      Q.    Well, did you observe any
21  physical deficits in him after you used
22  force on him?
23      A.    No.  Because at one point, he
24  even threw himself onto the floor.  I mean,
25  he was able to move.

Page 66

1                    K. LEONARDO
2        Q.      When did he throw himself on
3    the floor?
4        A.      Time-wise, I don't know, but it
5    was obviously after he was restrained.  All
6    force was done.  I don't know exactly how
7    many minutes after the initial incident,
8    but some point while were we still dealing
9    with what was going on, he had thrown
10   himself on the floor.
11       Q.      Describe for me what you
12   actually saw that you characterize as him
13   throwing himself on the floor.
14       A.      I didn't see the whole episode.
15   I can give you the parts that I saw.  I
16   remember vaguely at one point, I think he
17   had sat up.  Again, I don't know if this
18   was directly after or if I had left the
19   room and came back in.  That's why I didn't
20   really answer this to your previous
21   question because I don't know if I left the
22   room and came back at this point.  But I do
23   remember seeing him sitting up kind of at
24   the foot of the chair, I guess you would
25   say, where the legs go, kind of upright.

K. LEONARDO

2  And then he just, I guess, threw or flopped

3  himself onto the floor, threw himself off

4  of that onto the floor.

5      Q.     So did you keep him under

6  constant observation from the point that he

7  sat up in the chair and the time you saw

8  him go off the chair onto the floor?

9      A.     Constant enough to see that he

10  was the reason he went onto the floor.

11  Nobody else was in his area. Constant

12  enough to know that he threw himself on the

13  floor, yes.

14      Q.     Okay. So you concluded that he

15  voluntarily placed himself on the floor as

16  opposed to him involuntarily falling to the

17  floor; is that correct?

18      A.     That I can't answer. I don't

19  know if it was an involuntary fall or

20  voluntary, but he was sitting upright on

21  his own, and then I don't know the

22  timeframe after, but ended up throwing, or

23  falling, or tossing himself onto the floor.

24      Q.     Just so I'm clear. You don't

25  know if Mr. Stanbro got to the floor of his

Page 68

K. LEONARDO

1
2    own volition, or if he fell, or by some
3    other manner; is that correct?
4            MS. COLLINS:   Objection.
5       A.      Up to this point, I would say
6    that's correct.  I'm sorry.
7       Q.      In any event, when he went to
8    floor, describe how he went to the floor.
9    What part of his body made contact with the
10   floor?
11      A.      I don't know about initial
12   contact.  I know he was laying in like a
13   fetal position when he was on the floor.
14   You know, obviously his waist is chained,
15   so his hands were at his waist, elbows to
16   his side.  He is laying on his side, knees
17   kind of curled up a little bit, feet
18   together.
19      Q.      Was he on his right side or his
20   left side?
21      A.      I can't answer that accurately.
22      Q.      From the perspective of the
23   dental chair, was he on the right side of
24   the dental chair or the left side of the
25   dental chair?

Page 69

K. LEONARDO

1

2      A.      I would say if you are sitting

3  in the dental chair, it would have been the

4  right side of the chair toward the feet

5  area more.  Not directly on the side.

6  More toward the feet.

7      Q.      And when you saw him lying in

8  the fetal position on the floor, where was

9  his head?  Was it closer to the door,

10 closer to the opposite wall, or something

11 else?

12     A.      As far as I can remember, I

13 think it was more toward the wall, feet

14 more toward the door.  When I say "wall," I

15 mean far wall from the door, so kind of

16 feet toward the door area, head toward the

17 opposite wall area.

18     Q.      So in the opposite direction

19 that he would have been seated when he was

20 in the chair, correct?

21     A.      I don't know what you mean by

22 opposite in that particular instance.  I

23 don't know what you are asking.  If he is

24 sitting upright, he can fall one way or the

25 other.  I don't know what you mean by

Page 70

K. LEONARDO

1
2    "opposite."  If he would have fell the one
3    way, his head would have been toward the
4    wall.  If he would have fell the other way,
5    his head would have been toward the door.
6    So I don't know what you mean by opposite.
7         Q.    Well, when he is sitting in the
8    dental chair, his head is closer to the
9    door, correct?
10        A.    Right, but again, he was
11   sitting up with his feet on the ground.
12   Sorry.  Go ahead.
13        Q.    I understand.  But when he was
14   on the ground, you are saying his head was
15   no longer closer to the door; is that
16   correct?
17        A.    Correct.  As far as I remember,
18   yes.  The first time, yes.
19        Q.    Where was his head pointed when
20   you first saw him on the ground?
21        A.    Toward the wall.
22        Q.    Which wall?
23        A.    Opposite of the door.
24        Q.    Okay.  And then his feet would
25   have been closer to the door; is that

Page 71

K. LEONARDO

2    correct?

3        A.      Correct.

4        Q.      Did you see him actually strike

5    the ground?

6        A.      No.

7        Q.      Did you hear him strike the

8    ground?

9        A.      Yeah.  I mean, I heard a noise.

10   I don't know if it was the chains rattling

11   or him hitting the ground, but I heard

12   something that drew my attention back to

13   the area, yes.

14       Q.      How soon after you took your

15   hands off his arms did you observe him

16   going to the ground?

17       A.      I can't answer that accurately.

18   I'm not sure of the timeframe on that.

19       Q.      Just give me your best

20   estimation.

21       A.      Again, maybe a minute or two.

22       Q.      Tell me everything you recall

23   happening during that one or two-minute

24   period between when you let go of Mr.

25   Stanbro and the time that you saw him go to

K. LEONARDO

1
2   the floor.

3       A.      I don't really recall what
4   happened.

5       Q.      Well, do you recall anything
6   that happened during that period?

7       A.      Not accurately to give you an
8   answer.  I mean, I assume we were
9   discussing what we were going to do from
10  this point forward as far as talking to
11  medical staff.  And again, my concern was
12  to make sure everybody was safe.  In my
13  eyes at that point, basically, you know,
14  the force was over, and everybody was -- he
15  was secured.  Everybody else was secure.
16  Nobody seemed harmed, so probably just
17  conversation about wow, that could have
18  been bad or whatever.  I don't know
19  accurately to give you 100 percent
20  description.

21      Q.      Putting aside what probably
22  occurred, am I correct that you have no
23  recollection, no actual recollection of
24  what occurred between the time you took
25  your hands off Mr. Stanbro and the time he

1                    K.  LEONARDO

2    ended up on the floor; is that correct?

3        A.     I have no recollection of

4    specific conversation, but I remember us

5    having conversation.

6        Q.     Do you remember what those

7    conversations were about?

8        A.     Again, I do not.

9        Q.     And do you remember any other

10   things that occurred during that period

11   other than some unspecified conversations?

12       A.     I don't.

13       Q.     Did Mr. Stanbro appear to be

14   injured as a result of striking the floor?

15       A.     No.  He did not.  Nothing about

16   Mr. Stanbro changed other than his

17   position.  His demeanor remained the same.

18       Q.     He appeared to be as conscious

19   as before?

20       A.     Yes.

21       Q.     He appeared to be able to move

22   as much as before?

23       A.     Again, yeah.  I believe so.

24   Nothing really changed about his demeanor.

25       Q.     And then, what did you do after

1              K. LEONARDO
2  you observed Mr. Stanbro on the floor?
3       A.    Well, I think -- I am not
4  exactly sure timeframe-wise, again, but at
5  some point, a female staffer from the
6  medical center had come in and asked can we
7  get him up off the floor.  Obviously, he is
8  a patient at the hospital, so we said yes,
9  if that is what you want.  I'm not exactly
10 sure who helped me, but I believe it was
11 Officer Deal, I want to say.  We both
12 assisted Mr. Stanbro up, again, because he
13 is shackled and he has leg restraints on,
14 so we assisted him up, sat him back on the
15 chair, and that was it as far as that
16 particular instance.
17      Q.    Now, when you say you "assisted
18 Mr. Stanbro up," at that point, was Mr.
19 Stanbro deadweight, or was he able to
20 participate in getting up, or something
21 else?
22      A.    He was not deadweight.  He
23 assisted once we got him up.  He kind of
24 helped tiptoe over to the chair.  And we
25 sat him back in the chair.

Page 75

K. LEONARDO

1

2      Q.      When you say "tiptoe," do you

3  mean he took a couple of steps toward the

4  chair?

5      A.      Yeah.   I mean, his feet were on

6  the ground.   He was bearing some of his

7  weight.   It was not like his legs were

8  dangling in the air and we had him

9  ourselves.

10      Q.      Approximately how many steps

11  did Mr. Stanbro take when you saw him on

12  the floor and before you got him back into

13  the dental chair?

14      A.      I honestly don't even feel

15  accurate calling them steps, to be honest.

16  I can't tell whether they were steps or

17  not, but like I said, he beared some of his

18  weight, so steps, I don't really have an

19  accurate count of how many steps he may

20  have taken.

21      Q.      Was he saying anything at this

22  point?

23      A.      Same demeanor.   Just some sort

24  of hulking sound coming out of his mouth.

25      Q.      And just so for the record, can

1                    K.  LEONARDO

2    you spell the word hulking?

3         A.      Hulking, H-U-L-K-I-N-G.

4    Hulking, incredible Hulk.

5         Q.      Okay.  So after you and someone

6    else who you believe may have been Officer

7    Deal placed Mr. Stanbro back in the chair,

8    what happened next?

9         A.      Again, sorry about the

10   timeframe, but I don't know how many

11   minutes had elapsed.  And then, I don't

12   remember actually being in the room, I just

13   remember hearing a crash from a monitor,

14   and I looked over, and Mr. Stanbro also

15   threw himself on the ground for a second

16   time.  This time, he just rolled out of the

17   chair, it had seemed.  His positioning on

18   the floor was as if he rolled out of the

19   chair and he dragged the monitor that was

20   hooked to his arm still.

21        Q.      Now, did you see Mr. Stanbro

22   roll to the floor that second time, or did

23   you first see him when he was on the floor?

24        A.      No.  I saw him rolling.  I

25   heard like a monitor moving or something,

1                    K. LEONARDO
2   and I looked, and again I can't remember if
3   I was in the room or in the hallway, but I
4   remember seeing him roll himself out of the
5   chair one more time.
6        Q.    Again, were you able to
7   determine if this was a voluntary roll, or
8   if he fell, or something else?
9        A.    I would say based off his
10  positioning in the chair, he was fully
11  sitting in the chair this time, as if he
12  voluntarily sat in the chair for a dental
13  procedure.  It would have took a
14  substantial wind gust to blow him out of
15  the chair, so I would assume that it was
16  voluntary.  Again, that is an assumption on
17  my part.  It seemed voluntary to me.
18       Q.    I mean, did you see him do
19  anything that one would ordinarily do to
20  try to get oneself out of the chair?
21       A.    I mean, yeah.  He rolled.  I
22  can explain it as if you were stealing the
23  covers from a significant other.  You roll
24  over, and you take the covers with you as
25  you roll.  He rolled, and he dragged the

Page 78

K. LEONARDO

1
2  monitor with him as he rolled to his side
3  of the chair, the right side of the chair.
4      Q.    Now, as he was sitting in the
5  chair, where was the monitor in relation to
6  his body?
7      A.    It would be on the left side of
8  the chair, so his left side, on some sort
9  of table, or desk, or bench, or something
10  of that nature.  A cabinet or something.
11      Q.    Did you see him grab onto or
12  reach up for this monitor in any manner?
13      A.    No.  His hands would have been
14  secured to his waist.
15      Q.    But in any event, you then saw
16  Mr. Stanbro again on the floor for the
17  second time, correct?
18      A.    Correct.
19      Q.    What position was he in on the
20  floor for the second time?
21      A.    This time he was head closer to
22  the door, feet toward the wall.
23      Q.    Was he lying on his back, side,
24  or something else?
25      A.    I don't really recall actually

Page 79

K. LEONARDO

how he was on the floor at this time.

Q.     Was he moving on the floor
after he ended up there for the second
time?

A.     I can't recall accurately.

Q.     Well, did his demeanor change
at all, or did he appear to be in the same
physical condition he was when you first
saw him?

A.     At this point, it was all just
noise to me.  I didn't really -- I wasn't
super focused on him at this point.  I had
other inmates there that I had to tend to,
so I believe at this stage in the game is
where I kind of passed the buck back to the
owning officers and went back to what I was
doing prior to the incident.  So I don't
really have any accurate answers from this
point forward as far as what he was doing
himself, inmate Stanbro.

Q.     What else specifically, if
anything, do you recall about Mr. Stanbro
after you saw him on the floor for the
second time?

K. LEONARDO

1

2      A.      Honestly, nothing.  I don't

3  recall anything after that.

4      Q.      Did there ever come a time when

5  you observed Mr. Stanbro and it looked like

6  he was unable to move his legs?

7      A.      No.

8      Q.      How about unable to move his

9  arms?

10      A.      Other than just being

11  mechanically restrained, which is going to

12  restrict your movement anyway, no.

13      Q.      At any time did you observe Mr.

14  Stanbro have any restrictions in the

15  movement of his arms, or his legs, or his

16  body other than the restrictions that

17  ordinarily would have come from handcuffs

18  or leg irons?

19      A.      No.

20      Q.      Did he appear to you to be

21  perfectly normal physically --

22          MS. COLLINS:  Objection to

23      form.

24      Q.      -- at all times?

25          MS. COLLINS:  Objection.  You

Page 81

K. LEONARDO

1
2    can answer if you understand.

3       A.    I really don't understand what

4    "perfectly normal" means.

5       Q.    Did you ever observe Mr.

6    Stanbro in any type of physical condition

7    you would characterize as abnormal,

8    compromised, limited, restricted, other

9    than the restrictions that would have

10   resulted from the handcuffs and the leg

11   irons?

12              MS. COLLINS:  I'm objecting to

13           the form of the question.  You can

14           answer.

15      A.    Based off what I believe your

16   question is, I would say no.  I don't think

17   he looked any different than he would look

18   for anyone else handcuffed and waist

19   chained just coming out of sedation.

20      Q.    Okay.  Where was Mr. Stanbro

21   when you last saw him that day?

22      A.    When I last saw him?

23      Q.    Yes.

24      A.    I want to say right there on

25   the floor.  Like I said, I kind of stopped

Page 82

K. LEONARDO

2  paying attention at that point and went

3  back to my duties with my inmates.

4       Q.    Did you ever see him exit the

5  room?

6       A.    No.

7       Q.    Did you ever see him exit the

8  premises of the hospital?

9       A.    No.

10       Q.    Did you see anything that you

11  believe could have caused any type of

12  bruise to any portion of Mr. Stanbro's

13  neck?

14       A.    No.   Not that I saw, no.

15       Q.    The inmates who you brought to

16  the dental clinic from Greene, did they

17  undergo some type of sedation during their

18  procedures?

19       A.    Yeah.   If we are going to use

20  the term "sedation," I don't know exactly

21  what they give, but I would assume they get

22  something to ease the pain throughout the

23  sedation, so yes.   Some sort of sedation.

24       Q.    Did you escort those Greene

25  inmates out of the clinic that day?

Page 83

1                    K. LEONARDO

2        A.      The ones I brought with me,

3   yes.  All four of them.

4        Q.      Did all four of them walk out

5   on their own accord, or go out in a

6   wheelchair, or something else?

7        A.      No.  They walked out.

8        Q.      On any of the prior occasions

9   when you brought inmates to the dental

10  clinic, were any of those inmates taken out

11  in a wheelchair?

12       A.      No.

13       Q.      Do you know how Mr. Stanbro was

14  taken out of the clinic?

15       A.      I do not.  I wasn't there when

16  he left the room.

17       Q.      Did you see or hear anything

18  that you believe would have required Mr.

19  Stanbro to be brought out in a wheelchair?

20       A.      No.

21       Q.      When you heard Mr. Stanbro

22  arguing with the dentist at the point when

23  you first saw him get agitated, did you

24  notice any problems or impairment with his

25  speech?

Page 96

1                    K. LEONARDO

2   Stanbro, though?  What was your impression

3   of that when you left the hospital?

4              MS. COLLINS:  Objection to the

5         form of the question.  You can answer

6         if you understand it.

7         A.    Can you rephrase the question?

8   I don't understand what you're asking.

9         Q.    Did you believe Mr. Stanbro was

10  injured a result of this incident?

11        A.    No.

12        Q.    Okay.  Now, about one-third of

13  the way down on page one of Exhibit 24, it

14  says identify all staff involved in the use

15  of force.  And you only put yourself; is

16  that correct?

17        A.    Correct.

18        Q.    Why did you not list any of the

19  other officers?

20        A.    If you go down a little

21  further, you see in the paragraph, I was

22  unsure of the officer's names at the time,

23  so I think I addressed them as the Fishkill

24  officers, or the officers owning the

25  inmate, or the owning facility.  I was

Page 161

1                    K.  LEONARDO

2            C E R T I F I C A T E

3

4   STATE OF NEW YORK        )

                            :   SS.:

5   COUNTY OF ORANGE         )

6

7        I, VICTORIA CHUMAS, a Notary Public

8   for and within the State of New York, do

9   hereby certify:

10       That the witness whose examination is

11  hereinbefore set forth was duly sworn and

12  that such examination is a true record of

13  the testimony given by that witness.

14       I further certify that I am not

15  related to any of the parties to this

16  action by blood or by marriage and that I

17  am in no way interested in the outcome of

18  this matter.

19       IN WITNESS WHEREOF, I have hereunto

20  set my hand this 16th day of March 2021.

21

22

23

            VICTORIA CHUMAS

24

25