Page 1

1
2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ------------------------------------------X
       CHAD STANBRO,
4                                    PLAINTIFF,
5
              -against-             Case No.:
6                                  19-CV-10857
7
       WESTCHESTER COUNTY HEALTH CORPORATION,
8      WESTCHESTER MEDICAL CENTER, FRANK WEBER,
       AND JOHN FULL,
9
                                   DEFENDANTS.
10     ------------------------------------------X
       CHAD STANBRO,
11                                 PLAINTIFF,
12
              -against-             Case No.:
13                                 19-CV-10857
14     C.O. Nadya Palou, C.O. Raymond Deal, C.O.
       Kristopher Leonardo, C.O. Richard Landry,
15     Correction Nurse Gary Pagliaro, and
       Correction Sergeant Enrique Torres,
16
                                   DEFENDANTS.
17     ------------------------------------------X
18
                        DATE:   March 2, 2021
19                      TIME:   2:00 P.M.
20
                    DEPOSITION of the Defendant,
21     RICHARD LANDRY, taken by the respective
       parties, pursuant to an Order and to the
22     Federal Rules of Civil Procedure, held via
       videoconference, before Victoria Chumas, a
23     Notary Public of the State of New York.
24
25

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
      SIVIN, MILLER & ROCHE LLP
 4       Attorneys for the Plaintiff
         CHAD STANBRO
 5       20 Vesey Street, #1400
         New York, New York 10007
 6       BY:  EDWARD SIVIN, ESQ.
         esivin@sivinandmiller.com
 7
 8
      WILSON BAVE CONBOY COZZA, P.C.
 9       ATTORNEYS FOR THE DEFENDANTS
         WESTCHESTER MEDICAL CENTER AND JOHN FULL
10       707 Westchester Avenue
         White Plains, New York 10604
11       BY:  CLAUDINE L. WEIS, ESQ.
         cweis@wbccc.com
12
13
      RAWLE & HENDERSON, LLP
14       Attorneys for the Defendant
         FRANK WEBER
15       14 Wall Street, 27th Floor
         New York, New York 10005
16       BY:  ROBERT A. FITCH, ESQ.
         rfitch@rawle.com
17
18
      NEW YORK STATE OFFICE OF THE ATTORNEY
19    GENERAL
         Attorneys for the Defendants
20       KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
         CORRECTION NURSE GARY PAGLIARO, AND
21       CORRECTION SERGEANT ENRIQUE TORRES
         28 Liberty Street, Floor 18
22       New York, New York 10005
         BY:  DEANNA L. COLLINS, ESQ.
23       deanna.collins@ag.ny.gov
24
25
```

Page 3

1

2

   OFECK & HEINZE, LLP

3     Attorneys for the Defendant
      C.O. Raymond Deal

4     85 Main Street, Suite 204
      Hackensack, New Jersey 07601

5     BY:   MARK F. HEINZE, ESQ.
      markfheinze@gmail.com

6

7

8   Also present:

9   Glenn Miller

10  Jason Miller

11  Andrew Weiss

12              *            *            *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1

2       F E D E R A L   S T I P U L A T I O N S

3

4

5       IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24              *       *       *       *

25

Page 5

1                    R. LANDRY

2    R I C H A R D    L A N D R Y, called as a

3    witness, having been first duly sworn by a

4    Notary Public of the State of New York, was

5    examined and testified as follows:

6    EXAMINATION BY

7    MR. SIVIN:

8              (Whereupon, PDF document was

9         deemed marked as Plaintiff's Exhibit

10        25 for identification as of this date

11        by the Reporter.)

12        Q.    Please state your name for the

13   record.

14        A.    Richard Landry.

15        Q.    What is your address?

16        A.    165 Plank Road, Coxsackie, New

17   York 12051.

18        Q.    Good afternoon, Officer.   My

19   name is Edward Sivin.   I represent the

20   plaintiff, Chad Stanbro, in this lawsuit.

21   I'm going to go ask you some questions

22   about an incident that took place on August

23   31, 2018, at Westchester Medical Center.

24   If for any reason the question is not clear

25   to you or you don't hear the question quite

Page 6

```
1                    R. LANDRY
2   well, don't answer the question.  Ask me to
3   repeat it or rephrase it, and I'll do so,
4   okay?
5        A.      Okay.
6        Q.      And please also make sure that
7   all of your answers are verbal because the
8   stenographer can't take down hand gestures
9   or head gestures, okay?
10       A.      Okay.
11       Q.      Are you currently a correction
12  officer with the Department of Corrections
13  and Community Supervision?
14       A.      Yes.
15       Q.      What correctional facility do
16  you currently work at?
17       A.      Greene Correctional Facility.
18       Q.      Your title is Correction
19  Officer, correct?
20       A.      Correct.
21       Q.      When did you graduate the
22  academy?
23       A.      January 2007.
24       Q.      I would like you to take me
25  through all of your assignments between the
```

Page 7

1                  R.  LANDRY
2    time you graduated and the present?
3         A.    I was a correctional officer at
4    Eastern Correctional Facility for
5    approximately five months, I was sent there
6    right after graduation.  From Eastern, I
7    went to Hudson, I remained at Hudson for
8    ten years.  From Hudson, I transferred to
9    Greene, where I have been since.
10        Q.    So when did you first start at
11   Greene?
12        A.    2017 roughly.
13        Q.    The incident for which we are
14   here today occurred in August of 2017 --
15   18.  How long were you an officer at
16   Greene, prior to this incident?
17        A.    Probably just over a year.
18        Q.    Did you have a regular bid in
19   August of 2018?
20        A.    I had a bid in the arsenal.
21        Q.    Was that your regular bid at
22   that time?
23        A.    Yes.
24        Q.    And describe for me what that
25   bid entailed --

```
 1                        R. LANDRY
 2        A.        He was in a dental chair on his
 3   back with his feet out in front of him.
 4        Q.        Was he situated in a way that a
 5   patient would ordinarily be situated in a
 6   dental chair undergoing a procedure or in
 7   some other position?
 8                  MS. COLLINS:   Objection form.
 9        You can answer.
10        Q.     Go ahead.  I didn't hear your
11   answer.
12                  MS. COLLINS:   You can answer.
13        A.     Oh.  He was -- how was he in
14   the chair?  Is that what you are asking me?
15        Q.     Yes.
16        A.     He was sitting in a chair like
17   you normally would for a dental procedure.
18        Q.     Was his back against the upper
19   portion --
20        A.        Headrest, yes.
21        Q.     The back of his bed was against
22   the headrest?
23        A.     Yes.
24        Q.     Were his legs extended out in
25   front of him?
```

Page 25

1                    R. LANDRY

2       A.      Correct.

3       Q.      Where were his arms?

4       A.      By his side.

5       Q.      Was he moving when you first

6   saw him?

7       A.      Nope.  They already had him in

8   the chair.

9       Q.      Way anyone restraining him when

10  you first saw him?

11      A.      They couldn't because they did

12  not have the setups.

13      Q.      Well, was anyone restraining

14  him in any other manner when you first saw

15  him?

16      A.      Yes, my partner and the female

17  were holding him in the chair.

18      Q.      Describe -- your partner, you

19  mean Officer Leonardo, correct?

20      A.      Correct, yes.

21      Q.      Describe the manner in which

22  Officer Leonardo was restraining Mr.

23  Stanbro when you first entered the room?

24      A.      Officer Leonardo was on -- if

25  you are looking at him while he is in the

1                 R. LANDRY

2    chair, the inmate's right side holding his

3    left elbow and his left biceps, and the

4    female was doing the same on the opposite

5    side.

6         Q.    So was Officer Leonardo --

7         A.    To keep him in the chair.

8         Q.    -- holding Mr. Stanbro's left

9    arm with Officer Leonardo's two hands?

10        A.    Yes.

11        Q.    For how long a period of time

12   did you observe Officer Leonardo holding

13   down Mr. Stanbro's left arm?

14        A.    It took minutes to put the

15   restraints back on.

16        Q.    During those minutes did

17   Officer Leonardo maintain that same hold on

18   Mr. Stanbro's left arm?

19        A.    Yes.

20        Q.    Did you ever see Officer

21   Leonardo physically restrain Mr. Stanbro in

22   any manner, other than holding his --

23   holding Mr. Stanbro's left arm?

24        A.    No.

25        Q.    Did you ever see Officer

Page 27

R. LANDRY

Leonardo place his hand near Mr. Stanbro's
face?

     A.     No that I can recall.

     Q.     I'm sorry, and you say on the
other side the female officer was holding
onto Mr. Stanbro's right arm?

     A.     Yes.

     Q.     Was she holding onto his right
arm essentially in the same manner that
Officer Leonardo was holding onto Mr.
Stanbro's left arm?

     A.     Yes.

     Q.     So the female officer had both
of her hands on Mr. Stanbro's right arm,
correct?

     A.     I believe so.

     Q.     Did you see --

     A.     Both of their backs were to me
and I was holding his feet.  So from what I
could -- I couldn't see their hands 100% of
the time.  I am looking at their backs if
that makes sense.

     Q.     Well so, these observations
that you made of --

Page 28

1                    R. LANDRY

2        A.      When I first got in the room.

3        Q.      Let me finish the question.

4   The observations that you made of Officer

5   Leonardo and Officer Palou holding down Mr.

6   Stanbro's left arm and right arm

7   respectively, you made those observations

8   when you were at the foot of the dental

9   chair?

10       A.      That was when I first entered

11   the room.

12       Q.      Okay. So at that point, these

13   two officers backs were not to you; is that

14   correct?

15       A.      Correct, because I am entering

16   the room.

17       Q.      And upon entering the room, did

18   you see the other male officer from

19   Fishkill?

20       A.      Yes.

21       Q.      Where was he?

22       A.      I believe he was holding the

23   legs. Because that's where I came in to

24   hold the legs so that he could get the

25   setups.

1                    R. LANDRY

2       Q.      Basically you --

3       A.      Exchanged.

4       Q.      You took over what the male

5  officer was doing?

6       A.      Correct.

7       Q.      And do you now know that

8  officer to be Officer Deal?

9       A.      If you say that's his name,

10 then yes.

11      Q.      Well, was he an

12 African-American officer from Fishkill?

13      A.      Yes.

14      Q.      Did you have any difficulty

15 holding Mr. Stanbro's legs?

16      A.      As far as if I was not holding

17 his legs, he would have definitely been

18 kicking everybody.

19      Q.      Okay.  But were you able to

20 hold his legs by putting pressure down on

21 them?

22      A.      Yes.

23      Q.      Was he ever able to escape your

24 grip?

25      A.      No, because I had the leg irons

1                    R.  LANDRY
2  in my hands and I held the leg irons to the
3  chair.
4        Q.     Did you observe at any time
5  that day, Officer Leonardo use any force
6  against Mr. Stanbro other than holding down
7  Mr. Stanbro's right arm?
8        A.     No.
9        Q.     Did you observe Officer Palou
10  use any force against Mr. Stanbro that day,
11  other than holding down his left arm?
12        A.     No.
13        Q.     Did you use any force again Mr.
14  Stanbro that day other than holding the
15  chain that linked his two ankles?
16        A.     No.
17        Q.     Did you see Officer Deal, the
18  African-American officer from Fishkill use
19  any force against Mr. Stanbro that day?
20        A.     No.
21        Q.     So describe what Officer Deal
22  did after you took over holding Mr.
23  Stanbro's legs?
24        A.     I believe Officer Deal received
25  -- not received.  I believe he got the

1                    R.  LANDRY

2   waist  chain,  the  padlocks,  cuffs,  and  black

3   box  to  secure  back  on  the  inmate.

4        Q.      And  while  he  did  that,  was  Mr.

5   Stanbro  in  that  same  position,  lying  on  his

6   back  in  the  chair  with  Officers  Leonardo

7   and  Palou  holding  down  his  arms  and  you

8   holding  down  his  leg  chains?

9        A.      That  is  correct.

10       Q.      How  much  time  elapsed  between

11  the  time  you  entered  the  room  and  the  point

12  Mr.  Stanbro  was  fully  restrained  and  the

13  handcuffs  and  whatever  other  mechanical

14  restraints  were  put  on  him?

15       A.      Approximately  one  to  two

16  minutes,  tops.

17       Q.      And  describe  everything  that

18  you  observed  about  Mr.  Stanbro  during  that

19  one  to  two  minute  period  between  when  you

20  first  entered  the  room  and  the  time  he  was

21  fully  restrained  in  mechanical  restraints?

22            MS.  COLLINS:   Objection  to

23       form.   You  can  answer.

24       Q.    Go  ahead.

25            MS.  COLLINS:   You  can  answer.

1                    R. LANDRY

2          A.     He was trying -- the entire --

3     don't answer?

4               MS. COLLINS:  No, you can.  I'm

5          sorry, you can.

6          A.     Yes?

7               MS. COLLINS:  Yes.

8          A.     Okay.  There is a lag.  I'm

9     sorry.

10              MS. COLLINS:  Okay.

11         A.     The entire time he was trying

12    to get out of the chair while the

13    restraints were being put on.

14         Q.     What did you see or hear that

15    led you to believe that he was trying to

16    get out of the chair?

17         A.     I could feel him trying to kick

18    me out of the way.

19         Q.     So you felt his legs move?

20         A.     Yes.

21         Q.     Other than feeling his legs

22    move, what else did you see or hear that

23    led you to believe that Mr. Stanbro was

24    trying to get out of the chair?

25         A.     That was really it.  He

Page 33

1                    R. LANDRY

2  couldn't really speak because his mouth was

3  wired.

4      Q.    How did you know his mouth was

5  wired?

6      A.    He was there to get his jaw

7  worked on.  You could see it, I'm assuming

8  his face is wired shut.  You can see all of

9  the metal in his face.

10     Q.    And you were able to see that

11 from the position you were in?

12     A.    Yes.

13     Q.    Did it appear --

14     A.    When I walked into the room.

15     Q.    Did it appear that Mr. Stanbro

16 was attempting to speak?

17     A.    That I did not -- No.  They

18 weren't legible words at all.  I don't know

19 if he was trying to speak.

20     Q.    Well did you hear any sounds

21 coming from Mr. Stanbro during the time he

22 was being restrained?

23     A.    No.

24     Q.    What happened after that one to

25 two minute period after which Mr. Stanbro

Page 34

R. LANDRY

was fully in those mechanical restraints?

A.     Once he was fully restrained, I left the room to monitor my four inmates.

Q.     Did you ever again see Mr. Stanbro after you left that room?

A.     Just on our way out when we left Westchester with our other four inmates.

Q.     Where was Mr. Stanbro when you next saw him after you exited the room?

A.     Sitting in the dental chair fully restrained.

Q.     Now, did you re-enter the dental room or you just made this observation as you were walking by, or something else?

A.     Made the observation as we left, the room is right there.

Q.     For how long a period of time did you observe Mr. Stanbro on that second occasion when you walked by the room?

A.     I think it was minutes. Because once we received our paperwork, we left.

R. LANDRY

1
2    Q.    Let me just try and clarify
3  this, were you standing there looking at
4  him or you saw him just in passing when you
5  walked out of the clinic?
6    A.    Just in passing.
7    Q.    So it wouldn't have been
8  minutes, correct?
9    A.    Right.
10    Q.    Couple of seconds?
11    A.    Probably.
12    Q.    And during those couple of
13  seconds, can you describe for me how Mr.
14  Stanbro appeared?
15    A.    Agitated.
16    Q.    What did you see or hear that
17  led you to believe he was agitated?
18    A.    Heavy breathing, just agitated,
19  is how I would describe it.
20    Q.    Other than the heavy briefing,
21  what else did you see or hear that led you
22  to believe he was agitated?
23    A.    I can't recall.
24    Q.    Did you hear him saying
25  anything?

Page 36

1                    R. LANDRY
2       A.      Not legible.
3       Q.      Regardless of whether it was
4    legible, did you hear him saying anything?
5       A.      No.
6       Q.      Did you hear any sounds coming
7    from him?
8       A.      No.
9       Q.      On that second occasion when
10   you saw him while you were walking past the
11   door, did you see him moving in any manner?
12      A.      No.
13      Q.      Was he lying flat on his back?
14      A.      No.
15      Q.      How was he lying?
16      A.      In a seated position, like I am
17   now.
18      Q.      Okay.  Was he seated with his
19   back against the top of the dental chair?
20      A.      I don't believe so.
21      Q.      How was he seated?
22      A.      Sideways, with his feet hanging
23   off the side of the chair if that makes
24   sense.
25      Q.      Okay.  Well, where was his

1                    R.  LANDRY

2    head?

3         A.      He was sitting, so his head was

4    like mine is now.  He was not lying down.

5    He was in a seated position with no

6    backrest.

7         Q.      All right.  Were there

8    essentially two parts of the dental chair,

9    an upper part against which someone leans

10   their back and a lower part against which

11   someone puts their legs?

12        A.      Correct.

13        Q.      Was his back against the top

14   part of the chair?

15              MS. COLLINS:  Objection.

16        A.      At that time, no.

17        Q.      How about -- so was he sitting

18   upright, erect?

19        A.      Correct.

20        Q.      And how was he restrained at

21   that point?

22        A.      He had his cuffs were on him,

23   black box, waist chains, leg irons, and two

24   padlocks.

25        Q.      And when you say his feet were

Page 38

1                    R. LANDRY
2    over the edge of the chair, were they over
3    the right side, the left side or something
4    else?
5         A.      As you are walking into the
6    room, it would be the right side I believe.
7    Because if it was to the left side, I
8    wouldn't have seen his face.
9         Q.      So, was it kind of like his
10   feet were dangling off the right side of
11   the chair as he was sitting upright in the
12   chair?
13        A.      Yes.
14        Q.      Would it be similar to the way
15   a patient sits on an examination table with
16   their feet hanging off of the side?
17        A.      Yes.
18        Q.      Sitting upright and normal?
19        A.      Correct.
20        Q.      Was he moving his arms at that
21   point?
22        A.      I don't recall.
23        Q.      Was he moving his legs at that
24   point?
25        A.      I don't recall again.

1                    R.  LANDRY

2        Q.      Was  anyone  physically

3   restraining  him  at  that  point?

4        A.      No.

5        Q.      Who  else  was  inside  of  the

6   dental  office  on  that  second  occasion  that

7   you  saw  Mr.  Stanbro  when  you  walked  by  the

8   office?

9        A.      I  don't  recall  if  anybody  was

10  in  there  honestly.   I  don't  know  if  any  of

11  the  doctors  were  in  there  still.   Maybe  the

12  Fishkill  officers  were  in  there.   They  had

13  to  have  been  because  this  was  their  inmate.

14  Everyone  was  still  down  there  when  we  left.

15       Q.      On  that  first  occasion  when  you

16  went  to  Mr.  Stanbro  --   to  the  office  that

17  Mr.  Stanbro  was  being  treated  in,  how  much

18  time  in  total  did  you  spend  in  there?

19       A.      Two,  three  minutes

20  approximately.

21       Q.      Did  you  see  anything  else

22  during  that  two  to  three  minutes  that  you

23  have  not  already  told  us?

24             MS.  COLLINS:   Objection.

25       A.      No.

Page 40

1                    R.  LANDRY

2        Q.        Sorry Officer.   You can answer,

3   Officer.

4        A.       Did I see what now?

5        Q.       Did you see anything else

6   during that two to three minute period that

7   have you not already told us?

8             MS.  COLLINS:   I'm objecting

9         again to form, but you can answer.

10       A.       Right.

11       Q.       I didn't get the answer,

12  Officer?

13       A.       No, I don't believe so.

14       Q.       Did you hear anything else

15  during those two to three minutes while you

16  were in the office that you have not

17  already told us?

18             MS.  COLLINS:   Objection to

19        form, but you can answer.

20       Q.       I didn't get the answer

21  Officer.

22       A.       No.

23       Q.       When you walked by the office

24  -- or the room in which Mr. Stanbro had

25  been treated, were you with Officer

Page 41

                    R.  LANDRY
1
2    Leonardo at that point?
3         A.     When we were leaving?
4         Q.     Yes.
5         A.     I believe so because we had to
6    take our four inmates out.
7         Q.     At the point when you were
8    leaving, had you had any discussions with
9    Officer Leonardo about what had happened
10   inside the dental room during the time that
11   were you not in there?
12        A.     No.
13        Q.     After leaving the dental
14   office, when you saw the other officers
15   restraining Mr. Stanbro, when is the next
16   time that you saw Officer Leonardo?
17        A.     After we left for the day or
18   that same day.
19        Q.     No, no, no.  I'm talking about
20   after Mr. Stanbro was restrained, you say
21   you then exited the office in which Mr.
22   Stanbro was being treated, when is the next
23   time that day that you saw Officer
24   Leonardo?
25        A.     Had to have been minutes after.

Page 42

R. LANDRY

1

2   Q.      And then how much time elapsed

3   between when you next saw Officer Leonardo

4   and the two of you left the hospital with

5   your inmates?

6   A.      Again, I can not recall the

7   exact time frame, but I don't think it was

8   maybe ten minutes after the fact.  I don't

9   know the actual time frame.

10  Q.      Describe all conversations that

11  you had with Officer Leonardo between the

12  time you exited the room in which Mr.

13  Stanbro was being treated and the point

14  that the two of you left the hospital?

15          MS. COLLINS:  Objection, but

16      you can answer.

17  A.      I can't recall, that was two

18  and a half years ago.

19  Q.      But do you recall any

20  conversations you had with him at that

21  point?

22  A.      No.

23  Q.      Did Officer Leonardo ever tell

24  you what happened inside that office during

25  the time you were not in there?

Page 43

1                    R.  LANDRY

2        A.      No.

3        Q.      After leaving Westchester

4   Medical Center did you and Officer Leonardo

5   drive directly back to Greene Correctional

6   Facility?

7        A.      Yes.

8        Q.      How long a ride was that?

9        A.      Approximately two, two and a

10  half hours.

11       Q.      At any time between the point

12  you left Westchester Medical Center and you

13  got back to Greene, did you have any

14  conversations with Officer Leonardo about

15  what happened inside the clinic?

16       A.      No.

17       Q.      What did you talk about during

18  that ride?

19       A.      Nothing.  Just listened to the

20  radio, it was a long day.  Our day started

21  at 4:00 a.m.

22       Q.      Who drove?

23       A.      I drove.

24       Q.      Both ways?

25       A.      Correct.

Page 44

R. LANDRY

1

2      Q.      Was Officer Leonardo sleeping

3   on the way back?

4      A.      I don't recall.

5      Q.      As a matter of procedure,

6   aren't both officers supposed to be awake

7   during the transport?

8      A.      Correct.

9      Q.      Did you hear Officer Leonardo

10  say anything during that trip back to

11  Greene Correctional Facility?

12     A.      In regards to --

13     Q.      Anything?

14     A.      Anything -- I am sure we

15  talked.

16     Q.      And did you hear him say

17  anything about what happened inside of

18  Westchester Medical Center?

19          MS. COLLINS:   Objection.   Asked

20      and answered.   You can answer.   You

21      can answer, Officer.

22     A.      No.

23     Q.      After you left Westchester

24  Medical Center with Officer Leonardo, did

25  you and he ever have any discussion about

Page 45

R. LANDRY

what happened inside of the hospital at any
time up until today?

A.    No.

Q.    Had you and he ever
communicated in any manner -- email, or
text, or letter, or any other manner --
about what happened inside of Westchester
Medical Center?

A.    No.

Q.    What did you do when you got
back to Greene Correctional Facility on
August 31, 2018?

A.    Secured my inmates back to
their housing location, returned all of the
equipment, clocked out, and went home.

Q.    When did you next work at
Greene, the following day or some other
day?

A.    I was -- most likely the
following day.

Q.    How about Officer Leonardo?  Do
you know when he next worked at Greene?

A.    I am assuming the next day, but
I don't know if he had an RDO after that or

Page 46

1                            R.  LANDRY

2    not.

3           Q.       When  is  the  next  time  you

4    recall  seeing  Officer  Leonardo  after  August

5    31,  2018?

6           A.       Probably  that  next  week.

7           Q.       When  you  say  that  next  week,

8    you  mean  as  opposed  to  the  next  day?

9           A.       Yeah,  again  I  don't  know  if  he

10   was  off  the  weekend  or  worked  the  weekend.

11          Q.       What  makes  you  believe  it  was

12   the  next  week  and  not  the  next  day?

13          A.       It  could  have  been.   I  don't

14   recall.   It  was  two  and  a  half  years  ago.

15          Q.       So  you  do  not  know  one  way  or

16   the  other,  correct?

17          A.       Correct.

18          Q.       Did  you  ever  tell  anyone  that

19   Mr.  Stanbro  had  a  panic  attack  that  day?

20          A.       Yes.

21          Q.       Who  did  you  tell  that  to?

22          A.       I  believe  at  my  Q&A.

23          Q.       And  what  did  you  see  or  hear

24   that  led  you  to  believe  that  Mr.  Stanbro

25   had  a  panic  attack?

Page 47

1                    R.  LANDRY
2          A.      Well,  I  am  not  a  doctor,  so  I
3     just  assumed  he  was  having  a  panic  attack.
4     The  doctor  that  was  actually  in  my  room
5     during  my  procedure  --
6          Q.      What  about  that  doctor?
7          A.      He  said,  "This  is  why  I  did  not
8     take  that  case."   Meaning  your  client,
9     because  this  has  happened  on  more  than  one
10    occasion.   I  assumed  he  was  having  a
11    reaction,  again  I  am  not  a  doctor,  but  this
12    has  happened  more  than  once.
13         Q.      Just  so  I  am  clear,  the  doctor
14    with  whom  you  spoke,  told  you  that
15    something  similar  had  happened  with  Mr.
16    Stanbro  on  a  prior  occasion?
17         A.      The  doctor  that  was  in  the  room
18    with  me  during  my  inmate's  procedure  wasn't
19    speaking  directly  to  me.   He  might  have
20    been  speaking  to  the  nurse.   He  stated,
21    "This  is  why  I  did  not  take  that  case."
22         Q.      But  specifically  with  respect
23    to  what  he  said  about  a  prior  occasion,
24    what  did  you  overhear  that  doctor  saying?
25         A.      That  this  happens  all  of  the

Page 48

```
 1                    R. LANDRY
 2   time.
 3        Q.      Particularly with Mr. Stanbro?
 4        A.      Correct.
 5        Q.      And did he characterize it is
 6   as a panic attack?
 7        A.      I can't recall if he said panic
 8   attack.
 9        Q.      Did he characterize it as
10   something comparable to a panic attack?
11        A.      He could have.
12        Q.      I am just wondering why did you
13   characterize it as a panic attack?  Is that
14   because that's what you understood from
15   this other doctor?
16        A.      No, that is just what I assumed
17   it to be.
18        Q.      Okay.  While you were inside
19   the room in which Mr. Stanbro was being
20   restrained, did you see anything that you
21   believe could have led to a bruise on Mr.
22   Stanbro's neck?
23              MS. COLLINS:  Objection.  But
24         you can answer.
25        A.      Not that I am aware of, I don't
```

1                          R.  LANDRY

2     know what you are asking.

3          Q.     Well, did you see anyone touch

4     Mr. Stanbro's neck?

5          A.     No.

6          Q.     Did you see Mr. Stanbro's neck

7     strike anything?

8          A.     No.

9          Q.     Or anything strike Mr.

10    Stanbro's neck?

11         A.     No.

12         Q.     Did you see any force being

13    applied to Mr. Stanbro's neck in any

14    manner?

15         A.     No.

16         Q.     For how long a period of time

17    were you holding down Mr. Stanbro's legs

18    with that leg iron?

19              MS. COLLINS:  Objection.  Asked

20         and answered, but you can answer.

21         A.     Again, one to two minutes.

22         Q.     Okay.  Let's put up Exhibit 25

23    please.  Officer I would like you to take a

24    look at this two-page document that's

25    marked Plaintiff's Exhibit 25.  Is that the

Page 76

1                          R. LANDRY

2      of his shift.

3           Q.      So you never see him during the

4      course of the tour?

5           A.      No.

6           Q.      And how about in the two and a

7      half years or so since this incident, did

8      you also work generally the same tours as

9      Officer Leonardo?

10          A.      Yes.

11          Q.      And did you ever see him during

12     the actual tours?

13          A.      Again, only in passing because

14     I work in the arsenal, I see everybody as

15     they go through the gates.

16          Q.      Did you and Officer Leonardo

17     have some time of a meeting after this use

18     of force incident and before your Q&A with

19     OSI?

20          A.      We -- yes.

21          Q.      Where was that meeting?

22          A.      I can't recall.  We -- can I

23     elaborate or no?

24          Q.      Sure, yeah.

25          A.      We met at Greene, myself,

Page 77

1                    R. LANDRY
2    Officer Leonardo, and Officer Tedford who
3    was our union representation.
4         Q.    I'm sorry Officer who?
5         A.    Tedford.
6         Q.    Spell that.
7         A.    T-E-D-F-O-R-D.  He was our
8    union rep. Our union steward.  Officer
9    Tedford drove us down to Fishkill for our
10   Q&A and we stopped somewhere for food prior
11   to the Q&A.
12        Q.    When you say you stopped
13   somewhere, you stopped at like a
14   restaurant?
15        A.    Yeah like a deli -- it was more
16   like a deli.
17        Q.    Okay.  And what was discussed
18   during the lunch?
19        A.    Nothing really.  I mean it's
20   just a Q&A.  We didn't discuss anything.
21        Q.    Well, did you and Officer
22   Leonardo discuss the facts of the incident?
23        A.    Not together.
24        Q.    Any reason why not?
25        A.    Conflict of interest.

Page 78

1                    R. LANDRY
2        Q.      Can you explain that to me?
3        A.      No. Officer Tedford's our rep,
4    so we just speak to him individually --
5    less is more if that makes sense.
6        Q.      Were you advised that you
7    couldn't speak with Officer Leonardo about
8    the incident?
9             MS. COLLINS:  Objection as to
10        form, but you can answer.
11       Q.      Officer?
12            MS. COLLINS:  Advised by whom,
13        Ed?
14            MR. SIVIN:  By anyone.
15       Q.      Without telling me who gave you
16   the advice, did you have an understanding
17   that you were not permitted to speak to
18   Officer Leonardo about the incident?
19       A.      Yes.
20            MR. SIVIN:  All right.  I don't
21        have any further questions.
22            MS. COLLINS:  I have a couple
23        of follow-ups if I may.  Officer, can
24        you shut that door if it's open?
25       A.      It is shut, it's just shift

Page 82

R. LANDRY

2  conversation with him about the events of

3  August 31st?

4      A.    No.

5      Q.    And Officer, again from what

6  you saw -- when you saw the prisoner, Mr.

7  Stanbro, was there any indication that he

8  had suffered any injuries when you last saw

9  him?

10      A.    No.

11          MR. FITCH:  And sir, I'm just

12          going to make a statement for the

13          record, this is not a question for

14          you, it's just something for the

15          record, for your counsel.  That I did

16          serve discovery demands that

17          concerned all of these officers and

18          some other information that I made a

19          record on this morning, with Mr.

20          Leonardo's deposition.  And I just

21          wanted to re-state that when I have

22          that information, I reserve my rights

23          to further deposition if necessary on

24          any issues that may arise from those

25          records.  And thank you very much,

Page 88

1                        R.  LANDRY

2            C E R T I F I C A T E

3

4    STATE OF NEW YORK            )

                                  :   SS.:

5    COUNTY OF ORANGE             )

6

7         I, VICTORIA CHUMAS, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 16th day of March 2021.

21

22

23

                   VICTORIA CHUMAS

24

25