Page 1

1
2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ------------------------------------------X
       CHAD STANBRO,
4                                    PLAINTIFF,
5
              -against-             Case No.:
6                                   19-CV-10857
7
       WESTCHESTER COUNTY HEALTH CORPORATION,
8      WESTCHESTER MEDICAL CENTER, FRANK WEBER,
       AND JOHN FULL,
9
                                   DEFENDANTS.
10     ------------------------------------------X
       CHAD STANBRO,
11                                  PLAINTIFF,
12
              -against-             Case No.:
13                                  20-cv-01591
14
       C.O. NADYA PALOU, C.O. RAYMOND DEAL, C.O.
15     KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
       CORRECTION NURSE GARY PAGLIARO, AND
16     CORRECTION SERGEANT ENRIQUE TORRES,
17                                  DEFENDANTS.
       ------------------------------------------X
18
                   DATE: March 4, 2021
19                 TIME: 2:45 P.M.
20
                   DEPOSITION of the Defendant,
21     ENRIQUE TORRES, taken by the respective
       parties, pursuant to an Order and to the
22     Federal Rules of Civil Procedure, held via
       videoconference, before Victoria Chumas, a
23     Notary Public of the State of New York.
24
25

Page 2

```
 1
 2     A P P E A R A N C E S:
 3
       SIVIN, MILLER & ROCHE LLP
 4        Attorneys for the Plaintiff
          CHAD STANBRO
 5        20 Vesey Street, Suite 1400
          New York, New York 10007
 6        BY: EDWARD SIVIN, ESQ.
          esivin@sivinandmiller.com
 7
 8
       WILSON, BAVE, CONBOY, COZZA & COUZENS, P.C.
 9        ATTORNEYS FOR THE DEFENDANTS
          WESTCHESTER MEDICAL CENTER AND JOHN FULL
10        707 Westchester Avenue
          White Plains, New York 10604
11        BY: CLAUDINE L. WEIS, ESQ.
          cweis@wbccc.com
12
13
       RAWLE & HENDERSON, LLP
14        Attorneys for the Defendant
          FRANK WEBER
15        14 Wall Street, 27th Floor
          New York, New York 10005
16        BY: ROBERT A. FITCH, ESQ.
          rfitch@rawle.com
17
18
       NEW YORK STATE OFFICE OF THE ATTORNEY
19     GENERAL
          Attorneys for the Defendants
20        KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
          CORRECTION NURSE GARY PAGLIARO, AND
21        CORRECTION SERGEANT ENRIQUE TORRES
          28 Liberty Street, Floor 18
22        New York, New York 10005
          BY: DEANNA L. COLLINS, ESQ.
23        deanna.collins@ag.ny.gov
24
25
```

Page 3

```
 1
 2
       OFECK & HEINZE, LLP
 3         Attorneys for the Defendant
           C.O. Raymond Deal
 4         85 Main Street, Suite 204
           Hackensack, New Jersey 07601
 5         BY: MARK F. HEINZE, ESQ.
           markfheinze@gmail.com
 6
 7
 8     Also present:
 9     Glenn Miller
10     Jason Miller
11     Andrew Weiss
12
                    *          *          *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24            *       *       *       *

25

1                         E. TORRES
2      E N R I Q U E      T O R R E S, called as a
3      witness, having been first duly sworn by a
4      Notary Public of the State of New York, was
5      examined and testified as follows:
6      EXAMINATION BY
7      MR. SIVIN:
8                    (Whereupon, PDF documents were
9            deemed marked as Plaintiff's Exhibit
10           30-33 for identification as of this
11           date by the Reporter.)
12           Q.    Please state your name for the
13     record.
14           A.    Enrique Torres.
15           Q.    What is your address?
16           A.    18 Strack Drive, Beacon, New
17     York 12508.
18           Q.    Is it Sergeant?
19           A.    Correct.
20           Q.    Good afternoon, Sergeant.  My
21     name is Edward Sivin.  I represent the
22     plaintiff, Char Stanbro.  I'm going to ask
23     you some questions relating to an incident
24     that took place at Westchester Medical
25     Center and Fishkill Correctional on August

1                    E. TORRES
2    31, 2018.  If for any reason you don't
3    understand the question or a question is
4    not clear to you, don't answer it.  Ask me
5    to repeat it or rephrase it and I will do
6    so, okay?
7          A.     Okay.
8          Q.     Please make sure also that all
9    of your answers are verbal because the
10   stenographer can't take down hand gestures
11   or head gestures, okay?
12         A.     Okay.
13         Q.     Are you currently a Sergeant at
14   Fishkill Correctional Facility?
15         A.     Yes.
16         Q.     How long have you worked at
17   Fishkill?
18         A.     I have been at Fishkill since
19   July 2018 as a supervisor.
20         Q.     Were you at Fishkill before
21   July of 2018 in some other capacity?
22         A.     Yes.
23         Q.     For how long -- when did you
24   first start working at Fishkill?
25         A.     I first started working at

Page 7

E. TORRES

1
2  Fishkill in 1999 when I came on the job.
3      Q.    Okay.  So actually, let's
4  backtrack.  Did you graduate the academy in
5  about 1999?
6      A.    Yes.
7      Q.    Take me through the various
8  assignments, various facilities you were
9  at, from 1999 until the present, and the
10 general timeframes as well.
11     A.    Okay.  From 1999, I did
12 approximately nine years in Fishkill
13 Correctional as an officer.  After that, I
14 transferred to Mid-Orange Correctional
15 Facility in Warwick, New York where I was
16 there for approximately three years.  They
17 closed the facility, and I was -- I
18 transferred to Eastern Correctional
19 Facility in Napanoch, New York after that
20 and did about seven years at Eastern
21 Correctional and was promoted to Sergeant
22 that year, 2018, and was promoted to Greene
23 Correctional Facility where I was there for
24 approximately a month and a half, and was
25 transferred to Fishkill.

Page 31

```
1                  E. TORRES
2        A.      Correct.
3        Q.      Did he move any other portion
4   of his body at the time you had that
5   conversation with him when he was
6   complaining about his neck?
7        A.     I don't remember.
8        Q.      What area of the bench seat was
9   he seated on?  Was it towards the side of
10  the van that you were standing, the
11  opposite side, the middle, or something
12  else?
13       A.       Towards the side of the van
14  where I was standing.
15       Q.      What happened after Mr. Stanbro
16  mentioned something about his neck?  What
17  is the next thing that happened?
18       A.      I directed one of the officers
19  to get medical, a nurse or medical staff to
20  the area right away.
21       Q.      Now.  Was Palou still around
22  that area at that time that you had that
23  conversation with Mr. Stanbro?
24       A.      I don't remember.
25       Q.      Who was the officer that you
```

Page 32

1                      E. TORRES
2    directed to get medical attention?
3        A.     I can't remember the officer's
4    name.
5        Q.     Was it Dickinson?
6        A.     I don't remember.  I don't
7    remember which officer I directed to get
8    medical, I don't.
9        Q.     Okay.  What happened after you
10   directed that officer to get medical
11   attention for Mr. Stanbro?
12       A.      The officer returned with the
13   nurse, Nurse Pagliaro, who came out with a
14   wheelchair and approached the area where
15   Stanbro was seated and asked what happened,
16   and he proceeded to assist to remove
17   Stanbro from the vehicle.
18       Q.     Now, did Pagliaro come out with
19   a wheelchair or a Stryker chair?
20       A.     I believe it's a Stryker chair,
21   correct.
22       Q.     Did Pagliaro come out along or
23   was somebody with him?
24       A.     One of the escort officers, so
25   yeah.  He came out with someone else.

1                    E. TORRES

2        Q.        Now, when you say "escort

3   officers," you don't mean one of the

4   transportation officers, correct?

5        A.        Correct.

6        Q.        Do you recall who the escort

7   officer was who Pagliaro was with?

8        A.        I don't recall which one of the

9   officers it was, no.

10        Q.        Okay.  Did Mr. Stanbro respond

11   to Pagliaro's question about what happened?

12        A.        I don't remember.

13        Q.        Did you see Mr. Stanbro react

14   in any manner in response to Pagliaro's

15   question of him as to what happened?

16             MS. COLLINS:  Objection as to

17        form, but you can answer.

18        A.        I don't remember, no.  I don't

19   remember him saying anything.

20        Q.        What happened next after

21   Pagliaro questioned Mr. Stanbro as to what

22   happened?

23        A.        Pagliaro proceeded to assist

24   Mr. Stanbro out of the vehicle and place

25   him in the Stryker chair.

Page 42

1                    E.  TORRES

2  to step down from the vehicle, yes, so it

3  is -- you know, the officer should assist

4  the inmate in stepping out of the vehicle.

5       Q.     When Mr. Stanbro was placed

6  into the Stryker chair, did you believe he

7  was physically injured at that point?

8       A.     I believe that -- no.

9       Q.     Did you have an opinion as to

10  why he was being placed in a Stryker chair?

11       A.     His statement of saying "my

12  neck."  I don't know what happened.  When

13  somebody says "my neck," you know, I don't

14  touch him.  I don't move him.  I let

15  medical handle that, especially I wasn't

16  aware exactly of what had happened.

17       Q.     Before Mr. Stanbro was taken

18  from the van, placed in the Stryker chair,

19  and wheeled into the RMU, did you make any

20  type of inquiry of anyone as to the details

21  of what happened during this use of force

22  incident?

23       A.     I don't remember if I did.  I

24  really don't.

25       Q.     Did you overhear Nurse Pagliaro

Page 50

E.  TORRES

1
2    at page one and two.   Have you ever seen
3    these photographs before just now?
4         A.     Yes.
5         Q.     When is the last time you saw
6    these photographs?
7         A.     It's been a while.   I think I
8    took those photographs.
9         Q.     Okay.   That was going to be one
10   of my questions.   So you took the
11   photographs that are identified as
12   Plaintiff's Exhibit 23?
13        A.     Yes.
14        Q.     What do those photographs
15   depict?
16        A.     Him in the Stryker chair.
17        Q.     Is that -- are these
18   photographs taken in the emergency room
19   where Mr. Stanbro was taken?
20        A.     Yes.
21        Q.     At the RMU, correct?
22        A.     Correct.
23        Q.     Do these photographs fairly and
24   accurately depict the position that Mr.
25   Stanbro was in that chair when you saw

Page 51

1                    E. TORRES

2    people were questioning him about what

3    happened inside of the ER?

4        A.     Yes.

5        Q.     Is it the position that Mr.

6    Stanbro was in when he was wheeled into the

7    RMU in the Stryker chair?

8        A.     I remember him sitting more

9    upright than in that position he is in in

10   that photograph.

11       Q.     When you say "more upright,"

12   were his feet ever off the ground when you

13   saw him in the Stryker chair?

14       A.     I don't remember his -- I do

15   remember him, his buttocks seated in the

16   actual seat.

17       Q.     When did you see his buttocks

18   seated in the actual seat of the Stryker

19   chair?

20       A.     As he was being transported

21   into the emergency room.

22       Q.     As he was being transported

23   into the emergency room of the RMU, was his

24   head in the same position as is depicted in

25   the photographs marked Exhibit 23?

1                          E. TORRES

2          A.      I don't remember his position.

3          Q.      Do you remember Mr. Stanbro's

4    head being in any position other than the

5    position depicted in the photographs marked

6    Exhibit 23 when he was in the Stryker

7    chair?

8          A.      No.   I think that is the way he

9    was.   That is the way he remained while he

10   was in that chair.

11         Q.      Other than him being further up

12   in the chair with his buttocks closer to

13   the top portion of the chair, were his legs

14   and arms essentially in the same position

15   for the entire time you saw him in the

16   Stryker chair?

17         A.      Yes.

18         Q.      Now, when you took these

19   photographs of Mr. Stanbro, were his eyes

20   open or were they closed?

21         A.      I don't remember.   They look to

22   be open from what I can see in the

23   photograph.   I don't remember at the time.

24         Q.      Did you take any photographs of

25   Mr. Stanbro other than those four

Page 53

1                    E.  TORRES
2  photographs?
3        A.      I don't remember.   I think that
4  was it.   I think that was it.
5        Q.      Did you see anyone else take
6  any photographs of Mr. Stanbro other than
7  the four photographs marked as Exhibit 23?
8        A.      No.
9        Q.      Have you ever seen any
10  photographs of Mr. Stanbro in the Stryker
11  chair other than the four photographs
12  marked as Exhibit 23?
13        A.      No.
14        Q.      What else do you recall
15  happening inside the RMU emergency room
16  besides people questioning Mr. Stanbro and
17  him either not responding or attempting to
18  respond and not being able to do so?
19        A.      Well, I remember him sliding
20  out of this chair that he is sitting in
21  onto the floor.   And I also remember the
22  nurse, Nurse Pagliaro, doing an examination
23  while he was on the floor.   And the only
24  thing I remember from that is I remember
25  him using a tool to like run it across the

Page 54

                        E. TORRES

1
2    bottom of his foot, I guess to see if he
3    would get a response from him.  I remember
4    that.  And after that, I remember, again,
5    medical staff in and out.  I think I
6    remember -- I also remember the captain
7    coming in and saying a few things briefly
8    asking a few questions, and then him
9    leaving.  And shortly thereafter, the
10   medics or the ambulance came to pick him up
11   to transport him.
12        Q.    Did you remain in the RMU for
13   the entire time between when Mr. Stanbro
14   was brought there and the time he was taken
15   away by medics?
16        A.    In the building, yes.
17        Q.    Did you remain in that same
18   room where Mr. Stanbro was?
19        A.    I don't remember if I left.
20   There is a possibility that I could have
21   stepped out.  I don't remember.
22        Q.    Putting aside the possibility
23   that you may have stepped out, do you
24   recall leaving the room into which Mr.
25   Stanbro was taken in the RMU at any point

Page 55

                          E.  TORRES

1

2      between the time he was first brought into

3      there and the time he was taken away by

4      medics?

5           A.     I don't remember.

6           Q.     Now, tell me about this

7      incident where he slid out of the chair.

8      Who else was in the room at that time

9      besides you and Mr. Stanbro?

10          A.     There was an officer in the

11     room.  There was a correction officer.

12          Q.     Who was the correction officer?

13          A.     Denbaum, Officer Denbaum.

14          Q.     I think we have his name.  Can

15     you spell his name?

16          A.     D-E-N-B-A-U-M.

17          Q.     What is his first name?

18          A.     I don't know his first name.

19          Q.     Is he still employed at

20     Fishkill?

21          A.     Yes.

22          Q.     And what did he look like back

23     in August of 2018?

24          A.     White male, I would say early

25     20s.  Short, black, dark hair.  I would say

1                    E. TORRES

2    maybe 190 pounds, 185 pounds, slim maybe

3    5'9", 5'10".

4        Q.    Okay.  Besides you and Officer

5    Denbaum, who else was present inside of

6    that room when you saw Mr. Stanbro slide

7    out of the Stryker chair?

8        A.    I don't recall anybody else

9    being in there.

10       Q.    Do you believe it was just you

11   and Officer Denbaum in the room at that

12   time?

13       A.    To my recollection, yeah.  Yes.

14       Q.    Now, were there any type of

15   straps on that Stryker chair?  Is it

16   equipped with any type of straps?

17       A.    Yes.  Stryker chairs have

18   straps.

19       Q.    How many sets of straps?

20       A.    I would be taking a guess, but

21   there is one for the ankles, one for the

22   waist, and I believe there is one on the

23   upper-back area.  I'm not 100 percent sure

24   on how many total.

25       Q.    At any point, did you see any

Page 57

1                    E.  TORRES

2    of  those  straps  around  Mr.  Stanbro  while  he

3    was  in  the  Stryker  chair?

4          A.     I  don't  remember.

5          Q.     Well,  were  the  straps  applied

6    before  he  was  wheeled  into  the  RMU?

7          A.     Yeah.

8          Q.     Okay.

9          A.     Yes.  He  was  secured  in  the

10   Stryker  chair.

11         Q.     That  would  be  standard

12   operating  procedure?

13         A.     Correct.

14         Q.     Once  he  was  brought  in  the  RMU,

15   were  the  straps  removed?

16         A.     I  don't  remember.

17         Q.     Do  you  know  any  reason  why  the

18   straps  would  be  removed  once  he  was  inside

19   of  the  RMU?

20         A.     For  medical  assessment.

21         Q.     Any  other  reason?

22         A.     I  mean,  maybe  to  be  --  not  just

23   Mr.  Stanbro,  but  anybody  else  to  need  to  be

24   moved  out  of  the  chair,  maybe  into  a  bed

25   into  another  position,  or  did  --  but  yes,  I

Page 58

1                           E. TORRES
2    could see them, yeah.
3         Q.      Any other reason?
4         A.      I can't think of anything.
5         Q.      Did Mr. Stanbro complain of
6    pain at all when he was in the RMU?
7         A.      I don't remember.
8         Q.      Did Mr. Stanbro express any
9    discomfort with the straps when he was in
10   the RMU?
11        A.      I don't remember.
12        Q.      Did he ask anyone to take off
13   the straps?
14        A.      I don't remember that.
15        Q.      So where specifically were you
16   in the RMU when you saw Mr. Stanbro slide
17   out of the chair?
18        A.      I probably stepped out of the
19   room a couple times, maybe to peek my head
20   out of the emergency room.  But I remember
21   there being a privacy screen that we use,
22   so that anybody that walks by the door
23   can't see what is going on inside, just to
24   protect the privacy of the inmate.  But I
25   remember the privacy screen being up, and I

1                    E. TORRES
2   was on the other side of the privacy
3   screen.   And I stepped out, looked outside,
4   or did something by the door, and as I
5   returned back toward the other side of the
6   privacy screen is when I saw him sliding
7   slowly out of the chair and the officer
8   that was standing on the opposite side of
9   the room went to grab, you know, to help
10  him secure him.   And he just slid and
11  guided him to the floor right over the
12  chair.
13          Q.    I'm sorry.   Are you saying the
14  officer guided Stanbro out of the chair?
15          A.    Yes.
16          Q.    This is Officer Denbaum?
17          A.    Correct.
18          Q.    How much time elapse between
19  the point you say Mr. Stanbro beginning to
20  slide out of the chair and the point the
21  that Officer Denbaum began to physically
22  guide Mr. Stanbro out of the chair?
23          A.    It was like slow motion,
24  really.   From the time I saw him sliding,
25  it was almost at the same time that I saw

```
 1                    E. TORRES
 2   the officer move toward the inmate's
 3   direction.  And it just became like a slow
 4   side out of the car, and he sort of just
 5   guided him out of the car and laid him on
 6   the ground.   What did that take?
 7   40 seconds.
 8        Q.    Did you assist at all while Mr.
 9   Stanbro was sliding out of the chair?
10        A.    I don't believe I did,  no.
11        Q.    When Mr. Stanbro eventually got
12   to the ground, in what position was he in?
13        A.    He was lying on his back.
14        Q.    Okay.  Back of his head against
15   the ground?
16        A.    Yes.
17        Q.    Locking straight up?  Flat on
18   his black looking straight up; is that
19   correct?
20        A.    Yes.
21        Q.    And were his legs and his arms
22   essentially in the same position as they
23   were as depicted in the photographs when he
24   was in the Stryker chair?  You know, his
25   arms by his side and legs fully extended?
```

Page 61

1                    E. TORRES

2      A.      Yes.

3      Q.      Now, did you form an opinion as

4  to why when Mr. Stanbro was sliding down

5  the Stryker chair and Officer Denbaum had

6  ahold of him, why Officer Denbaum didn't

7  just pull him back up into the chair?

8              MS. COLLINS:   Objection.   You

9         can answer.

10     A.      I believe that from what I

11 observed, that he did the right thing

12 because trying to pull him back would have

13 probably created -- would have been

14 difficult for him to do.

15     Q.      Now, did you document anywhere

16 that Officer Denbaum or any other

17 individual assisted Mr. Stanbro during his

18 slide from the Stryker chair to the ground?

19     A.      I don't remember if I did.

20     Q.      Then, you said that at some

21 point while he was on the ground Nurse

22 Pagliaro conducted an exam of Mr. Stanbro,

23 correct?

24     A.      Yes.

25     Q.      And you said that exam included

1                    E. TORRES

2  using a tool on the bottom of his foot,

3  correct?

4       A.    I remember that specific -- I

5  remember him doing that specifically, yes.

6       Q.    What was the tool that he used?

7       A.    I don't know what he used.

8       Q.    Well, what did it look like?

9       A.    I don't remember.

10       Q.    Did you see how Mr. Stanbro

11  responded, if at all, to that tool being

12  applied to bottom of his foot?

13       A.    I don't.

14       Q.    Now, was Nurse Pagliaro in the

15  room when Mr. Stanbro was sliding down to

16  the floor?

17            MS. COLLINS:  Objection, but

18       you can answer.

19       A.    No.

20       Q.    And when Pagliaro entered the

21  room, did he ask you, or Denbaum, or anyone

22  else how did this guy get down on the

23  floor?

24       A.    I'm sure he did, but I don't

25  remember if he did.  But I know when the

Page 63

1                    E. TORRES

2    nurses and the staff walked back in and saw

3    him on the ground, they were like, what

4    happened, and we explained he slid off the

5    chair.

6         Q.      You explained this to Nurse

7    Pagliaro and the other staff members?

8         A.      Yes.   People were there.   When

9    they walked in and saw, I remember having

10   to say yeah, he slid out of the chair.   I

11   don't remember specifically to who, but I

12   do recall Pagliaro, after he was on the

13   ground, conducting that exam on the bottom

14   of the foot.

15        Q.      In addition to telling Pagliaro

16   and the other staff members that Mr.

17   Stanbro slid out of the chair, did you or

18   anyone else tell Pagliaro or any other

19   staff members that Officer Denbaum assisted

20   Mr. Stanbro when he slid down out of the

21   Stryker chair?

22        A.      I don't know if I did.

23        Q.      Now, you say a captain then

24   entered and asked some questions, correct?

25        A.      Yes.

1                   E. TORRES

2       Q.      What is that captain's name?

3       A.      Captain Washer.

4       Q.      Is he still employed at

5  Fishkill?

6       A.      Yes.

7       Q.      Describe what he looks like or

8  looked like back then.

9       A.      White male, short, dark brown

10 comb-over, 5'9' in height.

11      Q.      What questions did Captain

12 Washer ask when he entered the room?

13      A.      I don't remember exactly.

14      Q.      How about in a general sense?

15      A.      You know, Captain Washer is a

16 very soft-spoken captain.  He always speaks

17 very low, and I guess I was not really

18 right in the close proximity.  I may have

19 been a further distance, maybe by the door.

20 Maybe even behind the privacy screen, but I

21 did remember the captain going in there and

22 trying to talk to him while he was on the

23 ground.

24      Q.      Did Mr. Stanbro respond to

25 Captain Washer in any manner?

Page 65

1                    E. TORRES

2        A.      I don't remember him

3    responding.

4        Q.      Now, the exam you say Nurse

5    Pagliaro conducted of Mr. Stanbro while

6    Stanbro was on the floor, what else did you

7    observe about that exam other than him

8    using a tool on the bottom of Mr. Stanbro's

9    foot?

10        A.      That just sticks out.  That is

11    the only thing I really remember when he

12    was on the ground I remember the nurse

13    doing.  Other than that, I don't remember

14    anything physically, anything else that was

15    done to him.

16        Q.      Did you ever see a nurse use

17    any type of a needle or sharp object to try

18    and test Mr. Stanbro's response to pain?

19        A.      I don't remember that.

20        Q.      How long -- strike that.  After

21    Mr. Stanbro was on the ground after sliding

22    out of the Stryker chair, did he remain on

23    the ground the entire time until he was

24    taken away by medics?

25        A.      I'm going to say yes.

Page 66

1              E. TORRES
2         Q.     Well, do you remember ever
3    seeing Mr. Stanbro in any other position
4    after he slid out of the Stryker chair onto
5    the ground before he was taken away by the
6    medics?
7         A.     I don't.
8         Q.     Did you notice any movement at
9    all from Mr. Stanbro while he was lying
10   flat on the ground?
11        A.     Yes.
12        Q.     What movement did you notice?
13        A.     I remember him moving his arms.
14   His legs were moving.  I do remember that
15   movement.  I do remember him moving while
16   he was on the ground.  And I don't know who
17   I said it to, it might have been the
18   officer that was there, but I remember
19   saying he's moving.  And I remember other
20   staff coming in and observing the same.
21   But he did move his arms and his legs while
22   he was lying on the ground.
23        Q.     While he was lying on the
24   ground and, as you say, moving his arms and
25   legs, was his body still in the same

Page 77

E. TORRES

1
2  some point after Mr. Stanbro was taken away

3  you had a further conversation with Officer

4  Deal about what had happened back at

5  Westchester; is that correct?

6        A.     I don't remember if it was

7  right after.  I don't remember that.

8        Q.     Regardless of when it was --

9  regardless of when it was, did there come a

10  time when you had a conversation with

11  Officer Deal about what had happened back

12  at Westchester Medical Center?

13        A.     No.

14        Q.     You never spoke to him about

15  what happened?

16        A.     After this was reported to me,

17  and after I received their reports, there

18  really wasn't any other conversation about

19  what happened.

20        Q.     Now, let's back up.  Did

21  Officer Deal ever tell you about what

22  happened back at Westchester Medical

23  Center?

24        A.     Yes.

25        Q.     Okay.  As best as you can

Page 78

1                    E. TORRES
2    recall, when did that conversation take
3    place?
4         A.    I can't remember.   I remember
5    him telling me briefly and then being
6    directed to put it on paper.   That was...
7         Q.    Okay.   What did he tell you
8    during this brief conversation before he
9    was directed to put it on paper?
10        A.    I remember him saying Stanbro
11   kicked him in the stomach and he was not
12   very -- he did not give me a lot of detail,
13   a lot of information.
14        Q.    Where did that conversation
15   take place?
16        A.    I don't remember.
17        Q.    Other than telling you that Mr.
18   Stanbro kicked him in the stomach, did Deal
19   tell you anything else about what happened
20   during that first discussion you had with
21   him?
22        A.    Specifically, no.   I don't -- I
23   remember him just being really brief in his
24   verbal conversation.
25        Q.    When Deal told you that Mr.

Page 79

```
 1                    E. TORRES
 2    Stanbro kicked him in the stomach during
 3    this brief conversation, was Palou also
 4    there at that time?  Meaning, was it a
 5    conversation among the three of you?
 6         A.    No.  I don't remember speaking
 7    to them, no.
 8         Q.    Did you ever again have a
 9    conversation with Deal about what happened
10    after that initial brief conversation when
11    he told you just that Mr. Stanbro had
12    kicked him in the stomach?
13         A.    No.
14         Q.    Okay.  Did you ever speak to
15    Officer Palou about what happened at
16    Westchester Medical Center?
17         A.    I can't remember if I had a
18    conversation with her.
19         Q.    Did you ever have a
20    conversation with anyone about what
21    happened at Westchester Medical Center
22    other than that brief conversation that you
23    had with Officer Deal where he told you
24    that Mr. Stanbro had kicked him?
25         A.    I can't remember having a
```

Page 80

1                          E. TORRES

2      conversation with anybody else.  I don't

3      remember.

4            Q.    I am going to show you some

5      Exhibits.  Sergeant, do you see the

6      document marked Exhibit 27 titled employee

7      accident/injury report?

8            A.    Yes.

9            Q.    Did you fill out any portion of

10     this report or write anything on this

11     report?

12           A.    Yes.

13           Q.    What portion of the report is

14     in your handwriting?

15           A.    It says -- it's hard to read.

16     Supervisor, name on the bottom, and

17     statement of supervisor, 16, and 17, and

18     then my signature and the date.

19           Q.    Okay.  So 16, next to where the

20     words were printed "as reported to me."

21     You wrote that?

22           A.    Correct.

23           Q.    And then you wrote your name

24     underneath and signed it next to that; is

25     that correct?

Page 81

1                        E. TORRES

2        A.      Yes.

3        Q.      Anything else you wrote on that

4   report?

5        A.      No.

6        Q.      Now, going to item 10.

7        A.      Okay.

8        Q.      Do you see where it says

9   "employee remained on duty" and check off

10  of "yes?"

11       A.      Yes.

12       Q.      Did you check that off?

13       A.      No.

14       Q.      Next to that 11, where it says

15  "employee required medical attention" and

16  checked off "no." Do you see that?

17       A.      Yes.  I see that.

18       Q.      Did you check that off?

19       A.      No.

20       Q.      Exhibit 30 is a three-page

21  report.  Is this a use of force report that

22  you filled out, Sergeant?

23       A.      Yes.

24       Q.      Now, why did you fill out a use

25  of force report?

Page 82

1                    E. TORRES

2         A.    The incident was reported to

3    me.

4         Q.    Okay.  As a supervisor, were

5    you required to fill out this report?

6         A.    Yes.

7         Q.    Now, going to page one of the

8    report, where it says, "on the above date

9    and approximate time, it was reported to me

10   an inmate, Mr. Stanbro..." and then you go

11   on.  By whom was that reported to you?

12        A.    This with specifically -- these

13   are different, so it depends on whose it

14   was here.  This one is -- this is the

15   general summary of the incident, so when we

16   say "it was reported to me," it's the

17   summarizing of what both officers have

18   reported in writing.

19        Q.    This is what Deal and Palou

20   were reporting to you, correct?

21        A.    Correct.

22        Q.    Let's go to page two and the

23   typewritten portion where it says,

24   "describe in detail the actual fore used."

25   Do you see that section?

Page 99

1                    E.  TORRES
2    anyone ever tell you that Mr. Stanbro,
3    other than that incident where he stood up
4    and attempted to strike someone, that Mr.
5    Stanbro fell out of the dental chair, or
6    threw himself to the floor from the dental
7    chair, or rolled out of the dental chair
8    onto the ground?
9              MS. COLLINS:  Objection.  You
10        can answer.
11       A.    I don't recall that
12   specifically.
13       Q.    Do you recall it in a general
14   sense?
15       A.    Rolled out, fell out, no.
16       Q.    Okay.  Is this the first you
17   are hearing about that?
18             MS. COLLINS:  Objection.  You
19        can answer.
20       A.    Yes.
21       Q.    Okay.  Now, the mention of the
22   video in the revised memorandum, what video
23   were you talking about there?
24       A.    Video regarding of transport is
25   the actual handheld videocamera.  I could

1                    E. TORRES
2    have been more specific there.
3         Q.      That's okay.
4         A.      Yeah.  Handheld videocamera was
5    authorized by, honestly, to tell you, I
6    don't know who.  Maybe it was coming from
7    the higher-ups because there was a serious
8    use of force or a of use of force on the
9    outside, the inmate was combative, as
10   reported, and assaulted -- they require the
11   transport thereafter to be recorded and
12   transported with the escort of a
13   supervisor.
14        Q.      Now, when you say "the
15   transport," are you talking about the
16   transport from the location where the use
17   of force took place or some other
18   transport?
19        A.      This specifically is from the
20   transport of the facility of the RMU.
21        Q.      Okay.  So the transport
22   bringing Mr. Stanbro out of the RMU by the
23   medics to the hospital, correct?
24        A.      Correct.
25        Q.      And what is your understanding

1                          E.  TORRES

2      as  to  the  nature  of  that  video?   What

3      portion  was  videotaped?

4           A.      The  recording  should  start  when

5      they're  in  route  or  moving  with  the  inmate.

6      As  soon  as  they  start  to  move  with  the

7      inmate,  the  recorder  is  supposed  to  come

8      on.

9           Q.      When  you  say  "as  soon  as  they

10     start  to  move  with  the  inmate,"  do  you  mean

11     as  soon  as  EMS  takes  possession  of  the

12     inmate?

13          A.      As  they  start  to  move  with  the

14     inmate,  so  anywhere  that  he  is  moved  out  of

15     the  area,  I  don't  recall  if  they  started

16     recording  immediately  after  they  left  the

17     emergency  room  or  if  they  started  recording

18     when  they  got  outside  to  the  front  door.   I

19     don't  remember  what  point,  but  I  do

20     understand  that  the  recording  is  supposed

21     to  commence  once  the  intimate  is  in

22     transport.

23          Q.      Okay.   I  am  just  trying  to  nail

24     down  what  you  mean  by  "in  transport."   So

25     medics  did  come  inside  of  the  RMU,  correct?

Page 102

E. TORRES

1

2      A.      Yes.

3      Q.      And they took possession of Mr.

4 Stanbro inside of the RMU, correct?

5      A.      Yes.

6      Q.      They placed him on a gurney or

7 a stretcher in the RMU; is that correct?

8      A.      Yes.

9      Q.      And then they transported him

10 from inside of the RMU into their vehicle;

11 is that correct?

12     A.      Yes.

13     Q.      What is your understanding as

14 standard procedure as to when the videotape

15 is supposed to start?

16          MS. COLLINS:   Objection.   You

17      can answer.

18     A.      I understand -- it's as they

19 begin to move the inmate, as they begin the

20 transport as it becomes mobile, as they

21 start to move physically from area.

22     Q.      So are you saying as they begin

23 to move the intimate from floor up into the

24 stretcher or something else?

25     A.      Something else.   As they move

Page 103

1                           E.  TORRES

2      from  on  the  stretcher  mobiley  [sic]  moving

3      him  from  that  point  out  of  the  emergency

4      room  area,  from  that  point  on  the  recording

5      is  supposed  to  start.

6            Q.      So  once  Mr.  Stanbro  is  in  the

7      stretcher,  on  the  stretcher  inside  of  RMU

8      and  the  EMS  personnel  begin  to  transport

9      him  outside  of  the  RMU,  that  is  when  the

10     videotape  is  supposed  to  start,  correct?

11           A.      If  he  starts  to  move  right  out

12     of  the  emergency  room,  they  should  start

13     recording.

14           Q.      At  the  point  that  they  are

15     transporting  him,  they  are  actually  pushing

16     or  pulling  that  stretcher  and  he  is  in  the

17     stretcher,  is  that  the  point  that  the

18     videotape  is  supposed  to  start,  yes  or  no?

19                 MS.  COLLINS:   Objection.

20           A.      Yes.

21           Q.      And  did  you  see  anyone  do  a

22     handheld  videotape  of  Mr.  Stanbro  that  day?

23           A.      I  don't  --  I  remember  the

24     officers,  I  honestly  don't  remember  what

25     point,  at  what  point  they  started  to

1                          E.  TORRES

2      record.

3           Q.      But do you remember that at

4      some point they started to record?

5           A.      I honestly don't remember them

6      starting to record.   I do remember that it

7      was required.   I don't remember at what

8      point they started.

9           Q.      And as a matter of normal

10     procedure, when does the videotape end?

11     When do they stop videotaping?

12                MS. COLLINS:   Objection.   You

13         can answer.

14          A.      I'm not sure.

15          Q.      Well, let me ask you this, did

16     an officer or officers accompany Mr.

17     Stanbro from the RMU to Saint Luke's with

18     the EMS personnel?

19          A.      Yes.

20          Q.      That's standard procedure,

21     correct?

22          A.      Yes.

23          Q.      And would at least one officer

24     ride in the ambulance or the other EMS

25     vehicle with Mr. Stanbro?

Page 105

1                    E.  TORRES
2        A.      Yes.
3        Q.      And would the videotape
4    continue in route to the hospital?
5        A.      Yes.
6        Q.      Would it continue at any point
7    after the ambulance arrives at the
8    hospital?
9        A.      I'm not quite sure if they --
10   I'm trying to think.  I have never actually
11   transported to a hospital.  I have
12   transported to facilities, to correctional
13   facilities.  I've never transported to a
14   hospital, so I really don't know what they
15   did or when they stopped.
16       Q.      Okay.
17       A.      I really don't know.  I mean,
18   that is a good question for me to question.
19       Q.      On those occasions when you
20   have transported an inmate from a use of
21   force incident to another facility and it's
22   been videotaped, when does the videotape
23   typically end?  Is it when the inmate is
24   physically delivered into the new facility?
25       A.      Most occasions, yes.  Most

Page 106

1                    E. TORRES
2    times, sometimes, you are not even -- you
3    won't even go into the facility.  You drop
4    them off right outside of the gate, and
5    then they will take the inmate in.  You are
6    not going to record going into the
7    facility.  Most of the time, inmates that
8    are being recorded are in the special
9    housing unit, so everything is already on
10   camera.
11        Q.    That's fine.  Have you ever
12   seen the videotape that was taken of Mr.
13   Stanbro on that day?
14        A.    No.
15        Q.    Do you know if that videotape
16   still exists?
17        A.    I don't.
18        Q.    Do you know what the practice
19   and procedure was at Fishkill back in 2018
20   regarding the preservation of those types
21   of videotapes after use of force incident?
22        A.    It becomes part of the use of
23   force package.  It should have been
24   returned to watch commander's office and be
25   made a part of the whole incident.

```
1                    E. TORRES
2       Q.     And if there's an investigation
3   ongoing, the videotape is preserved at
4   least until the conclusion of the
5   investigation; is that correct?
6                MS. COLLINS:  Objection.
7       A.     Yes.  It should be available,
8   yes.
9                MR. SIVIN:  Okay.  Thank you.
10       I don't have any questions.
11                MS. COLLINS:  Does anyone else
12        want to inquire?
13                MR. HEINZE:  I have a couple of
14        questions.
15                MS. COLLINS:  Go ahead, Mark.
16   EXAMINATION BY
17   MR. HEINZE
18       Q.     My name is Mark Heinze.  I
19   represent Raymond Deal.  How are you?
20       A.     Good.  Hi.  How are you?
21       Q.     Same instructions you heard
22   before apply to my questions as well.  I
23   just want to clear up a couple of things,
24   so I will be jumping around a little bit.
25   Were you assigned as the supervisor for
```

```
 1                    E.  TORRES
 2    this use of force incident?
 3          A.      Yes.
 4          Q.      And maybe you said this, but
 5    who gave you that assignment?
 6          A.      I was the building sergeant, so
 7    it was reported to me, so the incident was
 8    reported to me by the officers.  I am the
 9    RMU sergeant, so the incident becomes my
10    report.
11          Q.      So that was just automatic
12    because you were the sergeant on duty at
13    the RMU?
14          A.      Correct.
15          Q.      Was this still your case?
16          MS. COLLINS:   Objection.  You
17       can answer.
18          Q.      Well, are you still the
19    supervisor on this use of force?
20          MS. COLLINS:   Objection.  You
21       can answer.
22          A.      Well, I am still here.  Being
23    in this deposition, I'm a part of it.  My
24    name is on that paperwork forever, yeah.
25          Q.      I was not trying to be cleaver.
```

1                       E. TORRES
2     I was just asking did somebody take it over
3     for you.   Maybe I should just ask you, did
4     somebody take it over for you?
5           A.      No.
6           Q.      Is any physical contact between
7     a correction officer and an inmate
8     considered a use of force?
9           A.      Is any physical -- no.
10          Q.      Let's say you are escorting an
11    intimate into court or something, and they
12    trip and fall, and you pick them up off the
13    ground; is that a use of force?
14          A.      No.
15          Q.      What about when they just had
16    an accident on their own, like in their
17    cell or out in the common areas or
18    whatever, and you helped them in some way;
19    is that a use of force?
20          A.      No, no.
21          Q.      Do you know if you are under
22    directive 4944, or just generally, is there
23    some mechanism to request that a C.O.
24    supplement any reports that they have
25    given?

Page 119

1                        E.  TORRES

2          Q.      Hi,  good  evening,  really.   My

3    name  is  Claudine  Weis.   I'm  an  attorney  for

4    Westchester  Medical  Center  and  Resident  Dr.

5    Full.   Do  you  recall  having  any

6    conversations  with  anyone  from  Westchester

7    Medical  Center  concerning  Mr.  Stanbro?

8          A.      No.

9          Q.      When  Mr.  Stanbro  was  in  the

10   emergency  room  in  the  medical  unit,  do  you

11   recall  him  yelling,  or  screaming,  or

12   calling  out?

13         A.      No.

14              MS.  WEIS:   I  have  no  other

15         questions.   Thank  you.

16              (Whereupon,  at  5:30  P.M.,  the

17         Examination  of  this  witness  was

18         concluded.)

19

20              °         °         °         °

21

22

23

24

25

Page 123

1                        E. TORRES

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK          )

                               :   SS.:

5    COUNTY OF ORANGE           )

6

7         I, VICTORIA CHUMAS, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 24th day of March 2021.

21

22

23

                    VICTORIA CHUMAS

24

25