Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------X
     CHAD STANBRO,
 4                                    PLAINTIFF,
 5
           -against-              Case No.:
 6                                19-CV-10857
 7
     WESTCHESTER COUNTY HEALTH CORPORATION,
 8   WESTCHESTER MEDICAL CENTER, FRANK WEBER,
     AND JOHN FULL,
 9
                                     DEFENDANTS.
10   ------------------------------------------X
     CHAD STANBRO,
11                                    PLAINTIFF,
12
           -against-              Case No.:
13                                19-CV-10857
14   C.O. NADYA PALOU, C.O. RAYMOND DEAL, C.O.
     KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
15   CORRECTION NURSE GARY PAGLIARO, AND
     CORRECTION SERGEANT ENRIQUE TORRES,
16
                                     DEFENDANTS.
17   ------------------------------------------X
18
                 DATE:   May 4, 2021
19               TIME:   11:00 A.M.
20
             DEPOSITION of the Defendant,
21   STEPHEN URBANSKI, taken by the respective
     parties, pursuant to an Order and to the
22   Federal Rules of Civil Procedure, held via
     videoconference, before Victoria Chumas, a
23   Notary Public of the State of New York.
24
25
```

Page 2

```
 1
 2     A P P E A R A N C E S:
 3
       SIVIN, MILLER & ROCHE LLP
 4       Attorneys for the Plaintiff
         CHAD STANBRO
 5       20 Vesey Street, #1400
         New York, New York 10007
 6       BY:  EDWARD SIVIN, ESQ.
         esivin@sivinandmiller.com
 7
 8
       WILSON BAVE CONBOY COZZA, P.C.
 9       ATTORNEYS FOR THE DEFENDANTS
         WESTCHESTER MEDICAL CENTER AND JOHN FULL
10       707 Westchester Avenue
         White Plains, New York 10604
11       BY:  CLAUDINE L. WEIS, ESQ.
         cweis@wbccc.com
12
13
       RAWLE & HENDERSON, LLP
14       Attorneys for the Defendant
         FRANK WEBER
15       14 Wall Street, 27th Floor
         New York, New York 10005
16       BY:  ROBERT A. FITCH, ESQ.
         rfitch@rawle.com
17
18
       NEW YORK STATE OFFICE OF THE ATTORNEY
19     GENERAL
         Attorneys for the Defendants
20       KRISTOPHER LEONARDO, C.O. RICHARD LANDRY,
         CORRECTION NURSE GARY PAGLIARO, AND
21       CORRECTION SERGEANT ENRIQUE TORRES
         28 Liberty Street, Floor 18
22       New York, New York 10005
         BY:  DEANNA L. COLLINS, ESQ.
23       deanna.collins@ag.ny.gov
24
25
```

**Page 3**

1
2

OFECK & HEINZE, LLP
3     Attorneys for the Defendant
      C.O. Raymond Deal
4     85 Main Street, Suite 204
      Hackensack, New Jersey 07601
5     BY:   MARK F. HEINZE, ESQ.
      markfheinze@gmail.com
6
7
8  Also present:
9  Glenn Miller
10 Andrew Weiss
11            *            *            *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1

2    F E D E R A L    S T I P U L A T I O N S

3

4

5    IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20   IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24            *      *      *      *

25

Page 5

S. URBANSKI

1                    S. URBANSKI
2    S T E V E N    U R B A N S K I, called as a
3    witness, having been first duly sworn by a
4    Notary Public of the State of New York, was
5    examined and testified as follows:
6    EXAMINATION BY
7    MR. SIVIN:
8                    (Whereupon, PDF Documents were
9            deemed marked as Plaintiff's Exhibit
10           37 & 38 for identification as of this
11           date by the Reporter.)
12       Q.     Please state your name for the
13    record.
14       A.     Steven Urbanski.
15       Q.     What is your address?
16       A.     18 Strack Drive, Beacon, New
17    York 12508.
18       Q.     Good morning, Deputy.  My name
19    is Edward Sivin, and I represent the
20    plaintiff, Chad Stanbro, in this lawsuit.
21    I am going to be asking you questions
22    relating to an incident that took place on
23    August 31st of 2018.  If for any reason you
24    do not understand a question, or a question
25    is not clear, or you can't hear it well

Page 6

S. URBANSKI

1
2  enough because we're doing this virtually,
3  do not answer the question.  Ask me to
4  repeat it or rephrase it, and I will do so.
5      A.      Absolutely.
6      Q.      Please also make sure that all
7  of your answers are verbal because the
8  stenographer can't take down hand gestures
9  or head gestures.  And also, please wait
10 until I completely finish my question
11 before you begin your answer even if you
12 know what I am about to ask because the
13 stenographer cannot take down both of us
14 talking at the same time, okay?
15     A.      Okay.
16     Q.      Also from time to time you may
17 hear one or more of the lawyers in response
18 to one of my questions say the word
19 "objection."  Now, that does not mean that
20 you should not answer the question.  You
21 should continue to answer the question
22 unless the lawyer tells you for whatever
23 reason not to answer the question.  I just
24 don't want you to be distracted if you hear
25 someone say "objection."  You can continue

1                    S. URBANSKI

2  to answer the question, okay?

3        A.     Okay.

4        Q.     All right.  So are you

5  currently the deputy superintendent of

6  security at Fishkill Correctional Facility?

7        A.     Yes.

8        Q.     And how long have you held that

9  position?

10       A.     Approximately five and a half

11 years.

12       Q.     When did you graduate the

13 academy?

14       A.     October of '89.

15       Q.     I would like you to take me

16 through generally what your assignments

17 were --

18       A.     It would be November of '89,

19 I'm sorry.

20       Q.     Okay.  And I would like you to

21 take me generally through your assignments

22 from when you graduated the academy to the

23 present.

24            MS. COLLINS:  I'm sorry, Ed.

25       Is there a way to make your screen

1                    S. URBANSKI

2        not so shaky?

3              MR. SIVIN:   Yes.   I can stop

4        shaking it.

5        A.    I was a correction officer for

6    10 years.  My predominant work facility was

7    Mid-Orange.  I was promoted to sergeant at

8    Lincoln.  From Lincoln, I transferred to

9    Otisville Correctional Facility as a

10   sergeant.  I remained there until I made

11   lieutenant at Taconic Correctional

12   Facility, at which time I eventually

13   transferred to Mid-Orange as lieutenant.

14   From Mid-Orange, I was promoted to captain

15   at Bedford Hills.  From there, I

16   transferred to Sullivan Correctional

17   Facility as captain, where I remained until

18   I was promoted to deputy superintendent of

19   security at Taconic Correctional Facility,

20   where I remained for approximately a year

21   and then was promoted to deputy

22   superintendent at Fishkill.

23        Q.    Did you ever work at Greene

24   Correction Facility?

25        A.    No.

Page 9

1                    S. URBANSKI

2        Q.    Can you tell me generally what

3    the duties were of the deputy

4    superintendent at Fishkill back in August

5    of 2018?

6        A.    I oversee all aspects of the

7    security functions at the facility.

8        Q.    Did there come a time on

9    August 31, 2018 when you learned that there

10   was some type of a use of force incident

11   involving a Fishkill prisoner named Chad

12   Stanbro?

13       A.    Yes.

14       Q.    And how did you first learn of

15   this incident?

16       A.    I don't recall exactly how I

17   first learned about it.

18       Q.    Were you working on August 31,

19   2018?

20       A.    Yes, I was.

21       Q.    And you were working inside of

22   the facility?

23       A.    Yes.

24       Q.    Did you learn of the incident

25   on that day, August 31, 2018?

1                    S. URBANSKI

2        A.      Yes, I did.

3        Q.      Okay.  And generally, how did

4    you find out?  Did someone call you?  Did

5    you see something?

6        A.      I got notified, but who did the

7    notification, I don't recall.

8        Q.      When you say you "got

9    notified," did you get notified by

10   telephone, in person, or something else?

11       A.      Again, I don't recall.  The

12   watch commander's office is just down the

13   hall.  I don't remember if they called me,

14   if they came down, if I got a phone call

15   from the outside hospital.  I became aware

16   of the incident shortly after it happened.

17       Q.      What was the first thing you

18   became aware of though?  What was the first

19   bit of information you got?

20       A.      We had an inmate, I believe it

21   was at Westchester Medical Center, for I

22   believe a dental procedure.  During a

23   dental procedure, force became necessary.

24   Two staff members from our facility used

25   force on the inmate.  As a result of the

Page 11

```
 1                  S. URBANSKI
 2   incident, the inmate was being brought back
 3   to the facility.
 4        Q.     So at the point you became
 5   aware of this incident, Mr. Stanbro was
 6   still at Westchester Medical Center; is
 7   that correct?
 8             MS. COLLINS:   Objection.
 9        A.     Again, I am not exactly sure
10   where we were when I got notified.  He
11   either was there or on his way back to the
12   facility.  I knew about it prior to him
13   returning to the facility.
14        Q.     And at that point, did you know
15   any more details about the incident or the
16   force that was used against him?
17        A.     Not at that time.  I had just
18   basic information.
19        Q.     What, if anything, did you do
20   in response to receiving this information
21   that there had been a use of force incident
22   involving Mr. Stanbro at Westchester
23   Medical Center?
24        A.     We would normally in these
25   cases when the staff returned to the
```

Page 12

S. URBANSKI

1

2  facility, they would have a use of force

3  report to write where we would get the

4  detailed information as to what took place.

5      Q.    Okay.  I am going to ask you to

6  try to distinguish between what is normal

7  procedure and what you actually recall

8  happening on that day.  So let me ask you

9  this, after you found out in a general

10  sense, that there had been use of force

11  involving Mr. Stanbro at the Westchester

12  Medical Center, what is the next thing, if

13  anything, that you did that day in

14  connection with this incident?

15      A.    The inmate was coming back to

16  the facility and we needed to make

17  arrangements to speak with staff that were

18  involved to find out what happened.

19      Q.    And did you make these

20  arrangements or participate in these

21  arrangements?

22      A.    Well, these arrangements were

23  already taking place.  The inmate was

24  already on his way back to the facility,

25  and when the staff got there, we would have

1                    S. URBANSKI

2     had them relieved, which is normal

3     procedure, to start filling out the reports

4     and get information.

5          Q.    Okay.  Again, you are using

6     words like "we would have" and "this is

7     normal procedure."  Again, I understand

8     this was a while ago.  If you don't

9     remember certain things, that's fine.  But

10    initially what I want to do is just limit

11    your testimony to what you actually recall,

12    so --

13         A.    The officers --

14         Q.    Go ahead.

15         A.    The officers were in the van

16    driving back to the facility, so we had to

17    wait for them to get back to the facility

18    to get additional information.  Once they

19    would return to the facility, we would have

20    gotten them relieved and then started to

21    get the information put together.

22         Q.    Did you see Mr. Stanbro at all

23    on August 31, 2018?

24         A.    I don't recall if I went over

25    to our regional medical unit or not to

Page 14

1                    S. URBANSKI
2  actually see Mr. Stanbro.
3        Q.    And when you mentioned
4  "regional medical unit," was that because
5  it was your understanding that Mr. Stanbro
6  was being brought from Westchester Medical
7  Center to the RMU?
8        A.    Yes.  When --
9        Q.    I'm sorry?
10        A.    When inmates come back from the
11  outside hospital they go to the RMU prior
12  to being returned to population.
13        Q.    Did you go to the RMU at any
14  point on August 31, 2018?
15        A.    I don't remember.
16        Q.    Do you have a recollection of
17  seeing Mr. Stanbro at any point on
18  August 31, 2018?
19        A.    I don't recall.
20        Q.    Do you have a recollection of
21  ever seeing Mr. Stanbro before August 31,
22  2018?
23        A.    I don't recall.
24        Q.    How about after August 31,
25  2018?

1                    S. URBANSKI

2        A.    I don't remember if Mr. Stanbro

3   returned to Fishkill after that incident or

4   not.

5        Q.    Did you speak to any of the

6   officers, Fishkill officers, who were

7   involved in the use of force with Mr.

8   Stanbro?

9        A.    Yes.

10              MR. SIVIN:   Let's give Claudine

11         a call.

12              (Whereupon, a short recess was

13         taken.)

14        Q.    Deputy, which officers did you

15   speak with that were involved in the use of

16   force with Mr. Stanbro?

17        A.    Deal, Officer Deal, and Officer

18   Palou.

19        Q.    When did you first speak with

20   Officer Deal about this incident?

21        A.    It would be the date of the

22   incident.

23        Q.    Was it upon his return to

24   Fishkill, or was it prior to his return to

25   Fishkill?

1                  S. URBANSKI

2        A.     Upon his return to Fishkill.

3        Q.     How about Officer Palou?  When

4    did you first speak with her about the

5    incident?

6        A.     Upon her return to Fishkill.

7        Q.     Did you speak to the two of

8    them at the same time?

9        A.     I don't recall.

10        Q.     Where did you have your first

11    conversation with Officer Deal?

12        A.     I believe it was in the admin

13    building at the facility.

14        Q.     The administration building?

15        A.     Yes.

16        Q.     And how about with Officer

17    Palou?  When did you have your first

18    conversation with her?

19        A.     Palou would be the same.

20        Q.     Do you have any idea as to how

21    soon after they arrived at the facility you

22    had your conversations with them?

23        A.     I don't recall, but it wouldn't

24    have been a substantial period of time.

25        Q.     What was the purpose of that

Page 17

```
 1                    S. URBANSKI
 2   conversation?
 3        A.    Well, we had an incident that
 4   happened at an outside hospital.  By that
 5   point, the facility received additional
 6   information from Westchester Hospital, and
 7   we were assessing, trying to assess what
 8   actually took place.
 9        Q.    What additional information had
10   you received from Westchester Hospital?
11        A.    That there was additional staff
12   involved in the incident than was initially
13   reported to me.
14        Q.    Who provided you with that
15   additional information that there was more
16   staff involved?
17        A.    The information came from
18   Westchester Medical Center.
19        Q.    From who at --
20        A.    I don't remember specifically
21   who.
22        Q.    Do you know if it was from one
23   of the healthcare providers?
24        A.    Again, I don't remember
25   specifically who.
```

Page 18

1              S. URBANSKI

2        Q.    Do you know Dr. Weber?

3        A.    Not that I recollect.

4        Q.    Now, do you interview all

5   correction officers who are involved in a

6   use of force incident with a prisoner?

7        A.    No, not always.

8        Q.    Okay.  Why did you interview

9   Deal and Palou on this occasion?

10        A.    Because we received information

11   from Westchester that there was issues with

12   the use of force, and we were looking to

13   gather information.

14        Q.    Well, what additional

15   information did you receive that prompted

16   you to interview Palou and Deal?

17        A.    Again, the initial report I

18   received, it was that an inmate needed to

19   be restrained while at the hospital for I

20   believe it was a dental procedure, and two

21   staff members assisted in restraining.  The

22   hospital called complaining and said that

23   there was, in fact, four staff members

24   involved, and at that point, we needed to

25   interview the staff members to get

Page 19

S. URBANSKI

1

2  additional information.

3      Q.    And when you said "the hospital

4  called complaining," what do you mean by

5  "complaining?"

6      A.    They were complaining about the

7  use of force.  They did not feel it was

8  appropriate.

9      Q.    And this was a discussion that

10  was had between and someone at the

11  hospital?

12      A.    No.  I don't remember if it was

13  a discussion or if it was an email.

14      Q.    And be as specific as you can

15  as to what the nature of the complaint was

16  at the hospital regarding the use of force

17  by the Fishkill correction officers.

18      A.    It was just that there was --

19  that they felt that the force was

20  unnecessary.  The specifics beyond that, I

21  don't remember specifically.

22      Q.    Did anyone tell you that any

23  force was applied to Mr. Stanbro's neck?

24      A.    I don't recall the specifics as

25  far as that goes with the conversation.

Page 20

S. URBANSKI

1
2    Q.    Okay.  Let me just press on
3 that a little further because you hesitated
4 for about 10 seconds before answering that.
5 Do you have some recollection of someone at
6 Westchester Medical Center mentioning
7 anything to you about any force used
8 against Mr. Stanbro's neck?
9      MS. COLLINS:  I'm going to make
10    an objection, but you can answer.
11    A.   Again, I don't recollect.  At
12 one time during this incident it became
13 obvious that the inmate had suffered a neck
14 injury, and my pause was because I was
15 trying to remember where exactly I was in
16 the situation.  But I really, truly don't
17 recollect if Westchester said that somebody
18 had used force specifically on his neck or
19 not.
20    Q.   Do you recall hearing from any
21 source that force had been used against Mr.
22 Stanbro's neck on August 31, 2018?
23    A.   I am just trying to remember
24 the specific use of force reports.  I
25 believe the initial report was -- and

1                      S. URBANSKI

2    again, I know it's that he was -- during a

3    medical procedure he had to be restrained.

4    I just don't recall specifically if the

5    force used to restrain him was around his

6    neck area or not.

7        Q.    But did you hear from any

8    source that any force was used against Mr.

9    Stanbro's neck?

10            MS. COLLINS:   Objection.   You

11        can answer.

12       A.    Again, I don't specifically

13   recall.   I know that he suffered a neck

14   injury, so I don't recall whether a staff

15   member specifically said that they used

16   force on his neck or not.

17       Q.    Well, was it your understanding

18   in any event that the neck injury was

19   sustained as a result of the use of force

20   by correction officers?

21       A.    The neck injury was a result

22   from a use of force by correction officers

23   from what I'm told, but I am not medical

24   staff.

25       Q.    Now, when you received this

Page 22

S. URBANSKI

1
2  complaint from someone at Westchester about
3  what they thought was unnecessary force
4  used against Mr. Stanbro, did you inquire
5  further to ask for specifics?  Like what
6  was done?  What do you think was
7  unnecessary?  What type of force was used?
8        A.     It began a further
9  investigation into what took place.  I
10 believe that day we contacted the Office of
11 Special Investigations for the department
12 because the injuries, once they became
13 obvious, and then the complaint from
14 Westchester Medical Center, we would have
15 called the Office of Special Investigations
16 and forwarded the issue to them because
17 they are our investigating body for our
18 department.
19       Q.     Now, was it after you received
20 this complaint from Westchester Medical
21 Center that you decided to interview
22 Officers Deal and Palou?
23       A.     They were on the way back from
24 the facility and the initial information I
25 had was a little vague.  And then, by the

Page 23

1                    S. URBANSKI

2    time he was back at the facility, we were

3    aware that there were at least what

4    appeared to be injuries, so the decision to

5    interview them was to gain additional

6    information and find out what was going on

7    because at that point, we knew that

8    Westchester had made a phone call and we

9    were looking to get the information

10   together as to what took place.

11        Q.    Okay.  Just so I'm clear, at

12   the time you interviewed Deal and Palou you

13   already received this complaint from

14   Westchester Medical Center, correct?

15        A.    I believe so, yes.

16        Q.    And then was one of your

17   purposes of interviewing Deal and Palou to

18   determine the nature of the force that was

19   used against Mr. Stanbro?

20        A.    Yes.

21        Q.    Let's start with Officer Palou.

22   What did Officer Palou tell you with

23   respect to the force that was used against

24   Mr. Stanbro?

25        A.    I don't remember the specifics

Page 24

S. URBANSKI

2 of the conversation.  It was quite a few

3 years ago.

4      Q.    How about in a general sense?

5      A.    In general, they told me the

6 inmate was in for a dental procedure, that

7 during the procedure he went out or had to

8 be restrained because the dentist he went

9 to interact with, and then when they

10 restrained him, he was injured and then

11 they had put him in a wheelchair, put him

12 in a van, and brought him back to the

13 facility.

14      Q.    Did you ask Officer Palou what

15 type of actions or maneuvers were used to

16 restrain Mr. Stanbro?

17      A.    That was reported in her 2104A,

18 so at that time, we went over the basics of

19 what took place.  They would have been sat

20 down and started to fill out the reports.

21      Q.    Well, here is what I am trying

22 to get at.  You received a complaint from

23 Westchester that, in their opinion,

24 excessive force had been --

25          MS. COLLINS: Objection.

1                S. URBANSKI

2        Q.    Or unnecessary force had been

3   used.  What, if anything, did you discuss

4   with Officer Palou to determine whether in

5   your view unnecessary force was used?

6        A.    I asked her what took place.

7   She gave me an overview of what took place

8   that day, and then they sat down and put it

9   in writing.

10        Q.    And what did she tell you with

11   respect to the nature of the force that was

12   used against Mr. Stanbro?

13        A.    That they had to use force to

14   restrain the inmate because he was acting

15   up during the dental procedure.

16        Q.    What type of force did she say

17   was used against him?

18        A.    Again, I don't remember

19   specifics about the conversation, but her

20   2104A that was submitted that day would

21   have those details in it.

22        Q.    Did you ask her the details of

23   the force that was used against Mr.

24   Stanbro?

25        A.    I may have, but again, I don't

Page 26

1                        S. URBANSKI

2      remember the specifics of that

3      conversation.  It was quite a while ago.

4           Q.    Did Officer Palou tell you that

5      she observed an officer apply force to Mr.

6      Stanbro's neck?

7                 MS. COLLINS:  Objection.

8           A.    Again, I don't remember the

9      specifics of the conversation.

10          Q.    But I want to focus in on that

11     particular question.  Did Officer Palou

12     tell you that any officer applied force to

13     Mr. Stanbro's neck?

14                MS. COLLINS:  I'm going to

15          object to this.  This has been asked

16          and answered numerous times.  You can

17          answer.

18          A.    Again, I don't remember the

19     specifics of the conversation.  She may

20     have, but the information that she provided

21     to me that day would have been in the 2104A

22     she submitted that day.

23          Q.    And when you say "2104A," what

24     is that?

25          A.    That is a use of force report

Page 27

S. URBANSKI

1
2  that staff submits.
3       Q.    How about your conversation
4  with Officer Deal?  What did he tell you
5  about the nature of force that was used
6  against Mr. Stanbro?
7       A.    My recollection of the
8  conversation with both staff members is
9  basically the same.  They reported during
10  the dental procedure that the inmate
11  started acting out, and they had to use
12  force to restrain the inmate.
13       Q.    Did Officer Deal tell you
14  whether any force was used against Mr.
15  Stanbro's neck?
16       A.    Again, I don't remember the
17  specifics of the conversation that day.
18       Q.    So you don't remember that,
19  correct?
20            MS. COLLINS:  Objection.  You
21       can answer.
22       A.    Not the specifics.  Again, when
23  they came back, I spoke to them briefly to
24  get a better overview of what took place
25  that day.  Then they would be sat down to

Page 28

S. URBANSKI

1

2  fill out the 2104A, and the information

3  that they provide in the 2104A is the

4  specific force that they reported using.

5      Q.    Now, when you first spoke with

6  Officers Deal and Palou, did they tell you

7  that any officers other than themselves

8  were involved in the use of force?

9      A.    I do not believe initially they

10 reported that.

11     Q.    So after you had this initial

12 conversation with them in the

13 administration building, they filled out

14 their use of force reports, correct?

15     A.    Yes.

16     Q.    Were you with them when they

17 filled out their use of force reports?

18     A.    My office is outside of the

19 area that's normally done in, so I would be

20 in the area, but specifically sitting with

21 them, no.

22     Q.    So where were they sitting when

23 they filled out these use of force reports?

24     A.    There is a conference room

25 outside of my office that is normally used

Page 29

1                    S. URBANSKI

2    for that.   And I believe on the day in

3    question that is where they filled out the

4    reports.

5         Q.    After they filled out those

6    reports, did you have any further

7    conversation with either of them, with Deal

8    or Palou?

9         A.    I don't recall.

10        Q.    Well, do you recall ever having

11   any conversations with Officer Deal or

12   Palou other than that initial conversation

13   that you had with them on August 31, 2018

14   in the administration building?

15             MS. COLLINS:   Objection, but

16        you can answer.

17        A.    I don't recall.  I may have,

18   absolutely, but I don't recall.

19        Q.    Now, earlier you said that the

20   complaint from Westchester you didn't know

21   if it came via phone conversation, or

22   email, or something else; is that correct?

23        A.    Correct.

24        Q.    Have you checked through any

25   emails to see if there is any communication

Page 30

```
 1              S. URBANSKI
 2   that you had or that Fishkill had with
 3   Westchester Medical Center about this
 4   incident?
 5       A.    I have not.  There was some
 6   email communication with the hospital
 7   afterwards that he was receiving treatment
 8   at.  I don't remember if that was
 9   Westchester or not, but as far as anybody
10   requesting that, I don't remember a
11   specific email like that, no.
12       Q.    Other than that initial
13   communication between Fishkill and
14   Westchester where Westchester made the
15   complaint, were there any further
16   communications between Westchester Medical
17   Center and Fishkill on August 31, 2018
18   regarding this incident?
19           MS. COLLINS:  Objection.  You
20       can answer.
21       A.    At this point, the facility
22   recognized there appeared to be an issue.
23   And again, we contacted the Office of
24   Special Investigations.  They pretty much
25   took over that investigation at that point,
```

1              S. URBANSKI

2    so specific conversations with the hospital

3    I don't recall, but I do believe they would

4    have gone through OSI.

5         Q.    Other than your initial

6    conversation with officers Deal and Palou,

7    did you speak with anyone else regarding

8    the incident involving Mr. Stanbro at

9    Westchester Medical Center?

10        A.    I'm sure I did.

11        Q.    Well, tell me who you recall

12   speaking to about this.

13        A.    I'm sure I talked to the

14   superintendent in regards to it and my

15   captains.

16        Q.    Did you speak to anyone who

17   witnessed any portion of the incident

18   involving Mr. Stanbro?

19        A.    Other than Palou and Deal?

20        Q.    Yes.

21        A.    I don't believe so.

22        Q.    Did you ever speak with Nurse

23   Gary Pagliaro about the incident?

24        A.    I may have, but I don't recall.

25        Q.    How about Sergeant Enrique

Page 32

1              S. URBANSKI

2   Torres?

3        A.    I believe Sergeant Torres

4   responded to the situation, so the

5   likelihood is I spoke to him.

6        Q.    Do you have any recollection of

7   any conversation with Sergeant Torres?

8        A.    Not specifically, no.

9        Q.    How about in a general sense?

10       A.    Like I said, I'm sure that

11  since he was in the area and responding, I

12  spoke to him, but specifically what the

13  conversations were about, I don't recall

14  the specifics.

15       Q.    Do you have any recollection of

16  any of the conversations you've had with

17  any other staff at Fishkill or staff at

18  Westchester Medical Center who observed Mr.

19  Stanbro on August 31, 2018?

20       A.    No.

21       Q.    Did there come a point when you

22  learned that additional officers besides

23  Palou and Deal had been involved in the use

24  of force?

25       A.    Yes.

Page 33

1                    S. URBANSKI

2        Q.      When for the first time did you

3   learn this?

4        A.      I don't specifically recall

5   whether it was the date of the incident or

6   the day after, but it was shortly after the

7   incident took place.

8        Q.      And how did you learn of this?

9        A.      I believe initially it was part

10  of the report I received from Westchester.

11       Q.      When you say "the report

12  received from Westchester," what

13  specifically are you referring to?

14       A.      Well, they contacted the

15  facility in regards to the incident, and I

16  believe that through their report, we

17  determined that there were more staff

18  members involved than just the two Fishkill

19  officers.

20       Q.      When you refer to this report

21  from Westchester, are you referring to the

22  initial communication where they complained

23  about what they felt was unnecessary force,

24  or are you referring to some additional

25  communication?

Page 34

1               S. URBANSKI

2          A.    I believe that took place in

3     the initial communication.

4          Q.    So by the time that you

5     interviewed Palou and Deal you already were

6     privy to this complaint by Westchester

7     wherein they indicated that there were

8     additional officers involved, correct?

9          A.    I believe so, yes.

10         Q.    And did you ask Deal and Palou

11    were there any other officers involved?

12         A.    Initially, no.  They have to

13    fill out a 2104A, which is a staff use of

14    force report, so before we start

15    questioning them in regards to things like

16    this, when the initial report is received,

17    we have them put down what they report in

18    writing.  Now, I believe that the hospital

19    phone call came in ahead of that, but for

20    me to start questioning them on that would

21    give them the ability to alter their

22    report, and would be inappropriate.  We

23    normally have them report their use of

24    force first.

25         Q.    Okay.  Just so I'm clear, when

1                     S. URBANSKI

2    you spoke to Palou and Deal, you knew about

3    the complaint from Westchester that

4    included an allegation that there were

5    additional officers involved, but you did

6    not call this to the attention of Officers

7    Palou or Deal, correct?

8         A.     To the best of my recollection

9    with the timeframes, yes.  And no, I would

10   not have initially asked them about that.

11   It would have came up later.

12        Q.     Okay.  In any event, in their

13   use of force reports, Palou and Deal

14   omitted any reference to any other officers

15   involved, correct?

16        A.     I believe their initial reports

17   omitted it, yes.

18        Q.     And did you ever confront them

19   about that subsequently?

20        A.     At that point, and again, we

21   recognize that there were issues with the

22   incident and we reported the incident to

23   the Office of Special Investigations.

24   Again, they are the investigating body for

25   the Department of Corrections, and in a

1                          S. URBANSKI

2    case like this, this would normally take

3    over such investigation.

4           Q.     Okay, but by virtue of the fact

5    that you referred it to OSI, are you saying

6    that you did not have any subsequent direct

7    conversations with Palou and Deal; is that

8    correct?

9           A.     You were a little broken up.

10   Can you repeat the question?

11          Q.     Are you saying that by virtue

12   of the fact that the matter was referred to

13   OSI that you did not have any further

14   conversations with Palou and Deal about

15   this incident; is that correct?

16          A.     Again, it's two and a half

17   years ago, but no.  I don't recall after

18   the initial talk that we had to ascertain

19   facts and then the reporting of the

20   incident.  We would have called OSI prior

21   to going any further.

22          Q.     Now, I want to ask you some

23   questions about general procedure.  Back in

24   2018, in August of 2018, when officers were

25   involved in a use of force with a prisoner,

Page 37

1                    S. URBANSKI

2      what was the procedure in effect as to

3      whether those officers would remain with

4      that prisoner after the use of force was

5      completed?

6           A.    Well, within the facility, if

7      we have the ability to relieve them, they

8      would be relieved and staff will take over

9      the custody of the inmate.

10          Q.    How about if the use of force

11     took place outside of the facility?

12          A.    Outside of the facility, we do

13     not have the ability necessarily to relieve

14     them, and the initial report was that the

15     inmate acted out on this incident, and we

16     were looking to secure the inmate and

17     staff.  And the way we do that would be to

18     bring them back to the facility.

19          Q.    Just as a matter of

20     clarification though, why would officers

21     not be sent to Westchester to relieve the

22     officers who were involved in the use of

23     force rather than have those same officers

24     transport the prisoner back to Fishkill?

25          A.    The ability -- so, we are

```
 1                  S. URBANSKI
 2    talking a timeframe of relieving staff,
 3    getting staff in a van, sending them down
 4    to Westchester and then relieved and
 5    brought back up, which puts the inmate out
 6    in the community for an additional length
 7    of time.   The initial report in this
 8    incident was that force was used to
 9    restrain the inmate and secure him, so
10    bringing the inmate back was the avenue
11    that we decided to go.
12          Q.    Do you know Tracey DeCosta?
13          A.    She is my watch commander at
14    the facility, a lieutenant.
15          Q.    So was she the watch commander
16    on August 31, 2018?
17          A.    Off the top of my head, I don't
18    know.
19          Q.    I want you to assume there has
20    been testimony that she was the watch
21    commander that day.   Can you tell me what
22    her job duties as watch commander would
23    have been that day?
24          A.    She runs the particular shift
25    in the jail.   She is normally the tour two
```

                        S. URBANSKI

1

2    watch commander, so she runs the specifics

3    of the shift.

4        Q.    What does that mean, to run

5    "the specifics of the shift?"

6        A.    She will take use of force

7    reports, UI reports, if staff are needed

8    for escorts or anything else, she will give

9    direction to the normal day in and day out

10   running of the facility.

11       Q.    And at that point, you said her

12   rank was lieutenant, correct?

13       A.    I believe it was.

14       Q.    Do you know what her current

15   rank is?

16       A.    It's lieutenant.

17       Q.    Did you speak with Lieutenant

18   DeCosta on August 31, 2018 about this

19   incident?

20       A.    I'm sure I did.

21       Q.    Okay.  What conversations did

22   you have with her on August 31, 2018?

23       A.    Again, it's two and a half

24   years ago.  I really don't recall specifics

25   of the conversation, but with an incident

1                           S.  URBANSKI
2    like this, I would absolutely have
3    communication with the watch commander.
4         Q.     Do you recall anything that was
5    said between you and Lieutenant DeCosta on
6    August 31, 2018 regarding the Stanbro
7    incident?
8         A.     Not specifics.  Again, because
9    of her position, if she was the watch
10   commander at the end of the day we would
11   definitely have had conversations.  But as
12   far as specific conversations, it's been so
13   long, I do not recall them.
14        Q.     When you first received this
15   communication from Westchester Medical
16   Center regarding this incident, were you
17   told that Mr. Stanbro was injured?
18        A.     You know, I don't know.  I
19   don't remember what the initial report was.
20   I know that they felt that the use of force
21   was unnecessary, but I don't recall if they
22   reported injuries or not.
23        Q.     Now as deputy superintendent of
24   security, did you ever take it upon
25   yourself to make determination as to

Page 41

1                    S. URBANSKI
2  whether the use of force against Mr.
3  Stanbro on August 31, 2018 was appropriate?
4       A.    I wasn't present for the use of
5  force.  I see the paperwork.  If the inmate
6  in fact acted out in the outside hospital
7  and staff had to use force to restrain him,
8  that would be appropriate.  I didn't see
9  exactly how the inmate acted out, and I was
10  not there to see the amount of force the
11  staff used, so your question is one I don't
12  feel I can answer.
13       Q.    Okay.  Well, putting aside
14  whether use of force was appropriate, did
15  you ever come to a determination as to
16  whether the use of force was excessive?
17       A.    Again, you're asking me a
18  question I can't answer.  The initial
19  reports that I got, as I recall, did not
20  have additional staff involved in the
21  incident.  So my issue with the incident
22  and why we turned it over to OSI for
23  additional investigation was the
24  information we originally received didn't
25  coincide with the information we got from

Page 42

1                    S. URBANSKI

2      the hospital, and at that point, we turned

3      it over to OSI, which would be our normal

4      chain for procedures.

5           Q.     But you have since learned

6      additional information about this incident,

7      correct?

8           A.     I have learned information.

9      For me to gauge the accuracy of it, I have

10     not read a final report from OSI or seen a

11     final report from OSI, so I would be

12     speculating on the authenticity of the

13     information I have.  Is that a fair way to

14     describe it?

15          Q.     Well, let me ask it this way.

16     As deputy superintendent of security of

17     Fishkill Correctional Facility, can you

18     tell me one way or the other whether you

19     have made a determination as to whether the

20     force that was used against Mr. Stanbro on

21     August 31, 2018 was excessive?

22               MS. COLLINS:  Objection.  You

23          can answer.

24          A.     I already told you that.  I

25     would have had to have been present to see

Page 43

S. URBANSKI

1

2  that.  For me to say anything else would be

3  me speculating.  There was problems with

4  the report, and we turned it in because of

5  that.  Specifically, the amount of staff

6  that was used or that were present, but the

7  force used, I don't know exactly how far

8  the inmate acted out, and I would be

9  speculating on that.

10      Q.    So just so I'm clear, you do

11  not have an opinion one way or the other as

12  to whether the force that was used on Mr.

13  Stanbro was excessive; is that correct?

14          MS. COLLINS:  Objection.  You

15      can answer.

16      A.    It would be speculation on my

17  part, and I try not to do that.

18      Q.    Okay.  Now, once Mr. Stanbro

19  was brought back from Westchester to the

20  RMU, did the procedure require that Officer

21  Deal and Palou who were involved in the use

22  of force immediately be relieved and taken

23  out of the presence of Mr. Stanbro?

24      A.    They would be seen by medical,

25  and the RMU building is medical, so it's

1                    S. URBANSKI

2    possible that they remained the in area to

3    be seen by medical.   Any officer that's

4    involved in a use of force is observed by

5    medical staff.   So it's possible they

6    remained in the area for a while to get

7    that accomplished.

8         Q.    But at that point, procedure

9    requires that they no longer have custody

10   of Mr. Stanbro, correct?

11              MS. COLLINS:   I am going to

12         object to the line of questioning as

13         outside of the scope of the

14         deposition subpoena, but you can

15         answer.

16        Q.    Go ahead.

17        A.    Can you repeat the question one

18   more time for me?

19        Q.    So once officers are involved

20   in a use of force, was it the procedure at

21   Fishkill that those officers as soon as

22   possible would no longer have custody of

23   the prisoner?

24        A.    We would make an effort to

25   relieve them, yes.

Page 45

S. URBANSKI

1

2    Q.     Okay.   So upon Palou and Deal's

3    arrival back in Fishkill with Mr. Stanbro,

4    the procedure would be to have them

5    relieved by other officers, correct?

6    A.     That would be normal procedure,

7    yes.

8    Q.     Okay.   And when a prisoner is

9    involved in a use of force incident, is the

10   procedure then to take him either to the

11   SHU or to the medical facility?

12   A.     Yes.   If an inmate is involved

13   in a use of force incident, they are seen

14   by medical.

15   Q.     And would they be escorted to

16   medical by escort officers at that point?

17   A.     Yes.   Officers would escort him

18   to medical, and our SHU has medical in it

19   too, so if it's determined they are going

20   to SHU, we could bring them straight to SHU

21   and have medical see them there also.

22   Q.     And in those circumstances

23   where an inmate is involved in a use of

24   force incident and is escorted to medical,

25   are those escorts typically videotaped?

Page 46

1                    S. URBANSKI
2        A.    Not always.  They --
3        Q.    Okay.  Under what -- go ahead.
4        A.    Go ahead.
5        Q.    Under what circumstances are
6    they videotaped?
7        A.    Back in 2018, Fishkill did not
8    have body-worn cameras, so on a pre-planned
9    use of force the facility would send out a
10   handheld camera, and we would try to
11   videotape such an incident, but if the use
12   of force incident wasn't pre-planned, then
13   the escort could be done without the
14   camera.
15       Q.    But the escort could be done
16   with handheld cameras as well, correct?
17       A.    Excuse me, I didn't hear your
18   question.
19       Q.    But the escort could be done
20   with handheld cameras as well, correct?
21       A.    If it was a pre-planned use of
22   force, a camera would be present.
23       Q.    Well, would a camera or could a
24   camera ever be present other than in
25   pre-planned uses of force?

Page 47

```
 1                    S. URBANSKI
 2        A.        In 2018 when this took place,
 3    the camera would be in the facility for a
 4    pre-planned use of force, a videocamera.
 5    If we have a use of force in an area, we
 6    are not going to hold an inmate there and
 7    not secure him or bring him to medical
 8    attention due to waiting for a camera, so
 9    the escort would be done immediately.
10        Q.        Now, if someone wanted to
11    escort -- I'm sorry.  If someone wanted to
12    videotape Mr. Stanbro being escorted from
13    the van into the RMU back in August of
14    2018, where would one get the handheld
15    camera to do that?
16              MS. COLLINS:  Objection to the
17         question, but you can answer.
18        A.     The watch commander's office
19    would have access to handheld video
20    cameras.
21        Q.     Where was the watch commander's
22    office in relation to the RMU?
23        A.     It's in the administration
24    building.
25        Q.     And how far is the
```

Page 48

S. URBANSKI

1
2    administration building from the RMU?
3        A.    It's across the roadway and
4    slightly down a couple hundred yards.
5        Q.    On August 31, 2018, did anyone
6    advise you of anything that happened with
7    Mr. Stanbro while in the RMU after his
8    return from Westchester?
9        A.    I was informed eventually --
10   and I don't recall by who -- that Mr.
11   Stanbro had suffered an injury and as such,
12   he was not able to move.
13       Q.    When did you first obtain that
14   information?
15       A.    I don't recall the specifics.
16   Shortly after he arrived back at the
17   facility.
18       Q.    But that was on August 31,
19   2018?
20       A.    It would be the date of the
21   incident, yes.
22       Q.    Okay.  But did anybody tell you
23   of any events that took place inside of the
24   RMU with respect to Mr. Stanbro?
25       A.    You're going to have to be more

Page 49

```
 1                   S. URBANSKI
 2   specific than that, sir.
 3        Q.    Well, Mr. Stanbro was escorted
 4   from the van to the RMU based upon your
 5   understanding, correct?
 6        A.    Yes.   He was brought into the
 7   RMU.
 8        Q.    Did anybody ever tell you
 9   anything that happened with Mr. Stanbro
10   while in the RMU?
11        A.    He was seen by medical.
12        Q.    Okay.   Anything else?
13   Generally, he was seen by medical?
14        A.    They brought him into the RMU.
15   I believe they used a wheelchair, brought
16   him into the RMU.   He was seen by medical,
17   at which point somewhere within that range
18   I was informed that he had an injury and
19   could not move and we were sending him to
20   an outside hospital.   And I do believe it
21   was via ambulance.
22        Q.    Did you ever have any
23   discussion with anyone at Fishkill
24   regarding the propriety of the decision to
25   bring Mr. Stanbro back to Fishkill after
```

Page 50

S. URBANSKI

1
2    the use of force incident at Westchester?
3        A.    I'm not sure if I truly
4    understand your question.
5        Q.    Okay.  Well, it is your
6    understanding, is it not, that Mr. Stanbro
7    was injured in this use of force incident
8    at Westchester Medical Center, correct?
9        A.    Not initially.
10        Q.    Sitting here today, you know
11    that Mr. Stanbro was injured at Westchester
12    Medical Center during this use of force
13    incident, correct?
14        A.    Correct.  But you are asking me
15    about August of 2018, and at that time, I
16    didn't.
17        Q.    Okay.  No, no, let me rephrase
18    that.  Have you ever had a discussion with
19    anyone at Fishkill regarding whether it was
20    appropriate to bring Mr. Stanbro back to
21    Fishkill immediately after that use of
22    force incident at Westchester Medical
23    Center?
24        A.    No.  I don't believe I did.
25        Q.    Have you overheard any

Page 51

S. URBANSKI

1          S. URBANSKI

2   discussions with anyone at Fishkill about

3   that particular issue?

4          MS. COLLINS:   Objection.   You

5       can answer.

6      A.    No.  I don't believe I have.

7      Q.    Have you had any communication

8   with anyone at Westchester Medical Center

9   about the appropriateness of the decision

10  to return Mr. Stanbro to Fishkill after he

11  was injured, as opposed to treating him

12  right away at Westchester Medical Center?

13     A.    I would not be the contact for

14  people at Westchester Medical Center.   At

15  our facility, we have a regional medical

16  center, and with the regional medical unit

17  we have a deputy superintendent for health.

18  So the normal contact for Westchester

19  Medical Center would be deputy

20  superintendent of health, so if there was a

21  discussion there, I am not aware of it.

22     Q.    Who was the deputy

23  superintendent of health back in August of

24  2018?

25     A.    I'm not sure if it was Akinola

1                    S. URBANSKI

2    Akinyombo or Angie Maume because I don't

3    remember the exact date of her retirement.

4         Q.    Can you just spell both of

5    those name for the record, please?

6         A.    A-N-G-I-E, I believe is the

7    first name, Angie.   Maume is M-A-U-M-E, and

8    I will provide the correct spelling for

9    Akinyombo because I don't want to give you

10   a butchered spelling.   Akinyombo is

11   A-K-I-N-Y-A-M-B-O [sic], I believe.

12        Q.    What was your understanding as

13   to whose decision it would have been on

14   August 31, 2018 whether to bring Mr.

15   Stanbro back to Fishkill after he suffered

16   his injury or for him to remain at

17   Westchester to be treated for this injury?

18             MS. COLLINS:   I'm going to

19        object to the question.   I'm going to

20        object to the continuance of this

21        line of questioning as well for the

22        record.   You can answer.

23        A.    Well, initially, again, we did

24   not have the report of inmate Stanbro

25   suffering any kind of severe injury, and

Page 53

1                    S. URBANSKI

2    again, to protect the inmate and the public

3    in a situation where an inmate is acting

4    out in public, we would bring them back to

5    the facility.  So the initial report was

6    received, and either the watch commander or

7    I -- I might have made it that day -- made

8    the determination to bring the inmate back.

9    There was no -- at that time, we had no

10   information about any kind of significant

11   injury.

12            MS. COLLINS:  Can I just ask to

13        take a very, very short break?  I

14        need to attend to a personal issue.

15            MR. SIVIN: Sure.

16            (Whereupon, a short recess was

17        taken.)

18            MR. SIVIN:  Are we back?

19            MS. COLLINS:  Yes.

20        Q.     Deputy, what was your

21   understanding back in August of 2018 as to

22   whether there was a disagreement -- I'm

23   sorry.  If there was a disagreement between

24   DOCCS and the medical facility as to

25   whether the prisoner should be discharged

1              S. URBANSKI

2   from the facility and brought back to the

3   prison, who would have the authority to

4   make that decision?  Whose decision would

5   take precedent over the other?  Did you

6   have an understanding of that back in

7   August of 2018?

8              MS. COLLINS:  I'm going to

9         object to that.  There's a few

10        questions in there, Mr. Sivin.  Maybe

11        we want to break it down.

12             MR. SIVIN:  Let's see if he can

13        answer as is, if not, I'll try to

14        break it down

15             MR. FITCH:  I'll just note my

16        objection to the form also.

17             MS. WEIS:  Objection to the

18        form.

19   A.      So the inmate was at

20   Westchester Medical Center for a dental

21   procedure.  He acted out, staff used force

22   to secure him.  At that point, the

23   information we had from Westchester was

24   that they were terminating that procedure.

25   Not that they required additional care,

1              S. URBANSKI

2    that they were terminating the procedure.

3    If the procedure was terminated, at that

4    point, we look to secure the inmate who was

5    acting out in the public and bring him back

6    to the facility.  So that was the

7    information we had initially.

8         Q.    Had Fishkill been advised that

9    Mr. Stanbro required additional medical

10   care, would it have been appropriate to

11   bring him back to Fishkill without him

12   getting additional medical care?

13             MS. COLLINS:  Objection.

14             MR. FITCH:  Just note my

15        objection also.

16             MS. WEIS:  Objection.

17        A.    If we had information prior to

18   him being in the van leaving that medical

19   staff felt that he needed medical care, we

20   would have directed staff to take him for

21   medical care.

22        Q.    How about in the event of a

23   disagreement?  Westchester says yeah, he

24   needs additional medical care and DOCCS

25   says no, we need him back at the facility.

1                    S. URBANSKI

2   Whose vote would prevail in that event?

3              MS. COLLINS:  Objection.  You

4        can answer.

5        A.     I'm not a doctor, so if a

6   doctor is telling us he needed additional

7   care, if I had a question about it, I may

8   have asked my dep of health.  But again, if

9   an outside doctor with the inmate says he

10  needs additional care, we would normally

11  err on the side of caution.

12       Q.     And when you say "dep of

13  health," is the full title deputy

14  superintendent of health?

15       A.     Yes.

16       Q.     Was the deputy superintendent

17  of health consulted at all before Mr.

18  Stanbro was brought back to Fishkill from

19  Westchester Medical Center?

20             MS. COLLINS:  Objection, you

21        can answer.

22       A.     I don't believe we had any

23  indication at the time that inmate Stanbro

24  needed additional medical care, so no.  I

25  don't believe he was.

1                   S. URBANSKI

2         Q.      I want you to assume that

3   Officer Palou testified that before

4   bringing Mr. Stanbro back to Fishkill, Mr.

5   Stanbro was complaining that he had no

6   feeling in his legs.  Under those

7   circumstances, do you believe it was

8   appropriate to bring Mr. Stanbro back to

9   Fishkill?

10              MS. COLLINS:  Objection.  You

11         can answer.

12        A.      I have already testified, sir,

13  that we did not have any information to

14  that effect, so why would I speculate on

15  this?

16        Q.      Okay.  That's why I am asking

17  you to get outside the realm of

18  speculation.  I am asking you to assume

19  something that is true, that Officer Palou

20  testified that she communicated with

21  Fishkill and said Stanbro says he has no

22  feeling in his legs --

23              MS. COLLINS:  I am objecting to

24         this question, Mr. Sivin.  There is

25         no evidence --

```
 1                    S. URBANSKI
 2          MR. SIVIN:  Please do not
 3       interrupt me.  You can put your
 4       objection after I ask the question.
 5          MS. COLLINS:  Okay, I thought
 6       you were done.  Continue.
 7          MR. SIVIN:  I obviously wasn't
 8       done.  I was in mid-sentence.
 9       Q.    I want you to assume that
10  Officer Palou testified that she
11  communicated with Fishkill and told
12  Fishkill that Mr. Stanbro was complaining
13  that he had no feeling in his legs.  Under
14  those circumstances, assuming that's true,
15  under those circumstances was it
16  appropriate to bring Mr. Stanbro back to
17  Fishkill?
18          MS. COLLINS:  Objection.
19       A.    So I didn't have that
20  information that you want me to subject
21  that Officer Palou made.  So the
22  information or the decision to bring him
23  back was to bring him back.  We did not
24  have the information that you are alleging
25  that Officer Palou testified to.  But if an
```

Page 59

S. URBANSKI

1
2  inmate was reporting that he could not feel
3  his legs and Westchester Medical Center
4  said he needed additional care, we would
5  have erred on the side of caution and he
6  would have received additional care.
7       Q.    Okay.  Were there any video or
8  surveillance cameras posted outside of the
9  RMU on August 31, 2018?
10      A.    The RMU building has no camera
11  system attached or associated with it.
12      Q.    And was that the case also back
13  in August of 2018?
14      A.    Yes, sir.
15      Q.    Okay.  How about a video system
16  whereby you could look at a monitor and see
17  somebody entering the RMU?
18      A.    I don't believe -- I am just
19  trying to -- in the interior of the fence
20  line there would be no cameras.  There is
21  one camera for an electronic gate there, so
22  there should be a camera associated with
23  the electronic gate, but it is not a
24  recording camera.
25      Q.    Okay.  Now, did you come to

Page 60

S. URBANSKI

1
2    learn that after Mr. Stanbro was returned
3    to the RMU he was then brought by ambulance
4    to an outside hospital?
5         A.    Yes.
6         Q.    And did you come to learn that
7    this escort to the outside hospital was
8    videotaped?
9         A.    Yes.   I ordered the
10   videotaping.
11        Q.    To whom did you give that
12   order?
13        A.    I would probably have given it
14   to the watch commander, but specifically
15   who I gave it to that day I don't recall.
16   Sergeant Carreras was the supervisor sent
17   on it and he was given the direction.
18   Whether it came specifically for him or the
19   watch commander, I don't recall.
20        Q.    I'm sorry, what was Sergeant
21   Carreras' role that day?
22        A.    He was a supervisor that we
23   sent on the trip.
24        Q.    Why did you order that the
25   escort from the RMU to the outside hospital

Page 61

1                    S. URBANSKI
2     be videotaped?
3          A.    Well, we became aware of the
4     significance of his injury.  The hospital
5     had sent information that they had
6     questioned the need for the use of force,
7     and at that time I felt it was appropriate
8     to send a supervisor and a videocamera on
9     the medical trip.
10         Q.    And was it your understanding
11    that that videotape was required to be
12    preserved?
13         A.    It should be, yes.
14         Q.    Did you ever have any
15    discussions with Sergeant Carreras
16    regarding his observations of Mr. Stanbro?
17         A.    Observations in regards to?
18         Q.    Any observations he had of Mr.
19    Stanbro.
20         A.    Not that I specifically
21    remember.  I may have.
22         Q.    Have you ever viewed the
23    videotape of the escort from the RMU to the
24    outside hospital?
25         A.    I believe I did, yes.

Page 62

1                    S. URBANSKI

2        Q.    How many times did you review

3    that videotape?

4        A.    I don't recall.

5        Q.    Was it more than once?

6        A.    Once, I would imagine.

7        Q.    Give me just a general

8    timeframe as to when you reviewed that

9    videotape.

10        A.    It would have been shortly

11    after the incident, Probably the next day

12    because he went to the hospital later that

13    evening.  I would have eventually left the

14    facility, so the next day, the day after.

15        Q.    What was your purpose of

16    viewing that videotape?

17        A.    It's part of my job.

18        Q.    Do you view all or do you

19    review all videotapes of escorts of

20    prisoners to outside hospitals?

21        A.    Myself or the -- no.  Whenever

22    there is an unusual incident or a use of

23    force when a video is taken, either myself

24    or my captains review the video.

25        Q.    And did this tape also have

```
1                    S. URBANSKI
2   audio?
3        A.    It would have.
4        Q.    Tell me what you recall seeing
5   on the videotape.
6        A.    I don't recall.
7        Q.    Do you recall --
8        A.    It would have been the inmate
9   being brought to the van and into the van
10  to the hospital, but the specific video, I
11  don't recall it.
12       Q.    Do you recall what Mr. Stanbro
13  appeared like in the videotape?
14       A.    The picture in the UI packet is
15  more specific to what I remember.  That he
16  could not move his lower extremities.  It
17  looked like he was in a little bit of
18  discomfort or in discomfort.
19       Q.    What did you see or hear that
20  lead you to believe that he was in
21  discomfort?
22       A.    Just the way he was acting.
23       Q.    How was he acting?
24       A.    Again, he was -- I don't know
25  how to describe it.  He appeared to be in
```

Page 64

1                    S. URBANSKI
2   discomfort.
3          Q.     Was he crying?
4          A.     I don't recall.
5          Q.     Was he screaming out in pain?
6          A.     Sir, I don't recall.  I
7   remember the pictures especially from the
8   UI packet looked like he was in discomfort,
9   but whether he was crying or screaming in
10  pain, I don't recall.
11         Q.     Now, when you say the pictures
12  from the UI packet, are you referring to
13  pictures of him in the Stryker chair?
14         A.     Yes.
15         Q.     I would like you to take a look
16  at Exhibit 23, which consists of two pages
17  and four photographs.  Are those the
18  photographs you just referred to?
19         A.     Yes.
20         Q.     And when you observed the
21  videotape of Mr. Stanbro's escort from the
22  RMU to the hospital, did he appear in the
23  same condition that's depicted in these
24  photographs?
25         A.     He was obviously not in a

1                    S. URBANSKI

2    Stryker chair, but he appeared similarly in

3    discomfort.

4         Q.    Now, you say his legs were not

5    moving.  Did you see his arms moving at any

6    time in the videotape?

7         A.    Sir, I reviewed the video

8    almost three years ago.  I don't remember

9    the specifics of the video.  Like I said

10   previously, the photos of him in the

11   Stryker chair are what stick in my memory

12   the best.

13        Q.    In the videotape, did Mr.

14   Stanbro appear conscious to you?

15             MS. COLLINS:  Objection.  You

16        can answer.

17        A.    I don't recall if he was

18   conscious the entire video or not.

19        Q.    Do you recall if he was

20   conscious at any point in the video?

21             MS. COLLINS:  Objection.  You

22        can answer.

23        A.    I believe he was.

24        Q.    And what did you see or hear

25   that led you to believe he was conscious

Page 66

1                    S. URBANSKI

2     for a portion of the time that's depicted

3     in the video?

4              MS. COLLINS:  Objection.  You

5          can answer.

6          A.    I already testified I really

7     don't recall most of the video.  It's a

8     three-year gap since I reviewed it.  I do

9     remember these photos specifically, because

10    they are part of my UI packet and I have

11    reviewed it a couple times since then, but

12    the specifics of the video, I am not going

13    to give you a lot of information on.  I do

14    not recall them.

15         Q.    Do you recall one way or the

16    other whether his eyes were open in the

17    video?

18         A.    Sir, I don't recall the

19    specifics.  I am not going to be able to

20    answer that for you.

21         Q.    Do you recall anything that Mr.

22    Stanbro said in the video?

23         A.    No, I don't.

24         Q.    Do you recall anything that

25    anyone else said in the video?

Page 67

1                    S. URBANSKI

2        A.      No, I don't.

3        Q.      Now, do you know Officer

4    Richard Landry?

5        A.      Not specifically, no.

6        Q.      Have you ever met him?

7        A.      I'm sure I have.

8        Q.      Do you have a recollection of

9    ever meeting officer Richard Landry?

10       A.      No.   If he is a Fishkill

11   employee, I am sure I met him, but

12   specifically him off of the top of my head

13   -- I have 850 employees at the facility,

14   sir.   I don't know everybody by name and

15   face.

16       Q.      Well, let me take away a little

17   of the mystery.   Officer Landry is one of

18   the officers from Greene who was involved

19   in the use of force.

20       A.      Then no, I don't believe I know

21   him.

22       Q.      Okay.   How about the officer

23   who is Christopher Leonardo?

24       A.      I don't believe I have ever met

25   him either.

Page 68

1                    S. URBANSKI
2        Q.      Okay.  Do you know what the
3    current status of the OSI investigation
4    into this incident is?
5        A.      No, I don't.
6        Q.      Is there a person in OSI with
7    whom you have been in contact that you
8    understand is in charge of this
9    investigation?
10       A.      We send the information up and
11   ask them to investigate it that we feel
12   that there is issues with the incident.
13   And then as far as who it's assigned to,
14   the investigator itself will send down
15   sometimes the request for information.  Who
16   the investigator was, I don't recall at
17   this point.  And it's not common practice
18   for OSI to send down a completed
19   investigation for review.
20       Q.      When is the last time you have
21   spoken with anyone at OSI regarding this
22   incident?
23       A.      I don't recall, but it hasn't
24   been recently.
25       Q.      Okay.  Now, I am going to ask

1                    S. URBANSKI

2    you some questions about an affidavit that

3    you signed on April 20th of 2021.  Do you

4    have a hardcopy of that affidavit with you?

5         A.    Yes, I do.

6         Q.    Okay.  And this has been marked

7    as I believe Exhibit 37.

8              MR. SIVIN:  I don't think I am

9         going to bother putting it up on the

10        screen.  Does everyone have a

11        hardcopy?  It may be easier that way.

12             MR. FITCH:  Yes.

13        Q.    Okay.  Deputy, I would like you

14   to go to page two, specifically

15   paragraph five.  And do you see in that

16   paragraph where you list the identities of

17   the security team that accompanied Mr.

18   Stanbro to Saint Luke's Hospital?

19        A.    Yes.

20        Q.    Okay.  Now, the first name you

21   mentioned is Sergeant Carreras.  I

22   apologize, I don't remember if you told me.

23   What is his first time?

24        A.    John.

25        Q.    And is he still in Fishkill?

Page 70

1                    S. URBANSKI

2        A.      Yes.   He is currently a

3    lieutenant now.

4        Q.      Can you just give me his

5    general physical description as it existed

6    on August 31, 2018?

7        A.      About five-foot, I would guess

8    eight, black hair, he's Hispanic in

9    descent, slightly heavyset.

10       Q.      And the next name is C.O. Toro,

11   T-O-R-O.  What is Officer Toro's last name?

12       A.      I don't know.

13       Q.      Is he still employed as an

14   officer at Fishkill?

15       A.      I believe so.

16       Q.      Can you describe what he looked

17   like back in August of 2018?

18       A.      No, I can't.

19       Q.      How about C.O. Montross,

20   M-O-N-T-R-O-S-S?  Do you know his first

21   name?

22       A.      No, I don't.

23       Q.      Is he still employed as an

24   officer at Fishkill?  I don't know if you

25   got that last question.  Is he still

Page 71

1                         S. URBANSKI

2     employed as an officer at Fishkill,

3     Montross?

4          A.    Yes.

5          Q.    And what did he look like back

6     in August of 2018?

7          A.    He is a taller, white male

8     officer with kind of like sandy, brownish

9     blond hair.

10          Q.    And then last is C.O. Denbaum,

11     D-E-N-B-A-U-M.  Do you know his first name?

12          A.    No.

13          Q.    Is he still employed as an

14     officer at Fishkill?

15          A.    I think so.

16          Q.    And what did he look like back

17     in August of 2018?

18          A.    Again, I couldn't tell you.

19          Q.    Have you spoken with Sergeant

20     Carreras, C.O. Toro, C.O. Montross, or C.O.

21     Denbaum as to any observations they made of

22     Mr. Stanbro while en route to Saint Luke's

23     Hospital?

24          A.    No.  I don't recall doing that,

25     no.

Page 72

```
 1                  S. URBANSKI
 2       Q.      Where did the video start?
 3   Where did it begin?
 4       A.      I believe it started at the RMU
 5   when they were bringing the inmate to the
 6   ambulance, if I recall right.
 7       Q.      Do you recall if the video
 8   depicted Mr. Stanbro being placed on a
 9   stretcher?
10       A.      Again, I don't remember
11   specifics.  He would have been on a
12   stretcher going to the ambulance, but
13   whether it contained him being placed on
14   it, I don't recall.
15       Q.      When you had your conversation
16   with Officer Deal, did he mention whether
17   he was injured at all during the use of
18   force incident?
19              MS. COLLINS:   Objection to this
20         line of questioning for the same
21         reasons indicated before, but you can
22         answer.
23       A.      "He" would be meaning who?
24       Q.      Officer Deal.
25       A.      Whether Officer Deal was
```

Page 73

1                    S. URBANSKI

2      injured?

3           Q.     Yes.

4           A.     There would be an accident

5      report, but I don't recall off the top of

6      my head.   I believe he went out on injury,

7      so he probably was.

8           Q.     When an officer is involved in

9      a use of force and reports or complains of

10     injuries as a result of the use of force,

11     is it a requirement or was is it a

12     requirement that photographs be taken of

13     him?

14          A.     It's not unheard of.

15          Q.     Okay.   I understand it's not

16     unheard of, but was it also a requirement

17     in the DOCCS directives that photographs be

18     taken?

19          A.     There is no requirement that we

20     photograph staff injuries.   It is normal

21     practice, but there is no requirement.

22          Q.     All right.   Now, I would like

23     to discuss the maintenance and custody of

24     the videotape that was taken of the

25     transport from the RMU to Saint Luke's.

1              S. URBANSKI

2  Paragraph seven, the third sentence of your

3  affidavit reads as follows, "any videos

4  accompanying these files are stored on

5  electronic storage devices, which are then

6  stored in a secured room off the watch

7  commander's office within the security

8  suite."   Now, what did you mean by

9  "electronic storage devices?"

10       A.    Our videos are normally

11  transferred to a DVD, so a DVD.  Back in

12  earlier days, it was a VHS tape that would

13  be stored.

14       Q.    When you say "earlier days,"

15  how about August 31, 2018?  Would the

16  videos be transferred onto a DVD or some

17  other device?

18       A.    I believe it would be DVD.

19       Q.    And then you indicated that

20  they are stored in a secured room off the

21  watch commander's office.  Was this a room

22  that was devoted exclusively to these

23  storage devices, these electronic storage

24  devices, or did this room contain something

25  else as well?

1                    S. URBANSKI

2          A.     The room contains the -- how do

3     I describe it -- the equipment for the CCTV

4     camera systems that this facility does

5     have.   So there's hard drives and computer

6     equipment related to the camera systems.

7          Q.     And how are the DVDs actually

8     stored?   Are they put in a box, or an

9     envelope, or something else?

10         A.     They are labeled, they're

11    placed in a sleeve, and then they're stored

12    in a locked cabinet within that room.

13         Q.     And how are they separated?

14    In other words, how does somebody gain

15    access to them?   If I wanted to find out a

16    DVD for a particular date, are they in

17    sub-folders, or how does that work?

18         A.     They are given a number and the

19    number corresponds to the day of the video.

20    And it's just by year normally, so in 2018

21    the first video would be 00118.

22         Q.     Now, further on in this

23    paragraph you state as follows, "after

24    that, the UI/UOF files are moved to an

25    archived storage area in another part of

1                    S. URBANSKI

2    the facility."  Now, by that did you mean

3    that the electronic storage devices are

4    also moved to this other part of the

5    facility?

6         A.    Nothing from the year 2018

7    would be moved.  We have a -- it would take

8    -- eventually, the UI use of force reports,

9    which are the hardcopies are moved down in

10   storage, but 2018 is too recent and new to

11   be moved.  They are still stored in my

12   office or just outside of my office.

13        Q.    After how many years would they

14   be moved to the other site?

15        A.    I believe it's the fifth year

16   we move them.  I would have to check with

17   my secretary.

18        Q.    But in any event, when you say

19   the files are also moved to electronic

20   storage, would that include the electronic

21   storage devices?

22        A.    The videos are held longer

23   because they take up far less room and are

24   obviously much smaller.

25        Q.    So the video of this particular

1              S. URBANSKI

2   incident should still be in the secured

3   room off the watch commander's office; is

4   that correct?

5        A.     Yes.

6        Q.     Was there a practice and

7   procedure back in August of 2018 regarding

8   the chain of custody of these escort

9   videos?  In other words, after Stanbro is

10  taken to the hospital and the video is

11  done, what is supposed to be done with that

12  video?

13       A.     They get placed onto a DVD

14  format.  The DVD would get forwarded to my

15  secretary's office, and then it would be

16  placed into the storage.

17       Q.     And this particular case, was

18  the video transferred onto a DVD?

19       A.     I believe so.

20       Q.     Was the DVD then sent to your

21  secretary?

22       A.     Unfortunately, we can't find

23  the DVD now, so I don't know for certain.

24       Q.     Where were you when you viewed

25  this DVD?

Page 78

1                    S. URBANSKI

2        A.      I believe I viewed it in the

3    security suite area.

4        Q.      Do you recall how you retrieved

5    the DVD, where you got it from?

6        A.      When I reviewed it, it was

7    still on the camera on the handheld video

8    screen I was watching it.

9        Q.      So you actually looked at the

10   camera and played it for yourself on the

11   camera; is that correct?

12       A.      Yes.   The cameras are much

13   smaller, but yes, on the 2x2 screen.

14       Q.      Did you ever again view the

15   videotape after it was transferred onto the

16   DVD?

17       A.      No.   I believe the only time

18   that I reviewed it was when it was on the

19   camera.

20       Q.      Now, was there a procedure in

21   effect back in August of 2018 as to what

22   should be done with copies that are made of

23   the DVD?

24            MS. COLLINS:   Objection, but

25       you can answer.

**Page 79**

1              S. URBANSKI
2      A.    I don't know.  I'm not sure I
3  understand your question.
4      Q.    Well, let's say somebody wanted
5  a copy of the DVD.  What would the
6  procedure be?  How would you go about
7  making a copy?
8      A.    We would withdraw it from the
9  archives and we would burn a copy and put
10  the original back in the archives, and then
11  forward a copy to the requesting person or
12  entity if they were authorized to have it.
13      Q.    Where would you burn that copy?
14  Where would that be done?
15      A.    Normally, in the video room
16  they would use the equipment.
17      Q.    But in any event, any time a
18  copy is made, the procedure would be to
19  return the original back to the archive
20  storage area -- I'm sorry -- to the secured
21  room off the watch commander's office?
22      A.    Yes.
23      Q.    I would like you to go to
24  paragraph 10 of your affidavit.  Actually,
25  before I go any further, Exhibit 37, the

1                    S. URBANSKI

2    four-page document, that's an affidavit

3    that you generated and signed on April 20,

4    2021, correct?

5              MS. COLLINS:   Objection, but

6         you can answer.

7         A.    Yes.

8         Q.    So the first sentence of

9    paragraph 10 reads as follows, "in order to

10   ensure the video pertaining to this

11   incident was not incorrectly filed, my

12   staff and I at my direction also reviewed

13   the actual electronic content of the

14   storage devices at or around the date of

15   the August 31, 2018 incident to see if the

16   storage device had been mislabeled."  Did I

17   read that correctly?

18        A.    Yes.

19        Q.    How far outside of August 31,

20   2018, did you look to locate, to try to

21   locate the DVD?

22        A.    A couple days each side of the

23   incident.

24        Q.    By "couple," do you mean two?

25        A.    No, more than that.  Probably

Page 81

1                    S. URBANSKI

2   about five or six.

3        Q.    Okay.

4        A.    There were none -- they were

5   all perfectly labeled.

6        Q.    And paragraph 12 reads as

7   follows, "I have also spoken to Lieutenant

8   (at that time Sergeant) Carreras who

9   accompanied plaintiff during this transport

10  to Saint Luke's.  Lieutenant Carreras

11  confirmed that a handheld camera had been

12  taken on this transport.  He further

13  informed me that to the best of his

14  recollection the video camera battery had

15  died at some point after they left

16  Fishkill."  Did I read that correctly?

17       A.    Yeah, that's correct.

18       Q.    Okay.  Now, in that first

19  sentence when you said, "I have spoken with

20  Lieutenant Carreras," when did you have

21  this conversation with Lieutenant Carreras?

22       A.    Recently, within the last month

23  or so there was a -- the copy of the video

24  was requested.  The facility was not able

25  to locate the video, so I confirmed with

1                    S. URBANSKI
2    Lieutenant Carreras, then Sergeant
3    Carreras, that the direction was followed
4    and the video camera went out, which he
5    confirmed.
6        Q.    So this conversation happened
7    within the last couple of weeks?
8        A.    Within the last month or two.
9    The exact date I don't recall.
10       Q.    Before the recent conversation
11   with Lieutenant Carreras, had you ever been
12   advised from any source that the battery in
13   the video camera had died at some point
14   after the officers left Fishkill?
15       A.    I believe the battery's got a
16   certain lifespan.  I believe when the
17   battery died, it was actually when the
18   inmate -- somewhere along the way when the
19   inmate was being transferred from Saint
20   Luke's to Westchester, I believe, if I am
21   not mistaken.  It wasn't like they left the
22   facility and then the battery died 10
23   minutes later.  It lasted an appropriate
24   period of time.
25       Q.    But my question is, before this

```
 1                    S. URBANSKI
 2   recent conversation with Carreras, had you
 3   ever been advised by any source that the
 4   battery had died at some point after they
 5   left Fishkill?
 6        A.    I probably was, but do I recall
 7   being told so?  No, I don't.
 8        Q.    Other than this affidavit that
 9   you signed, is there any written report,
10   memo, or other documentation of that
11   battery having died at some point?
12             MS. COLLINS:  Objection, but
13        you can answer.
14        A.    If there is, it would be in the
15   UI packet.
16        Q.    Now, tell me again, I am not
17   sure I understood that clearly.  When were
18   you advised or when did Carreras tell you
19   that the battery died?  At what point
20   during the transport?
21        A.    Are we talking our recent
22   conversation, or are you talking about on
23   the date of the incident?  Because there is
24   two.  Recently, when him and I talked, he
25   actually went back and talked to officers
```

1                    S.  URBANSKI

2    and  that's  when  he  reminded  me  that  the

3    battery  had  died  and  that  I  believe  it  was

4    while  they  were  on  their  way  or  just  prior

5    to  them  going  to  Westchester.    Now,  was  I

6    informed  of  that  back  in  2018?    I  might

7    have  been,  but  I  don't  recall  it.

8          Q.     All  right,  so  let  me  just  clear

9    this  up.    It's  your  understanding  that

10   Stanbro  was  taken  from  Fishkill  to  Saint

11   Luke's  and  then  from  Saint  Luke's  to

12   Westchester,  correct?

13         A.     I  believe  the  second  hospital

14   was  Westchester,  that's  my  best

15   recollection.

16         Q.     But  it  is  your  understanding

17   that  the  battery  died  in  between  Saint

18   Luke's  and  that  second  hospital?

19         A.     I  believe  so.    He  told  me  the

20   battery  died.    They  were  at  Saint  Luke's

21   for  a  period  of  time,  and  it  died  I  believe

22   it  was  during  either  at  Westchester  or

23   during  the  movement  to  Westchester.

24   Lieutenant  Carreras  would  be  able  to

25   confirm  that  for  you.

Page 85

1                     S. URBANSKI
2        Q.      And you said that Lieutenant
3    Carreras reminded you of this, so are you
4    indicating that on the day of the incident
5    he also told you that the battery had died
6    at some point?
7        A.      Reminded me, as in when we last
8    spoke that it had happened.
9        Q.      Okay.  So you had more than one
10   conversation with Carreras about the issue
11   with the battery?
12       A.      No.  I use "remind" as he told
13   me, so he told me a month -- when we had
14   the conversation within the last month or
15   so that he informed me that just as a
16   reminder.  Now, did he tell me years ago?
17   When I use "remind," that he informed me
18   that the battery went dead while it was in
19   an outside hospital.
20       Q.      Now, as a matter of procedure,
21   had the battery not died, would the
22   videotape include everything that occurred
23   with Mr. Stanbro between the time he left
24   Fishkill until the time he arrived at
25   Westchester or something else?

Page 86

S. URBANSKI

1

2     A.     The purpose of why I authorized

3  the camera to go on this was there

4  obviously was a use of force that details

5  did not seem to add up on.  So the camera

6  was to ensure that during the transport

7  from the facility to the hospital that --

8  just to have a video record of it.  Once

9  the inmate was in the outside hospital and

10  there's medical staff there and everything

11  else, the video purpose for me as part as

12  of my security point of it really wasn't --

13  there was other people there to witness

14  interactions with the inmate and staff, so

15  it was the interaction from the facility to

16  the hospital.  And the inmate was

17  transported by ambulance.  But whenever we

18  have an incident like this when there is

19  unusual circumstances, we try to video it.

20     Q.     So the videotape would include

21  all periods where the inmate is in the

22  custody of DOCCS officers, correct?

23     A.     That would be when we recorded

24  the inmate, when we started the video.

25  Can we just take one break?

Page 87

```
 1                    S. URBANSKI
 2              (Whereupon, a short recess was
 3         taken.)
 4         Q.    Deputy, do you know who the
 5    videographer was for this escort, which of
 6    the officers actually did the videotaping?
 7         A.    It might be in the UI packet,
 8    but no.  I don't know off the top of my
 9    head.
10         Q.    Okay.  And just one more
11    question on this, and then we will move on.
12    Have you seen any documentation at all that
13    the battery died at some point after the
14    officers left Fishkill?
15         A.    I would have to check the UI
16    packet.  If I had received documentation,
17    it would be on the report in the packet.
18         Q.    Well, do you recall ever seeing
19    such documentation?
20         A.    I don't specifically recall,
21    but there is an absolute possibility that
22    Sergeant Carreras recorded it and the
23    packet might say it.
24         Q.    So if it's documented, it would
25    be in the UI packet, correct?
```

Page 88

1                    S. URBANSKI

2        A.     It should be, yes.

3        Q.     All right.   Let's go onto

4   paragraph 13.   The first sentence reads as

5   follows, "I also reached out the DOCCS

6   bureau of labor relation, BLR, because I

7   recalled that files pertaining to the

8   August 31, 2018 incident had been sent to

9   that office upon its request."   Did I read

10   that accurately?

11       A.     Yeah.

12       Q.     Okay.   Now, when did you reach

13   out to BLR regarding this matter?

14       A.     About -- within the last month

15   or so.

16       Q.     And with whom did you speak at

17   BLR?

18       A.     Matt Bloomingdale.   He is the

19   assistant director.

20       Q.     And you say you reached out

21   because you recalled that the file was sent

22   to BLR.   Tell me exactly what you recall

23   about the files having been sent to BLR.

24       A.     The lab relations was involved

25   in this in regards to the staff

Page 89

```
 1              S. URBANSKI
 2   involvement, so there were -- the copies of
 3   the reports and everything would have been
 4   filed and sent to them.  So as a result, we
 5   reached out to them to see if they had
 6   forwarded a copy of the original video.
 7   Initially, they believed they were, but
 8   they did not have a copy.
 9        Q.    But do you recall that the
10   files were actually sent to BLR?
11        A.    Do I recall if the video was
12   sent to BLR?  No, I don't.
13        Q.    No, the files.
14        A.    Yes.  The paperwork was sent to
15   BLR.
16        Q.    And did you participate in
17   sending those files to BLR?
18        A.    My office would.  I don't
19   directly do it.  The request would come
20   through me, and then my secretary normally
21   would do the scanning of the requested
22   documents.
23        Q.    Do you know if the videotape or
24   a copy of the videotape was included in the
25   files that were sent to BLR?
```

Page 90

S. URBANSKI

1

2      A.      I already said no, sir.   I

3   don't remember if it was or not.

4      Q.      But in any event, if the

5   videotape was sent to BLR, would the

6   procedure be to burn a copy and maintain an

7   original at the facility?

8      A.      Yes.

9      Q.      All right.   Then it goes on in

10   this paragraph to say that "assistant

11   director Michael Bloomingdale" --

12      A.      It's Matt Bloomingdale, for the

13   record.

14      Q.      In the affidavit it says

15   "Michael Bloomingdale," correct?

16      A.      Yes.   It's a typo.   It's Matt.

17      Q.      Okay.   Mr. Bloomingdale

18   informed you that he recalled that his

19   office did receive the video.   So Mr.

20   Bloomingdale told you that?

21      A.      He believed that they did is

22   what they told me.

23      Q.      Did he tell you whether he

24   received the original or a copy?

25      A.      What he told me is he believed

Page 91

S. URBANSKI

1
2  they received the video.  He would not know
3  if it was an original or a copy.
4          MS. WEIS:  I'm sorry.  I think
5      I just lost everyone again.  The last
6      question and answer was very choppy.
7          MR. SIVIN:  Victoria, could you
8      read those back for her?
9          (Whereupon, the referred to
10     question and answer was read back by
11     the Reporter.)
12     Q.    The next sentence says, "I
13 understand from Assistant Director
14 Bloomingdale that he believes that the
15 video was sent to the New York State
16 Correctional Offices and Police Benevolence
17 Association Inc. Union."  Did I read that
18 correctly?
19     A.    Yes.
20     Q.    Is this what Mr. Bloomingdale
21 told you?
22     A.    Yes.
23     Q.    Now, the video that he believes
24 was sent to the union, do you know whether
25 that was the same video you sent to him or

Page 92

1                    S. URBANSKI

2    whether it was a copy that he made?

3        A.    You would have to ask Mr.

4    Bloomingdale, I don't know.

5        Q.    Okay.  But he did not tell you

6    one way or the other, correct?

7        A.    He told me that he believed a

8    copy of the video was sent.  I don't know

9    if he meant the copy I sent or if he made

10   another one.  Again, you would have to ask

11   him.

12       Q.    Now, who is or what is New York

13   State Correctional Offices and Police

14   Benevolence Association Inc. Union?

15       A.    It is the union for the

16   correction officers.

17       Q.    So that union represents

18   Officers Deal and Palou, correct?

19           MS. COLLINS:  Objection, you

20        can answer.

21       A.    Yes.

22       Q.    And in this lawsuit there are,

23   also named as defendants, the other

24   officers involved in the use of force,

25   Officer Leonardo and Landry.  Does the

                    S.  URBANSKI

1

2   union represent them as well?

3             MS. COLLINS:  Objection, you

4      can answer.

5      A.      They're correction officers, I

6   would believe they are.

7      Q.      And correctional Sergeant

8   Enrique Torres is also named as a defendant

9   in this case, so the union represents

10  Sergeant Torres as well, correct?

11     A.      Yes.

12     Q.      And then the last sentence in

13  paragraph 13 reads as follows, "he informed

14  me that he would reach out to the union to

15  determine if they had a copy, but I have

16  not yet heard back from him."  Did I read

17  that correctly?

18     A.      Yes, sir.

19     Q.      Have you since heard back from

20  Mr. Bloomingdale to determine whether or

21  not the union has a copy?

22     A.      Yes.

23     Q.      And what did you find out?

24     A.      They do not have a copy.

25     Q.      I'm sorry?

Page 94

                    S. URBANSKI

1
2       A.      They reported not having a
3   copy.
4       Q.      Did the union, according to Mr.
5   Bloomingdale, acknowledge that they had
6   received a copy?
7       A.      You would have to ask Mr.
8   Bloomingdale.
9       Q.      Well, what did Mr. Bloomingdale
10  tell you about that, if anything?
11      A.      He didn't.  You would have to
12  ask Mr. Bloomingdale.
13      Q.      After you signed this April 20,
14  2021 affidavit, what additional steps, if
15  any, did you take to try to locate the
16  videotape?
17      A.      I took all steps available to
18  us prior to me signing this.
19      Q.      No, no, no.  I am asking after
20  you signed this.  So in the 14 days or so,
21  two weeks or so after you signed this, what
22  additional steps, if any, did you take to
23  attempt to locate the videotape?
24      A.      There were no additional steps
25  to take.  I took all steps prior to signing

Page 95

                    S. URBANSKI

 1
 2    this to locate the video.
 3        Q.    What additional steps, in any,
 4    did any other officials at Fishkill or
 5    DOCCS take to locate this videotape after
 6    you signed this affidavit on April 20,
 7    2021?
 8            MS. COLLINS:   Objection.  You
 9        can answer.
10        A.    Mr. Bloomingdale reached out to
11    the union to confirm whether or not they,
12    in fact, received a copy or not.  But
13    again, as of April 20th, all steps possible
14    were taken.
15            MR. SIVIN:   Okay.  Why don't we
16        just take a couple minute break?
17            (Whereupon, a short recess was
18        taken.)
19        Q.    Deputy, I just want to clarify
20    a couple of issues we discussed earlier.
21    Did you ever come to learn who at
22    Westchester Medical Center complained to
23    Fishkill that the force that was used
24    against Mr. Stanbro was unnecessary?
25        A.    I believe it was staff that was

1                    S. URBANSKI

2  present for the procedure, but today I

3  don't remember their names.

4      Q.    What makes you believe that it

5  was the staff present for the procedure who

6  made that complaint?

7      A.    They would have seen the

8  incident.

9      Q.    And was this a conversation

10  that you had directly with staff?

11      A.    No.   With Westchester staff you

12  mean?

13      Q.    Yeah.

14      A.    Yeah, no.

15      Q.    So this was something that you

16  learned secondhand?

17      A.    The report came through.   I

18  don't remember, again, specifically where

19  it was.   But I did not report or speak to

20  anyone, the dentist or any of his staff

21  that were there.

22      Q.    Okay.   Now, did you thereafter

23  take any steps to try and identify who this

24  eyewitness was who complained that

25  unnecessary force was being used again Mr.

Page 97

1                    S. URBANSKI

2    Stanbro?

3        A.     That would be OSI.   Again, the

4    facility very quickly in this process

5    recognized there was a problem and

6    contacted OSI.   OSI is our investigating

7    branch for the department, and they would

8    be the ones that deal with that

9    information.   But I am pretty sure that we

10   had all of that information of who was

11   making the claim.

12       Q.     Okay.   When you say you are

13   "pretty sure" you had that information, I

14   don't have that information.   I haven't

15   seen it documented anywhere.   What makes

16   you think that you had that information?

17   What do you recall looking at or hearing

18   that led you to believe that you had the

19   information as to who made that complaint?

20       A.     Maybe it was just talking to

21   the OSI investigator when he was at the

22   facility, or he or she.   I just recall that

23   that was where it came from.

24       Q.     So you recall there being some

25   type of documentation of the identity of

Page 98

```
 1              S. URBANSKI
 2    the person at Westchester who made this
 3    complaint about unnecessary force?
 4         A.    I believe somewhere along the
 5    way that in the discussion or writing that
 6    the information was that the hospital staff
 7    present -- which would be the dentist and
 8    whoever he had with him -- made the
 9    complaint.
10         Q.    Now, you also mentioned that
11    there may have been some email
12    correspondence between Westchester and
13    Fishkill regarding this complaint.  If we
14    wanted to locate those emails, how would we
15    go about doing that now?
16         A.    You would have to put a request
17    in.  I mean, I can go back in, but for me
18    to go back in emails and find it isn't
19    always that easy, but the department has
20    the ability to do that.
21         Q.    Okay.  Now, did you take any
22    notes at all on August 31, 2018 regarding
23    this incident or any communications that
24    you had regarding the incident?
25         A.    No, not that I recall.
```

Page 99

```
 1                S. URBANSKI
 2        Q.     Did you generate any documents
 3   of any kind in connection with this
 4   incident?
 5        A.     If there are, they should be
 6   part of the UI packet.
 7        Q.     Well, but do you recall
 8   generating any documents?
 9        A.     The unusual incident and use of
10   force itself, I would not have any
11   generating information.  My involvement
12   would be to get the information, obviously
13   direct staff and obviously I notified OSI.
14             MR. SIVIN:  Okay.  Thank you.
15        I don't have any other questions.
16             MS. WEIS:  May I go?
17             MR. FITCH:  How about you and
18        then me?
19             MR. HEINZE:   I have several
20        questions.
21             MR. FITCH:   I have a couple.
22   EXAMINATION BY
23   MR. FITCH:
24        Q.     Sir, I'm Robert Fitch.   I
25   represent Dr. Weber who was the dentist
```

Page 100

S. URBANSKI

1
2  providing treatment at Westchester Medical
3  Center.  It sounds like you have heard Dr.
4  Weber's name before today?
5      A.    It's familiar, but if you, out
6  of the blue, asked me who Dr. Weber was, I
7  would not be able to tell you.
8      Q.    I was going to say, other than
9  in context of this --
10     A.    I don't --
11     Q.    Do you have any knowledge of
12 who Dr. Weber is?
13     A.    No.
14     Q.    Sir, to your recollection, have
15 you ever spoken to Dr. Weber?
16     A.    No.
17     Q.    I'm sorry, it broke up.
18     A.    My answer?
19     Q.    Your answer, I didn't hear it,
20 sir.
21     A.    Okay, I'm sorry.  No.  I don't
22 believe I've ever spoke with Dr. Weber.
23     Q.    And just you mentioned that --
24 and I just want to see if you heard this
25 directly or if you heard it from somebody

                        S. URBANSKI

1
2    else -- that it was someone on the dental
3    staff who complained about the use of
4    force.  Did you have that conversation with
5    somebody at Westchester Medical Center, or
6    did you hear about it from somebody else?
7         A.      Again, it might have been from
8    the OSI investigator.  I don't recall
9    having direct conversation with anybody
10   from Westchester.
11        Q.      And if you could just tell me
12   your understanding of OSI's eventual role.
13   Are they obliged to produce some type of
14   report that gets sent to you or somebody in
15   the system?
16        A.      It is not common practice for
17   OSI to send a completed report to the
18   facility.
19        Q.      Do you know if they are
20   required to prepare a report to somebody
21   when they complete their investigation?
22        A.      I would imagine they do.  Who
23   it gets forwarded to, you would have to ask
24   OSI.
25             MR. FITCH:  Thank you, sir.  I

                    S. URBANSKI

1
2       have no further questions.
3   EXAMINATION BY
4   MS. WEIS:
5       Q.     Good afternoon.  My name is
6   Claudine Weis.  I represent Westchester
7   Medical Center.  And I know it's been gone
8   over, but I do have some questions to ask
9   about this complaint that you referenced to
10  from Westchester Medical Center.  The OSI
11  investigator that you may have learned
12  information from, do you recall who that
13  was?
14      A.     I do not remember who the
15  investigator was on this claim.  It's got
16  to be on record, you can find out, but off
17  the top of my head, I don't recall.
18      Q.     Well, I'm not asking what's in
19  the record.  I am asking, do you recall who
20  it was that conveyed to you the information
21  that there was a complaint.
22          MS. COLLINS:  Objection, but
23      you can answer.
24      A.     No, I don't.
25      Q.     Initially, you testified that

1                    S. URBANSKI

2    the complaint from Westchester Medical

3    Center came in either while Mr. Stanbro was

4    being transported or soon after arrival to

5    the RMU.  Do you remember a better

6    understanding as to when that complaint

7    came in?

8            MR. SIVIN:   Objection.

9        A.     You were a little broken up, so

10   I'm not sure if I heard the entire question

11   properly.

12       Q.     Do you recall when you learned

13   about complaints from OSI that someone from

14   Westchester Medical Center had a complaint

15   about the use of force?

16       A.     Again, I believe it was that

17   day, but the specific timeframes, it's

18   three years ago.

19       Q.     Do you have a recollection if

20   it was before or after Officer Deal and

21   Palou completed their use of force report?

22       A.     I believe that somebody reached

23   out from the hospital prior to that, but

24   that's the best of my recollection.

25       Q.     And that is information that

S. URBANSKI

1

2    you obtained after the fact from the OSI

3    investigator, correct?

4        A.    Your speech is broken up.  I am

5    having a hard time understanding you.

6            MS. COLLINS:  Claudine, you are

7        getting a little feedback.

8            (Whereupon, an off-the-record

9        discussion was held.)

10       Q.    The information that you

11   obtained from OSI, was it before or after

12   Officer Deal and Palou were completing

13   their use of force reports?

14       A.    Well, OSI was involved prior to

15   that because that was -- OSI was contacted

16   after that when we realized there was a

17   problem.  OSI would not have been contacted

18   quite that early in the incident to the

19   best of my recollection.

20       Q.    So at the time that you

21   requested Officer Deal and Palou to

22   complete their use of force reports, had

23   you obtained any information that someone

24   from Westchester Medical Center had made a

25   complaint about the force that was used at

Page 105

1                    S. URBANSKI

2    the time of the dental procedure?

3         A.    I believe we had information

4    that questioned the use of force from

5    Westchester prior to them returning.

6         Q.    What was the source of that

7    information to you?

8         A.    Again, I don't recall.  It was

9    three years ago.

10        Q.    How is it that you came to

11   learn that information?

12        A.    Again, you are asking three

13   years ago.  It's just something that I

14   remember that we received, which brought

15   the question.  But I don't recall at this

16   point; it's been years.

17        Q.    I appreciate that, and I don't

18   mean to belabor a point, but you keep

19   saying "we" learned.  Who is "we" in this

20   conversation?

21        A.    When I talk to "we," I refer to

22   we as the facility, so the facility learned

23   it.

24        Q.    And when you say "the

25   facility," who at the facility learned it?

1              S. URBANSKI

2        A.     Again, you have asked where

3   specifically the information came from, and

4   I can't answer it, so I really can't answer

5   that question either.

6        Q.     Do you know if it was a male or

7   a female who contacted the facility?

8        A.     I did not speak to anybody

9   personally from Westchester, so I don't

10  know.

11       Q.     If there was someone from

12  Westchester Medical Center from the

13  facility who reached out to Fishkill, who

14  would they have contacted?

15       A.     It could have been the deputy

16  of health.  They could have called -- we

17  have an automatic answering, so they could

18  have got the operator and then been

19  forwarded to the watch commander.  They

20  could have been forwarded to my captain's

21  office.  There's a lot of possibilities.

22  That's why for me to answer the question is

23  difficult.

24       Q.     The watch commander's office is

25  Officer DeCosta?

1                    S. URBANSKI

2        A.      Lieutenant DeCosta.

3                MS. WEIS:   Okay.   I have no

4          other questions.   Thank you.

5    EXAMINATION BY

6    MR. HEINZE:

7        Q.      Good afternoon, Deputy.   My

8    name is Mark Heinze.   I represent Officers

9    Deal and Palou.   Can you hear me okay?

10               MR. SIVIN:   Mark, you are

11         really breaking up.

12       Q.      How about now?

13       A.      Seems a little better, but two

14   words was not really enough to tell you.

15       Q.      Do you remember where precisely

16   you were located at Fishkill when you first

17   learned of this incident?

18       A.      No, I don't.

19       Q.      Do you remember who was the

20   person who first communicated to you

21   anything about it?

22       A.      Not specifically, no.

23       Q.      Do you know if you learned of

24   this incident by telephone, or in person,

25   or something else?

S. URBANSKI

1

2    A.    At this point, if I answer your

3    question, I would be speculating and just

4    telling you what normal procedure is.  No,

5    I don't remember who initially reported the

6    incident to me or how.

7    Q.    When it was reported to you,

8    did you receive any particular orders or

9    directives to do something about it?

10    A.    I couldn't understand your

11    question.

12    Q.    Were you given some directive

13    to do something about it?  Meaning, did you

14    learn this in connection from somebody

15    directing you to do something about this

16    incident?

17    A.    You are right now very broken.

18    It's like your audio is late to your

19    talking, and I don't know if I am getting

20    your full question or not.  You are on like

21    a lag almost, very choppy.

22    Q.    I will try again.  I'm hearing

23    everything on my end fine.  In terms of

24    your learning about this incident, was this

25    something that was assigned to you?

1           S. URBANSKI

2           (Court Reporter talking).

3           (Whereupon, the referred to

4       question was read back by the

5       Reporter.)

6       A.      Well, that's my job.  When

7   issues come up at the facility, I give

8   direction to deal with the incident, so I

9   would not be given direction to deal with

10  it.  I am the one giving directions.  Now,

11  the superintendent my have input, but I

12  don't recall that day him giving me any

13  directions other than what I have already

14  put in place.

15      Q.      Are use of force incidents

16  required to be reported to you?

17      A.      The audio problem still exists.

18          (Whereupon, the referred to

19      question was read back by the

20      Reporter.)

21      A.      Yes.

22      Q.      Can you outline the chain of

23  command as it existed both above you and

24  under you on August 31, 2018?

25      A.      Can you just clarify the

1              S.  URBANSKI

2  question for me?

3            (Whereupon, the referred to

4      question was read back by the

5      Reporter.)

6      A.    So Fishkill's chain would be at

7  the facility level is the superintendent.

8  He has the ultimate responsibility.

9  Fishkill has a first dep who is directly

10 underneath the superintendent, and the

11 deputy superintendents, which would be

12 myself, dep of programs, dep of

13 administration, and obviously we have a dep

14 of health because of our regional medical

15 unit.  Then, goes down to two captains at

16 the facility.  Then, it drops down to watch

17 commanders, sergeants, and ultimately the

18 final step would be the officers.

19      Q.    Do you know whether when

20 telephone calls come into Fishkill that a

21 log is maintained of them?

22      A.    The operator, if they come

23 through the operator, the operator has a

24 log that she keeps, but if somebody is

25 dialing directly in, they would not be part

Page 111

S. URBANSKI

2   of the log that way.   There might be an
3   electronic log, but that's not something
4   that my office would deal with.
5        Q.    Maybe you don't know this.   Do
6   you know if Westchester Hospital's point of
7   contact to Fishkill was through the RMU?
8        A.    In regards to?
9        Q.    I mean, I am asking you
10  generally, but I am referring also to --
11       A.    Generally speaking,
12  Westchester is a medical center and their
13  contact would be the medical department.
14       Q.    Okay.   Is this something that's
15  within your knowledge, or are you just
16  saying that's logical to you?
17       A.    It's within my knowledge and
18  logical.   Westchester is a medical center.
19  If there is a medical issue, they would
20  reach out to our medical staff to discuss
21  it with them, so the medical staff is their
22  normal point of contact.
23       Q.    I don't mean to belabor this,
24  but with respect to the complaint as you
25  described it from Westchester Hospital,

1                    S. URBANSKI

2    assuming it was reported to you verbally,

3    meaning either in person or on the phone,

4    was the person who reported that to you the

5    recipient of that complaint?  Meaning, you

6    are receiving it secondhand from the person

7    who got it, or were they further steps away

8    from the recipient of the complaint before

9    it was reported to you, if you know.

10        A.    I have testified to it three

11   different times already that I don't recall

12   specifically how I got the information.

13        Q.    You said that you referred the

14   matter to OSI.  Did you tell us by what

15   means you did that?

16        A.    On something like this that

17   develops and all of a sudden, we recognize

18   there's injuries, it would be a phone call.

19   That day, if I specifically placed the

20   phone call or if I brought it to the

21   superintendent's direction and he placed

22   phone call, I wouldn't be able to tell you.

23   But normally on a situation like this, it

24   would be a phone call.

25        Q.    Is there a particular person

Page 113

1                    S. URBANSKI

2  who you would call?

3       A.    Well, I have a general number,

4  and they put me through to an OSI staff

5  member.   Usually, it's someone in their

6  main office that will direct it out from

7  there.

8       Q.    Are you saying there is nobody

9  in particular you would call, that you

10  would be referred to somebody that was on

11  duty at the time?

12       A.    Not necessarily.   Not for

13  something like that.

14       Q.    Well, do you remember asking

15  for somebody in particular for this, or do

16  you remember it being a general referral,

17  or something else?

18       A.    I don't recall who specifically

19  I spoke to that day.

20       Q.    Okay.

21       A.    And I already testified the

22  superintendent might have actually placed

23  that phone call.

24       Q.    Okay.   One last thing, maybe

25  this is just for my education.   What do you

Page 114

```
 1                  S. URBANSKI
 2   mean when you refer to a "pre-planned use
 3   of force?"
 4        A.    So there's instances that
 5   happen -- I don't know what the best word
 6   to describe it is -- instantaneously, where
 7   you don't have control over it and you have
 8   to use force to control the situation.
 9   That's unplanned.  If an incident is taking
10   place and immediate force is not necessary
11   to control it and we have time, that would
12   be a pre-planned use of force, where we
13   would go through the process trying to talk
14   the inmate out.  But eventually, compliance
15   has to happen, and then the supervisor
16   would authorize that.  That would be a
17   pre-planned use of force.
18        Q.    So that would that be something
19   like an inmate refuses to come out of their
20   cell and you have to go in and take them
21   out, so it's planned and organized?
22        A.    I cell extraction could be
23   pre-planned or it could be the other
24   depending on the circumstances.
25             MR. HEINZE:  That's all I have.
```

```
 1                    S. URBANSKI
 2        Thank you very much.
 3              MS. COLLINS:  I have a very
 4        quick follow-up as well.
 5  EXAMINATION BY
 6  MS. COLLINS:
 7        Q.     Deputy Urbanski, thank you for
 8  your patience.  I know it's been a long
 9  day.  Are you familiar with HIPAA laws?
10        A.     Yes.
11        Q.     Are you aware if under HIPAA
12  officers are permitted to videotape inside
13  of a hospital?
14        A.     Normally, hospitals frown on
15  that, so they don't normally allow us.
16              MS. COLLINS:  Okay, I have
17        nothing further.
18              MR. SIVIN:  I'm sorry.  I have
19        a couple follow-ups.  There is
20        something I neglected to question you
21        on.
22
23
24
25
```

Page 122

1                    S. URBANSKI

2              C E R T I F I C A T E

3

4   STATE OF NEW YORK         )

                              :  SS.:

5   COUNTY OF ORANGE          )

6

7        I, VICTORIA CHUMAS, a Notary Public

8   for and within the State of New York, do

9   hereby certify:

10       That the witness whose examination is

11  hereinbefore set forth was duly sworn and

12  that such examination is a true record of

13  the testimony given by that witness.

14       I further certify that I am not

15  related to any of the parties to this

16  action by blood or by marriage and that I

17  am in no way interested in the outcome of

18  this matter.

19       IN WITNESS WHEREOF, I have hereunto

20  set my hand this 18th day of May 2021.

21

22

23  _____

            VICTORIA CHUMAS

24

25