UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CHAD STANBRO,

                    Plaintiff,

           -against-

WESTCHESTER COUNTY HEALTH CARE
CORPORATION, WESTCHESTER MEDICAL
CENTER, FRANK WEBER and JOHN FULL,

                  Defendants.
-------------------------------------------------------------X
CHAD STANBRO,

                    Plaintiff,

           -against-

CORRECTION OFFICER NADYA PALOU,
CORRECTION OFFICER RAYMOND DEAL,
CORRECTION OFFICER KRISTOFER LEONARDO,
CORRECTION OFFICER RICHARD LANDRY,
CORRECTION NURSE GARY PAGLIARO and
CORRECTION SERGEANT ENRIQUE TORRES,

                  Defendants.
-------------------------------------------------------------X

**ORDER**

19 Civ. 10857 (KMK)(JCM)

20 Civ. 1591 (KMK)(JCM)

       On November 22, 2019, Chad Stanbro ("Plaintiff"), a prisoner under the care of the New

York Department of Corrections and Community Supervision ("DOCCS"), brought suit against

Westchester Medical Center ("WMC"), Dr. Frank Weber ("Dr. Weber") and Dr. John Full for

failing to provide him with proper medical care and prematurely authorizing his discharge after

he underwent an outpatient procedure at WMC on August 31, 2018. *See generally Stanbro v.

Westchester County, et al.*, 19 Civ. 10857, Docket No. 1 ("Action No. 1"). Thereafter, on

February 24, 2020, Plaintiff filed a separate action against Correction Officers Nadya Palou

("Officer Palou"), Raymond Deal ("Officer Deal"), Kristofer Leonardo ("Officer Leonardo") and

Richard Landry ("Officer Landry") (collectively, "Officer Defendants"), Correction Nurse Gary Pagliaro ("Nurse Pagliaro") and Correction Sergeant Enrique Torres ("Sergeant Torres") for, *inter alia*, subjecting him to excessive force and acting with deliberate indifference to his medical needs, in violation of his Eighth Amendment rights. *See generally Stanbro v. Palou, et al.*, 20 Civ. 1591, Docket No. 12 ("Action No. 2"). On February 4, 2021, the Honorable Kenneth M. Karas so ordered a joint stipulation consolidating the actions for purposes of discovery, pursuant to Federal Rule of Civil Procedure 42. (Action No. 1, Docket No. 46; Action No. 2, Docket No. 43).

Presently before the Court is Plaintiff's motion for spoliation sanctions[1] ("Motion") against the Officer Defendants and Sergeant Torres, for their alleged failure to preserve a videotape ("Video") of Plaintiff's August 31, 2018 escort from Fishkill Correctional Facility ("Fishkill") to St. Luke's Hospital ("St. Luke's"). (Action 1, Docket No. 69; Action 2, Docket No. 71).[2]

---

[1] "Pursuant to Fed. R. Civ. P. 72(a), '[p]retrial matters "not dispositive of a party's claim or defense" may be referred to a magistrate judge for hearing and decision, subject to review, if timely objections are filed, on a "clearly erroneous" or "contrary to law" standard.'" *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15CV9363 (ALC)(DF), 2018 WL 1512055, at *7 (S.D.N.Y. Mar. 12, 2018) (quoting *Seena Int'l, Inc. v. One Step Up, Ltd.*, No. 15–cv–01095 (PKC)(BCM), 2016 WL 2865350, at *10 (S.D.N.Y. May 11, 2016)). Spoliation sanctions are not considered dispositive unless the sanction ordered disposes of a claim or defense. *See id.*; *accord Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 180 (S.D.N.Y. 2014). As discussed herein, the sanctions the Court finds appropriate would not "fully dispose of a claim or defense," and are therefore not dispositive. *See Oracle USA, Inc. v. SAP AG*, 541, 546 (N.D. Ca. 2009); *see also Seena Int'l, Inc.*, 2016 WL 2865350, at *10 ("the critical issue . . . is what sanction the magistrate judge actually imposes, not what sanction the moving party seeks.") (internal quotations and alterations omitted).

[2] Hereinafter, all references to ECF will refer to docket entries in *Stanbro v. Palou*, 20-cv-1591 (Action No. 2), unless otherwise indicated.

## I. BACKGROUND

On August 31, 2018, Plaintiff was transported from Fishkill to WMC by Officers Deal and Palou to undergo surgery for his dislocated jaw. (Palou Decl. [3] ¶ 2).  Officers Leonardo and Landry, who worked at Greene Correctional Facility ("Greene"), were also present at WMC supervising several Greene inmates. (Leonardo Dep.[4] at 23:14–23; *see* Landry Dep.[5] at 34:3–4). During the course of Plaintiff's procedure, he was administered anesthesia, to which he had an adverse reaction. (Docket No. 12 ¶ 38) ("Am. Compl.").  Plaintiff appeared agitated, (Palou Dep.[6] at 28:18–23, 30:9–11), but was unable to speak, as his jaw was "wired shut" for the procedure, (Landry Dep. at 33:6–9).  Plaintiff began swinging his arms and kicking his legs at Dr. Weber and Officer Deal. (Deal Dep.[7] at 52:25–53:8, 56:3–5; Leonardo Dep. at 48:6–6; Landry Dep. at 29:16–18).  Officer Leonardo, who was standing by the doorway of the room where the procedure was being conducted, came up behind Plaintiff and "pulled" him back down into the dental chair. (Palou Dep. at 32:17–34:23).  Officer Palou testified that Officer Leonardo held "[Plaintiff's] head and [the] upper part of his body" to keep him still. (*Id.* at 37:6–8, 37:12–15).  Officer Leonardo described his actions as placing Plaintiff in "half a bear hug." (Leonardo Dep. at 49:2).  Plaintiff continued to struggle with Officers Leonardo and Palou, who held his "upper" body and legs down in the dental chair. (Palou Dep. at 35:10–18, 37:13–15).  Officer

---

[3] Refers to the declaration of Nadya Palou submitted in connection with the instant Motion on June 15, 2021. (Docket No. 70-2).

[4] Refers to the transcript of the deposition of Kristofer Leonardo taken on March 2, 2021 in connection with this litigation. (Docket No. 72-2).

[5] Refers to the transcript of the deposition of Richard Landry taken on March 2, 2021 in connection with this litigation. (Docket No. 72-3).

[6] Refers to the transcript of the deposition of Nadya Palou taken on April 29, 2021 in connection with this litigation. (Docket No. 72-4).

[7] Refers to the transcript of the deposition of Raymond Deal taken on March 4, 2021 in connection with this litigation. (Docket No. 72-1).

Deal attempted to restrain Plaintiff's feet, (Deal Dep. at 57:10–14), until Plaintiff kicked Officer Deal in the stomach, pushing him backward into the wall, (Palou Dep. at 39:9–12; Deal Dep. at 58:4–7, 58:10–24).  This prompted Officer Landry to enter the room and hold down Plaintiff's feet while Officer Deal retrieved mechanical restraints. (Landry Dep. at 28:23–25, 31:2–3).  Officer Deal restrained Plaintiff in the dental chair with a waist chain, padlocks, cuffs and a black box. (Leonardo Dep. at 57:24–25; Palou Dep. at 42:19–21).  Officer Palou estimated that the officers applied pressure to Plaintiff's "upper" body for two to four minutes before the mechanical restraints were secured. (Palou Dep. at 42:22–43:7).

Once the mechanical restraints were secured, the officers stepped away from Plaintiff. (*Id.* at 46:3–17).  Palou testified that Plaintiff was "crying" and "hyperventilating," but did not appear injured. (*Id.* at 46:21–47:14).  Officers Leonardo and Deal similarly said that Plaintiff was "acting fine" and did not seem to be hurt in the aftermath of the incident. (Deal Dep. at 100:4–5; Leonardo Dep. at 65:3–6.).  Officers Palou, Leonardo and Deal denied that Plaintiff was unable to ambulate at this time. (Palou Dep. at 45:6–7; Deal Dep. at 100:19–23; Leonardo Dep. at 65:7–13).

Plaintiff was placed in a wheelchair and transported back to Fishkill by Officers Deal and Palou. (*See* Deal Dep. at 107:5–8).  Fishkill's Deputy Superintendent of Security, Stephen Urbanski ("DSS Urbanski"), testified that "by the time" Plaintiff returned to Fishkill, "[DOCCS was] aware that [Plaintiff suffered] at least what appeared to be injuries," which prompted DOCCS's Office of Special Investigation ("OSI") to open an investigation into the incident. (Urbanski Dep.[8] at 22:8–18, 22:25–23:4).  At some point before Plaintiff arrived at Fishkill, DSS

---

[8] Refers to the transcript of the deposition of Stephen Urbanski taken on May 4, 2021 in connection with this litigation. (Docket No. 72-7).

Urbanski received a call from someone at WMC "complaining about the use of force" on Plaintiff, which the individual "did not feel . . . was appropriate" and believed was "unnecessary." (*Id.* at 19:3–8, 19:18–20).

When Deal, Palou and Plaintiff arrived at Fishkill, they were met by Sergeant Torres, who was the sergeant on duty for Fishkill's Regional Medical Unit ("RMU"). (Torres Dep.[9] at 82:4–6; Urbanski Dep. 32:3–5). Plaintiff indicated to Sergeant Torres that his neck was in pain. (Torres Dep. at 31:15–20). Sergeant Torres summoned the assistance of Nurse Pagliaro, who removed Plaintiff from the transport van and secured him in a "Stryker" chair. (*Id.* at 31:18–20, 32:12–21, 33:23–25, 57:9–10; *see also* Stanbro Dep.[10] at 90:12–14). Nurse Pagliaro escorted Plaintiff to the emergency room ("ER") within Fishkill's RMU. (Stanbro Dep. at 92:10–18). Plaintiff described being in "excruciating" pain as he was taken to the ER. (*Id.* at 94:5–7). Sergeant Torres testified that he did not believe Plaintiff was physically injured at this time. (Torres Dep. at 42:5–8).

After Plaintiff arrived in the ER, Sergeant Torres photographed Plaintiff in the Stryker chair. (*Id.* at 50:7–16; Docket No. 68-3). Sergeant Torres testified that the entire time Plaintiff was in the Stryker chair, his head, legs and arms remained in substantially the same position as is depicted in the photographs produced during discovery. (Torres Dep. at 52:8–17; *see also* Docket No. 68-3). Plaintiff alleges that he was in the Stryker chair for a "period of hours." (Am. Compl. ¶ 54).

---

[9] Refers to the transcript of the deposition of Sergeant Enrique Torres taken on March 4, 2021 in connection with this litigation. (Docket No. 72-5).

[10] Refers to the transcript of the deposition of Chad Stanbro taken on February 3, 2021 in connection with this litigation. (Docket No. 68-2).

At some point thereafter, Sergeant Torres witnessed Plaintiff "slid[e] out of the [Stryker] chair . . . onto the floor" in "slow motion." (Torres Dep. at 53:19–21, 59:23).  Plaintiff lay on the ground on his back, looking straight up. (*Id.* at 60:11–61:2).  Nurse Pagliaro conducted an examination of Plaintiff while he lay on the ground, in which he removed Plaintiff's pants and shoes and used a plastic needle to "scan the bottom of" Plaintiff's foot to determine whether Plaintiff had a reflex. (*Id.* at 53:21–23; Stanbro Dep. at 94:15–22).  Plaintiff described that Nurse Pagliaro "stabb[ed] the bottom of [his] foot for a long period of time," and when Plaintiff did not exhibit a reflex, Nurse Pagliaro started to "push on [his] toenail" and pinch his legs. (Stanbro Dep. at 94:24–95:6).  Plaintiff did not feel any of Nurse Pagliaro's maneuvers. (*Id.* at 95:9–11). Plaintiff was unable to get up off the ground, prompting personnel within the ER to call an ambulance to bring Plaintiff to an outside hospital. (*Id.* at 95:24–96:2; Urbanski Dep. at 49:18–21).

Shortly after Plaintiff was examined by Nurse Pagliaro, DSS Urbanski was informed that Plaintiff "had an injury and could not move." (Urbanski Dep. at 49:14–19).  Sergeant Torres, however, testified that Plaintiff was moving his arms and legs while on the ground. (Torres Dep. at 66:13–16).  It is undisputed that Plaintiff remained on the ground until the medics arrived. (Stanbro Dep. at 96:3–5; Torres Dep. at 65:21–66:7).  The medics moved Plaintiff to a stretcher and transported him by ambulance from the RMU to St. Luke's. (Torres Dep. at 102:3–7). Plaintiff's transport was recorded on a handheld video camera. (*Id.* at 99:24–25).  Upon his arrival at St. Luke's, Plaintiff was diagnosed with, *inter alia*, quadriplegia. (*See* Stanbro Dep. at 96:3–5; Am. Compl. ¶ 54).

At the direction of DSS Urbanski, Plaintiff's transport to St. Luke's was recorded and Plaintiff was accompanied by a supervisor, Sergeant John Carreras ("Sergeant Carreras").

(Urbanski Dep. at 60:6–10; Torres Dep. at 99:24-25).  Pursuant to standard procedure, the officers should have started the video recording as soon as Plaintiff was moved, in this case, out of the ER via stretcher. (Torres Dep. at 102:22–103:5).  While the record indicates that the video recording started while Plaintiff was inside the RMU, (Urbanski Dep. at 72:4–6; Torres Dep. at 101:4–22), it is unclear whether the recording commenced while Plaintiff was in the ER or once he left the ER but was still inside the RMU.  Furthermore, the recording should have continued until Plaintiff arrived at St. Luke's, but, at some point after the ambulance departed, the battery of the handheld video camera died. (Urbanski Decl.[11] ¶ 12).

    DSS Urbanski ordered the recording because:

> [DOCCS] became aware of the significance of [Plaintiff's] injury. The hospital had sent information that they had questioned the need for the use of force, and at the time [DSS Urbanski] felt it was appropriate to send a supervisor and a video camera on the medical trip [to St. Luke's].

(Urbanski Dep. at 61:3–9).  In fact, when Plaintiff returned to Fishkill from WMC, DOCCS escalated the incident that had occurred at WMC from a "use of force" ("UOF") to a "use of force/unusual incident." ("UFO/UI"). (Urbanski Decl. ¶ 6).

    As part of its standard procedure, DOCCS maintains a corresponding file for every UOF and/or UI, which "contains things such as paperwork pertaining to the incident (*i.e.* memoranda from the staff members involved . . . ), any photographs taken of the officer/inmate after the incident . . ., and any other item deemed part of the incident, such as any electronic storage device containing any video." (*Id.*).

    As the sergeant on duty in the RMU, Sergeant Torres was required to complete several reports documenting the incident, including a "use of force" report. (Torres Dep. at 80:4–81:2,

---

[11] Refers to the declaration of Stephen Urbanski submitted by the OAG in connection with this litigation on April 20, 2021. (Docket No. 67-7 at 8–11).

81:20–82:20).  Sergeant Torres compiled Officer Deal's and Palou's reports and prepared his

own memorandum. (*Id.*).  Sergeant Torres referenced the Video taken of Plaintiff's transport to

St. Luke's in his memorandum. (*Id.* at 99:21–25).

Additionally, DSS Urbanski viewed the Video on the video camera itself. (Urbanski Dep.

at 78:6–8).  He recalled that the Video showed that Plaintiff "could not move his lower

extremities" and "[i]t looked like [Plaintiff] was in . . . discomfort." (*Id.* at 63:14–18).  The

Video was thereafter burned onto a DVD. (*Id.* at 77:17–19).  The DVD should have been

labeled, placed in a sleeve and stored in a locked cabinet in a secured room off the watch

commander's office. (*Id.* at 75:10–12; Urbanski Decl. ¶ 7).  However, the Video is missing.

DSS Urbanski and Sergeant Torres both testified that the Video should have been preserved.

(Urbanski Dep. at 61:10–13; Torres Dep. at 106:18–25, 107:2–8).

## II.  LEGAL STANDARD

"Spoliation is the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  District courts are

afforded broad discretion to mold a proper sanction for spoliation that "serve[s] the prophylactic,

punitive, and remedial rationales underlying" the doctrine. *Id.*  Sanctions for spoliation of

evidence are intended to: (1) deter parties from spoliating evidence; (2) "place the risk of an

erroneous judgment on the party who wrongfully created the risk;" and (3) restore "the

prejudiced party to the same position he would have been in absent the wrongful destruction of

evidence." *Id.* (internal quotations omitted).  An extreme sanction is an adverse-inference

instruction, which directs the jury that it may "infer that the party who destroyed potentially

relevant evidence did so out of a realization that the evidence was unfavorable." *Zubulake v.*

*UBS Warburg LLC*, 220 F.R.D. 212, 219–20 (S.D.N.Y. 2003) (internal alterations and quotations omitted).

Historically, a party seeking sanctions for the spoliation of evidence was required to establish the following three elements: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim . . . such that a reasonable trier of fact could find that it would support that claim." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (internal quotations omitted). However, on December 1, 2015, Federal Rule of Civil Procedure 37(e) ("Rule 37(e)") "was amended to provide a different standard" for sanctions arising from the "destruction of electronically stored information" ("ESI"). *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 425 (W.D.N.Y. 2017).

Federal Rule of Civil Procedure 37(e), as amended, currently provides as follows:

> **(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Rule 37(e)(2) provides that the harshest spoliation sanctions — including an adverse-inference instruction — are only available upon a finding that the spoliating party "acted with the intent to deprive another party of the information's use." Fed. R. Civ. P. 37(e)(2).  Thus, the amendment expressly "rejects cases such as *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence," where the spoliated evidence is ESI. Fed. R. Civ. P. 37(e)(2), Advisory Committee Note, 2015 Amendment.

"Aside from modifying the state of mind required of a spoliator, the 2015 amendments to Rule 37(e) did not significantly alter the elements required at common law for sanctions to issue." *Ungar v. City of New York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018).  The movant must still establish that the evidence "should have been preserved in the anticipation or conduct of litigation," *i.e.*, that the spoliator had a duty to preserve the evidence, and that the evidence was "lost because a party failed to take reasonable steps to preserve it," *i.e.*, that such a duty was breached. Fed. R. Civ. P. 37(e); *see Ungar*, 329 F.R.D. at 13 ("Rule 37(e) is based on this common-law duty; it does not attempt to create a new duty to preserve.") (quoting Fed. R. Civ. P. 37(e), Advisory Committee Note, 2015 Amendment).  Furthermore, the movant must be prejudiced by the absence of the spoliated evidence to be entitled to sanctions under Rule 37(e)(1) or (2). *See Ungar*, 329 F.R.D. at 13 (citing *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 749 (N.D. Ala. 2017) (explaining that the prejudice element is implicitly incorporated into Rule 37(e)(2)).

## III.  DISCUSSION

### A.  Imputing DOCCS's Conduct to the Individual Defendants Officer Defendants (Leonardo, Landry, Deal and Palou)

The Officer Defendants argue that because they "had no role in preserving or administering the video," which was lost "at the hands of" non-party DOCCS, they neither had a duty to preserve the Video, nor could they have possessed a culpable state of mind related to its loss. (Docket No. 69 at 19–21 ("OAG Def. Br."); Docket No. 70 at 6, 8 ("Palou & Deal Br."); *see also* Palou Decl. ¶¶ 13–14; Deal Decl.[12] ¶¶ 13–14).  It is undisputed that the Officer Defendants were not personally responsible for preserving the Video.

"Absent some special relationship or duty arising by reason of an agreement, contract, statute, or other special circumstance, the general rule is that there is no duty to preserve possible evidence for another party to aid that other party in some future legal action against a third party." *Wilson v. Beloit Corp.*, 921 F.2d 765, 767 (8th Cir. 1990) (internal quotations omitted); *accord* 101 A.L.R. 5th 61 (Originally published in 2002).  However, federal district courts have found that in some circumstances, "state correctional departments and municipalities 'ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners,'" and as such, a state correctional department's "failure to preserve evidence may be imputed to individual officer defendants 'in order to avoid unfair prejudice' to inmate litigants." *Johns v. Gwinn*, 503 F. Supp. 3d 452, 463 (W.D. Va. 2020) (citing cases) (quoting *Harvey v. Hall*, Civil Action No. 7:17-cv-00113, 2019 WL 1767568, at *6 (W.D. Va. Apr. 22, 2019)).  The court in *Johns* held that the spoliation of evidence by a state department of corrections ("DOC") was properly imputed to an individual officer based on the "uniquely intertwined relationship" between DOC

---

[12] Refers to the declaration of Raymond Deal submitted in connection with the instant motion on June 15, 2021. (Docket No. 70-1).

and its officers. 503 F. Supp. 3d at 463.  In reaching this holding, the court emphasized that DOC employed and trained the allegedly culpable officer, represented him via the state Attorney General's office, controlled the evidence introduced in the officer's favor in connection with the litigation, and maintained a general policy of indemnifying correctional officers when judgments are entered against them. *Id.*  In essence, the *Johns* court reasoned that any sanction against the individual officer was, "in many important respects a sanction felt most acutely by [DOC]." *Id.*

Several courts in this circuit have similarly opined on the unique relationship between DOCCS and its correctional officers in the context of spoliated evidence.  For example, in *Gross v. Lunduski*, the court found that DOCCS has a "substantial interest" in excessive force lawsuits brought against individual officers and that "DOCCS and [its officers'] interests are sufficiently aligned and closely interrelated" to support the conclusion that for the purposes of an inmate-prisoner's spoliation motion, an officer defendant has "the 'practical ability' to obtain documents held by DOCCS, although a non-party." [13] 304 F.R.D. 136, 143 (W.D.N.Y. 2014) (noting the "history of cooperation demonstrating DOCCS's willingness to produce documents required in the defense of a corrections officer . . . against a prisoner's excessive force claim").  The *Gross* court's finding was "reinforced by the commonly known fact that, in [New York], payments of settlements of claims against corrections officers in prisoner civil rights cases . . . are [generally] subject to approval by senior DOCCS officials and are made from the DOCCS's departmental budget." *Id.*; *see also Jackson v. Monin*, No. 13–CV–00004–RJA–JJM, 2015 WL 5714243, at *3 (W.D.N.Y. Sept. 29, 2015) (rejecting officer defendants' argument that they lacked possession of the evidence sought by plaintiff, which was in DOCCS's custody, on the ground that "practically every other court within the Second Circuit" has observed "that for litigation purposes, unless

---

[13] For the sake of completeness, the narrower question of whether DOCCS's correctional officers had the requisite "control" over the Video to give rise to a duty to preserve is addressed *infra*, Section III(D)(1)(i).

there is an obvious conflict of interest, DOCCS and its correctional officers are essentially inseparable when defending against constitutional claims.") (quoting *Wandering Dago Inc. v. New York State Office of Gen. Servs.*, Civ. No. 1:13–CV–1053 (MAD/RFT), 2015 WL 3453321, at *10, n.9 (N.D.N.Y. May 29, 2015) ("the closely coordinated interest and the irrefutable litigation history of cooperation between [DOCCS] and [its employees] in defending against these types of constitutional claims, in effect, gave the defendant and his counsel the practical ability to obtain access to the documents even if they were in the possession of [DOCCS]."")).

Furthermore, the Court is not persuaded by the OAG Defendants' argument that because the Officer Defendants were sued in their individual capacities, it is improper to impute DOCCS's conduct with respect to discoverable evidence onto them. (OAG Def. Br. at 19). Accepting the OAG's argument as a *per se* rule "would lead to the absurd result that a state-run correctional facility could wrongly destroy any piece of evidence in its control with near-zero risk of consequence in prisoner suits," *Johns*, 503 F. Supp. 3d at 464, since DOCCS cannot be sued for damages in Section 1983 cases, nor can it be held vicariously liable for the torts of its employees, *see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 70 (1989).[14]

At the same time, common sense cautions against endorsing a bright line rule that DOCCS's spoliation of evidence should always be imputed to correctional officers by virtue of

---

[14] Relatedly, to the extent that the OAG Defendants' reference to the Supreme Court's admonition in *Ashcroft v. Iqbal* that "vicarious liability is inapplicable to . . . § 1983 suits" suggests that imputing DOCCS's discovery obligations to its correctional officers runs afoul of the Eleventh Amendment, such an argument is unavailing. (*See* OAG Def. Br. at 19).  "That the Attorney General has chosen to defend Defendant[s] demonstrates, irrespective of Eleventh Amendment limitations on a district court's jurisdiction over civil actions seeking money damages brought against a state, . . . that the state, and thus DOCCS as a department thereof, has a substantial interest" in prisoner rights cases such as the instant matter. *Gross*, 304 F.R.D. at 143.  DOCCS cannot selectively choose to act in accordance with its "substantial interest" in such cases on some occasions (*e.g.*, by defending correctional officers, exercising settlement authority, and controlling the evidence produced to inmate-plaintiffs), while simultaneously disclaiming that interest for purposes of preserving discovery by stating that it is not a party to the action.

the unique relationship between them.  "[I]mpos[ing] a rule to cover every such situation" would

"impose an added burden on prison employees" and "force prison employees to constantly

second-guess their employer's ability to maintain potential evidence for possible litigation."

*Thousand v. Corrigan*, 9:15-CV-01025 (MAD/ATB), 2017 WL 4480185, at *3 (N.D.N.Y. Oct.

6, 2017) (quoting *Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012)).  Thus, "the more

prudent path . . . is to consider instances raising spoliation questions on a case-by-case basis." *Id.*

(quoting *Adkins*, 692 F.3d at 507).

      Here, Plaintiff seeks spoliation sanctions against each Officer Defendant, none of whom

were personally responsible for preserving the Video. (*See* Docket No. 71).  In resolving whether

DOCCS's supposed spoliation can be imputed to the Officer Defendants, the Court considers

"the purposes of a spoliation sanction and the factors for determining whether one should be

imposed." *See Adkins*, 692 F.3d at 506.

      The instant circumstances do not warrant imputing any malfeasance by DOCCS to

Officers Leonardo, Landry, Deal or Palou.  Crucially, the record does not indicate that the

absence of the Video prejudices Plaintiff's excessive force claim against the Officer Defendants.

*See GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 353 (S.D.N.Y. 2012)

("[A] court should never impose spoliation sanctions of any sort unless there has been a showing

— inferential or otherwise — that the movant has suffered prejudice.").  Plaintiff alleges that the

Video would show that he was paralyzed from the neck down and that the absence of the Video

prejudices his claim against the Officer Defendants because it prevents him from rebutting their

testimony that he did not appear significantly injured after the use of force. (Docket No. 73 at 16)

("Pl. Br.").  In short, Plaintiff argues that the Video would call the Officer Defendants'

credibility into question. (*See id.*).  However, Plaintiff admits that the Video was taken several

hours after the incident at WMC. (*See* Am. Compl. ¶ 54).  Thus, the Video would not show Plaintiff's physical state immediately after the use of force, which is at the heart of Plaintiff's claims against the Officer Defendants.  Furthermore, the record includes direct evidence of Plaintiff's physical condition immediately after the use of force, specifically, video footage of Plaintiff being wheeled out of WMC. (*See* Docket No. 68-1).  Accordingly, the absence of the Video does not prejudice Plaintiff in his claims against the Officer Defendants.

Furthermore, it is notable that Officers Deal and Palou are represented by privately retained counsel in this action. (*See generally* Palou & Deal Br.).  The fact that Officers Deal and Palou are not represented by the state is another factor that counsels against imputing DOCCS's conduct concerning the Video to Officers Deal and Palou. *See Gross*, 304 F.R.D. at 143–44. Additionally, Officers Leonardo and Landry do not work at the Fishkill facility, where the Video was recorded and subsequently lost or destroyed.  The Court has not found any precedent where the conduct of DOCCS with respect to evidence maintained in one facility was attributed to officers working in another facility.  For the foregoing reasons, the Court concludes that imputing DOCCS's supposed spoliation of evidence to the Officer Defendants is not appropriate here.

### B.  Imputing DOCCS's Conduct to Sergeant Torres

Plaintiff also seeks sanctions against Sergeant Torres for the alleged spoliation of the Video.  Unlike the Officer Defendants, Plaintiff argues that Sergeant Torres had an independent duty to preserve the Video, as he was the supervisor on duty for the RMU and ultimately signed off on the "use of force" report documenting the incident. (Pl. Br. at 16).  For the reasons that follow, the Court finds that DOCCS's undisputed duty to preserve the Video is properly imputed

to Sergeant Torres.  Therefore, the Court need not resolve the issue of whether Sergeant Torres had an independent duty to preserve the Video.

First, the record demonstrates that Plaintiff would be prejudiced in his claims against Sergeant Torres without the Video.  Plaintiff alleges in his complaint that Sergeant Torres was deliberately indifferent to his need for "prompt medical care" while in the RMU, resulting in an exacerbation of his injures. (Am. Compl. ¶¶ 50–54, 61).  Plaintiff avers that RMU staff, under the supervision of Sergeant Torres, waited "a period of hours" to bring Plaintiff to an outside hospital, despite his need for immediate care. (*Id.* ¶¶ 48, 52, 54).

Sergeant Torres testified that he did not believe Plaintiff was physically injured when he was brought to the RMU. (Torres Dep. at 42:5–8).  Sergeant Torres also claimed that Plaintiff retained the capacity to move his arms and legs after sliding out of the Stryker chair. (*Id.* at 66:8–22).  Plaintiff maintains that the Video would have shown that he was paralyzed at the time that he was transported from the RMU to St. Luke's, which would demonstrate that Sergeant Torres knew or should have known that he needed prompt medical attention.  Such a showing is necessary for Plaintiff to establish deliberate indifference.  Additionally, evidence that Plaintiff was paralyzed while in the RMU contradicts Sergeant Torres' deposition testimony and thus, is relevant to his credibility.[15]

---

[15] The OAG argues that the absence of the Video could not prejudice Plaintiff's case because "the Video would only show the same things that are portrayed by the photographs of Plaintiff that were taken moments before the escort while he was inside the RMU exam room . . ." (OAG Def. Br. at 23).  The OAG essentially argues that the Video is cumulative of other evidence in the record.  The OAG's argument fails for several reasons.  First, the record does not support the OAG's assertion that the photographs taken of Plaintiff in the ER were taken "moments before the escort" to St. Luke's. (*See id.*).  Indeed, the record is clear that paramedics moved Plaintiff from the ground to the stretcher in order to transport him to an ambulance. (*See* Torres Dep. at 65:21–66:7).  Thus, the fact that the photographs show that Plaintiff was still in the Stryker chair and had not yet slid to the ground or been examined by Nurse Pagliaro rebuts the OAG's contention that the photographs were taken "moments before" the escort.  Second, the photographs cannot conclusively demonstrate whether Plaintiff was paralyzed, as it is difficult to tell from still photographs whether Plaintiff was able to move his legs. (*See* Docket No. 68-3).  Third, in the context of spoliation sanctions, courts are split on whether the prejudice element requires a showing that the spoliated evidence: (1) would be probative of a party's claims or defenses; or (2) would have been of the nature alleged by the movant. *See Ungar*, 329 F.R.D. at 15; *infra* Section III(E).  Even assuming, *arguendo*, that the Video was cumulative of other

Furthermore, the record supports Plaintiff's contention that the Video would have shown that he was paralyzed at the time he left the RMU.  DSS Urbanski, the only witness in this case that viewed the Video, testified that the Video showed that Plaintiff "could not move his lower extremities." (Urbanski Dep. at 63:14–18).  Thus, the Video's absence is prejudicial to Plaintiff. *See Residential Funding*, 306 F.3d at 109; *infra*, Section III(E).

Second, the Court considers Sergeant Torres' practical ability to obtain the Video from DOCCS in connection with this litigation.[16] *See infra*, Section III(D)(1)(i).  Sergeant Torres is represented by the OAG in this action. (*See generally* OAG Def. Br.).  The OAG produced other evidence in this litigation, such as a video of Plaintiff from WMC and photographs of Plaintiff inside the RMU, (Docket Nos. 68-1, 68-3), that were in DOCCS's physical custody.  Since Sergeant Torres obtained this evidence for use in the instant litigation through his counsel, the OAG, it is safe to conclude that he could also obtain the Video if it existed. (*See id.*); *Guillory v. Skelly*, No. 12–CV–00847S(F), 2014 WL 4542468, at *8 (W.D.N.Y. Sept. 11, 2014) (finding that individual officers had control of spoliated evidence where "the production of other documents in th[e] action — through the intermediation of the Attorney General who represents both DOCCS and Defendants — was necessarily from DOCCS, rather than Defendants").

---

evidence in the record, such a finding would not necessitate the conclusion that the Video is not prejudicial under either test. *See Ungar*, 329 F.R.D. at 15.

[16] It is noteworthy that unlike the Officer Defendants — who were unaware that the Video was created — Sergeant Torres was inside the RMU when the video recording of Plaintiff's transport to St. Luke's began. (*See* Torres Dep. at 99:21–100:13).  Furthermore, as the supervisor assigned to the underlying UOF/UI, Sergeant Torres was familiar with the standard procedure by which the Video was recorded and preserved. (*See generally id.* at 101:13–107:8). Sergeant Torres testified that he signed off on the use of force report, which included a memorandum he drafted that referenced the Video, (*id.* at 82:4–6, 106:18–25), and that the Video became "part of the use of force package" and "should [have] be[en] available" until, at least, the conclusion of the OSI investigation, (*id.* at 106:18–25, 107:2–8).

In conclusion, as discussed in further detail *infra*, Section III(D)(1)(i), Sergeant Torres had the practical ability to obtain the Video from DOCCS in connection with this litigation. Accordingly, the Court finds that spoliation by DOCCS is properly attributed to Sergeant Torres.

## C. Nature of the Video

The parties dispute whether Rule 37(e) is applicable to Plaintiff's request for spoliation sanctions or whether it should be resolved under the common-law. This dispute turns on whether the Video constitutes "ESI." The 2015 Amendment to Rule 37(e)(2) "replaced the 'culpable state of mind' element under *Residential Funding* with a more stringent 'intent to deprive' requirement" in cases involving the spoliation of ESI. *Ungar*, 329 F.R.D. at 12; *accord Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 60 n.10 (S.D.N.Y. 2020). Plaintiff concedes in his opening brief that he "has adduced no evidence that DOCCS, the defendants, or any of their agents or representatives . . . willfully destroyed the videotape or otherwise acted in bad faith in connection with their failure to preserve the videotape." (Pl. Br. at 16). Further, Plaintiff specifically seeks an adverse-inference instruction, which is only available under the Federal Rules upon a showing of an intent to deprive. Thus, the Court must first determine whether the Video is ESI.

Plaintiff argues that the Video "was taken with a *handheld* video camera . . . 'transferred to a DVD,' 'placed in a sleeve,' 'stored in a locked cabinet' in a 'secured room off the watch commander's officer,'" where it should have been kept as a "hardcop[y]" for a minimum of five years. (Docket No. 75 at 3 (emphasis in original); quoting Urbanski Dep. at 74:10–11, 75:10–12, 76:9, 76:13–17). Plaintiff asserts that the Video is therefore not ESI and is distinguishable from a video recording taken on a fixed surveillance device and saved on a computer. (*Id.* at 3–4).

The OAG Defendants assume, without explaining, that Rule 37(e) governs the instant Motion. (OAG Def. Br. at 21).

The Federal Rules of Civil Procedure do not define ESI.  In its Note concerning the 2006 Amendment to Rule 34(a), the Advisory Committee explained that "[t]he wide variety of computer systems currently in use, and the rapidity of technological change, counsel against a limiting or precise definition of electronically stored information." Fed. R. Civ. P. 34(a), Advisory Committee Note, 2006 Amendment.  This proposition has even more validity today, in light of the immense technological change that has occurred in the past fifteen years. Furthermore, no court within the Second Circuit has opined on whether information copied onto a DVD is ESI for the purposes of Rule 37(e).

The Court finds that the Video at issue here constitutes ESI. *See* Barbara J. Rothstein, *et al.*, Managing Discovery of Electronic Information: A Pocket Guide for Judges, Federal Judicial Center (2007), https://www.uscourts.gov/sites/default/files/eldscpkt_1.pdf. ("ESI includes e-mails, webpages, word processing files, and databases stored in the memory of computers, magnetic disks (such as computer hard drives and floppy disks), optical disks (*such as DVDs* and CDs), and flash memory (such as 'thumb' or 'flash' drives).") (emphasis added).  The classification of evidence as "electronically *stored*" draws a distinction between "information that is fixed in a tangible form" and "information that is stored in a medium from which it can be retrieved and examined." Fed. R. Civ. P. 34(a), Advisory Committee Note, 2006 Amendment (remarking that the discovery rules apply with equal force to the former and the latter). Furthermore, several federal courts have recently recognized that digitized data necessarily constitutes ESI. *See Bistrian v. Levi*, 448 F. Supp. 3d 454, 467 (E.D. Pa. 2020) (Rule 37(e), which governs sanctions for the spoliation of ESI, applies to video footage that is stored

digitally); *accord Nyerges v. Hillstone Rest. Grp. Inc.*, No. CV-19-02376-PHX-DWL, 2021 WL 3299625, at *5 n.4 (D. Ariz. Aug. 2, 2021) (concluding that video footage constituted "ESI because it was presented to the Court in digital form.") (citing *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 880 n.19 (N.D. Ill. 2021) ("The digitized video was attached as a .mov file to an email. It was ESI.")

A DVD is a type of optical disk, defined as "a disk with plastic coating on which information (such as music, visual images, or computer data) is recorded *digitally* (as in the form of tiny pits) and which is read by using a laser." *Optical Disk*, MERRIAM-WEBSTER (11th ed. 2003) (emphasis added); *see also Optical disc*, BRITANNICA, https://www.britannica.com/technology/optical-disc (last visited Aug. 27, 2021) ("the optical disc makes use of laser technology: *digital data* are recorded by burning a series of microscopic holes, or pits, with a laser beam into thin metallic film") (emphasis added).  Therefore, by definition, information burned onto a DVD is both digitized and "stored in a medium from which it can be retrieved and examined." *See* Fed. R. Civ. P. 34(a), Advisory Committee Note, 2006 Amendment.  Accordingly, such information is ESI. *See id.*; *cf Zubulake v. Warburg LLC*, 217 F.R.D. 309, 318–19 (S.D.N.Y. 2003) (discussing optical disks as a type of "electronic data storage").

**D.  Availability of Sanctions Under Rule 37(e)**

Having found that the Video constitutes ESI, the Court will analyze Plaintiff's Motion for sanctions against Sergeant Torres pursuant to Rule 37(e).  However, before determining whether the Court may issue sanctions pursuant to Rule 37(e)(1) or (2), the Court must ascertain whether the threshold requirements of Rule 37(e) have been satisfied, namely whether the Video: (1) "should have been preserved in the anticipation or conduct of litigation;" (2) was lost because

both DOCCS and its counsel failed to take reasonable steps to preserve it; and (3) "cannot be entirely restored or replaced." *Lokai Holdings LLC v. Twin Tiger USA LLC*, 15cv9363 (ALC)(DF), 2018 WL 1512055, at *9 (S.D.N.Y. Mar. 12, 2018).  All three threshold requirements are met here.

### 1.  Duty to Preserve

Plaintiff must first "demonstrate that the spoliating party had an obligation to preserve the evidence at the time it was destroyed." *Karsch v. Blink Health Ltd.*, 17-CV-3880 (VM)(BCM), 2019 WL 2708125, at *18 (S.D.N.Y. June 20, 2019) (quoting *Leidig v. Buzzfeed, Inc.*, 16 Civ. 542 (VM)(GWG), 2017 WL 6512353, at *8 (S.D.N.Y. Dec. 19, 2017)).  "The obligation to preserve evidence arises when [a] party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).  "Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake*, 220 F.R.D. at 216 (emphasis in original).

In circumstances where a department of corrections internally investigates an incident within a prison, the department is obligated to preserve "[a]ll relevant evidence," meaning "all evidence that could be relevant to litigation that the DOC should have known could be forthcoming; and not just evidence that is relevant to the DOC's internal investigation into an incident." *Thomas v. Butkiewicus*, CIVIL ACTION NO. 3:13-CV-747 (JCH), 2016 WL 1718368, at *11 (D. Conn. Apr. 29, 2016).  Put differently, in addition to "evidence that is relevant for *their* purposes," the department of corrections must preserve "evidence that could be relevant" for a potential inmate-plaintiff's purposes. *Id.* (emphasis in original).

### i. Sergeant Torres' "Control" Over the Video

Implicit in a party's duty to preserve evidence is the assumption that the party against whom sanctions are sought had "control" over the missing evidence. *See Wandering Dago*, 2015 WL 3453321, at *8 ("the duties to preserve and maintain control over relevant documents are scrutably synonymous."); Fed. R. Civ. P. 37(e), Advisory Committee Note, 2015 Amendment (a party cannot breach its preservation obligation if the evidence at issue is not "in the party's control"). "The concept of 'control' has been construed broadly" by courts within this circuit. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006). Evidence is within a party's control for discovery purposes when "the party has the legal right, authority, *or practical ability to obtain*" such evidence "by virtue of its relationship with the party in possession of the evidence." *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010), *report and recommendation adopted*, 271 F.R.D. 55 (S.D.N.Y. 2010) (emphasis added). Thus, "even where a party . . . lacks actual physical possession or custody of requested documents . . . such party may nevertheless be found to have control of the documents" in certain circumstances. *Wilson v. Hauck*, 141 F. Supp. 3d 226, 229 (W.D.N.Y. 2015) (internal alterations omitted).

When assessing whether a party had the practical ability to obtain evidence from another entity, courts look at the interrelatedness of the relationship between the party against whom sanctions are sought and the entity with custody of the evidence. *See, e.g.*, *Guillory*, 2014 WL 4542468, at *8. Courts in this circuit addressing the issue have routinely found that "in suits against individual corrections officers employed by DOCCS where DOCCS is not a defendant, a sufficiently close relationship nonetheless exists to impute DOCCS's control over evidence to the individual officers." *Slater v. Lacapruccia*, 13-cv-1079S, 2019 WL 1723515, at *4 (W.D.N.Y. Apr. 18, 2019); *Wilson*, 141 F. Supp. 3d at 229 (expressly rejecting officer

defendants' arguments that they were not obligated to preserve a missing videotape on the grounds that the "[i]ndividual defendants are not the Department of Corrections and Community Supervision" and "[a]t no time did the individual defendants possess the video . . ."); *see also Vigliotti v. Selsky*, No. 08–CV–00875 (M), 2013 WL 3354423, at *4 (W.D.N.Y. July 3, 2013) (rejecting defendants' argument — in opposition to plaintiff's motion to inspect prison mental health ward — that prison facilities "are in the possession, custody and control of DOCCS, a non-party," because the argument ignored the fact that the individual defendants "had [a] sufficient nexus to DOCCS" to arrange for the requested inspection).

The same outcome is appropriate here.  It is undisputed that DOCCS had possession of the Video. (Urbanski Decl. ¶ 6; Urbanski Dep. 77:17–19).  Furthermore, the relationship between Sergeant Torres and DOCCS is sufficiently interrelated, such that Sergeant Torres had the practical ability to obtain the Video from DOCCS. *See Guillory*, 2014 WL 4542468, at *8 (DOCCS and its correctional officers "are interrelated and share the same mission and goals with respect to the incarceration and rehabilitation of convicted persons committed to DOCCS's custody."); *Wilson*, 141 F. Supp. 3d at 229  ("the relationship between DOCCS and its employees is sufficiently closely coordinated to find that DOCCS employees have control over evidence held by DOCCS") (internal quotations omitted).  As discussed, *supra*, the OAG represents Sergeant Torres in this action and has produced other documents in connection with this litigation that were "necessarily from DOCCS," rather than Sergeant Torres himself. *See Guillory*, 2014 WL 4542468, at *8.  Indeed, the OAG, in its representation of Sergeant Torres, directed various DOCCS personnel to search for the Video at issue here. (*See* Docket No. 72-6 at 4–11); *cf In re NTL, Inc. Securities Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (finding that parent company had the practical ability to obtain documents from a subsidiary where CEO of

parent company testified that "[w]henever there was a document that [it] needed [from the subsidiary] . . . [it] would call [the subsidiary] and ask if they had it, and if they had it, they'd send it.").  Accordingly, Sergeant Torres had the practical ability to obtain the Video from DOCCS and thus, had control over the Video.[17]

### ii.  When Did the Duty to Preserve Arise?

The OAG ostensibly does not contest that DOCCS was obligated to preserve the Video in connection with the present litigation. (OAG Def. Br. at 20; *see also* Urbanski Dep. at 61:10–13 (testifying that the Video should have been preserved); Torres Dep. at 107:2–8 (same)).  However, the OAG maintains that this duty arose *after* the Video was lost. (OAG Def. Br. at 20). The OAG directed DOCCS to put a litigation hold in place on November 8, 2018. (*Id.*).  The OAG avers that "because neither the Video, nor any copy thereof, can be located, it is reasonable to assume that it was lost at some point after DSS Urbanski viewed it . . ., [but] before the litigation hold was put into place." (*Id.*).  The OAG's argument is premised on the incorrect belief that DOCCS's duty to preserve did not arise until the litigation hold went into effect on November 8, 2018. (*See id.*).

In "situations where a party has knowledge that certain types of incidents tend to trigger litigation, courts within the Second Circuit have found that a duty to preserve relevant video footage may attach as soon as the triggering incident occurs and prior to when a claim is filed." *Taylor v. City of New York*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013); *accord Thomas*, 2016 WL 1718368, at *8. Here, the duty to preserve evidence relating to Plaintiff's constitutional claims arose on August 31, 2018, as soon as DSS Urbanski received a "complain[t]" from WMC

---

[17] Plaintiff's argument that the individual defendants had control over the Video by virtue of their agency relationship with their union, the New York State Correctional Officers & Police Benevolent Association, to whom a copy of the Video was purportedly sent, is rendered moot by the foregoing. (*See* Pl. Br. at 14–15, n.9; OAG Def. Br. at 12–17; Palou & Deal Br. at 9–11).

concerning the "unnecessary" and "inappropriate" use of force on Plaintiff, as well as notice

from RMU staff regarding the seriousness of Plaintiff's injuries. (*See* Urbanski Dep. at 19:3–8,

19:18–20, 49:14–19).  In fact, DSS Urbanski ordered that the Video be created *because* he was

notified that: (1) a WMC employee described the use of force on Plaintiff as "unnecessary;" (2)

Plaintiff sustained serious injuries as a result of that force and was unable to move; and (3) "the

details did not . . . add up" on the use of force, which occurred under "unusual circumstances."

(Urbanski Dep. at 49:14–19, 60:6–16, 60:24–61:4, 86:2–5).  Sergeant Torres confirmed that the

Video was "authorized" because of the seriousness of the use of force on Plaintiff. (Torres Dep.

at 100:4–9).  Thus, given this and in light of the frequency with which prisoners injured in

custody bring lawsuits, *see Taylor*, 293 F.R.D. at 610, DSS Urbanski should have known that

there was a reasonable likelihood that litigation would ensue.

      Accordingly, DOCCS's duty to preserve evidence arose before the Video was even taken.

*See Slovin v. Target Corp.*, No. 12 CV 863(HB), 2013 WL 840865, at *3 (S.D.N.Y. 2013)

(where defendant was "undoubtedly aware immediately following the fall" that a security video

"would likely be relevant to future litigation," defendant's duty to preserve the video arose "at

the time of the accident"); *see also Taylor*, 293 F.R.D. at 610 (duty to preserve arose within a

week of inmate's assault by another inmate where "[d]efendants should have reasonably

anticipated that Plaintiff would file a lawsuit against the DOC for failing to protect him in

connection with [the assault] . . . because the DOC has documented that, in the hundreds of other

instances where inmates have been injured while in DOC custody, lawsuits by the injured

inmates against the agency have invariably ensued.").  Where, as here, a party's duty to preserve

arises *before* relevant evidence is created, "it is clear" that the party in control of the newly

created evidence is obligated to preserve it. *See Congregation Rabbinical Coll. of Tartikov, Inc.*

*v. Vill. of Pomona*, 138 F. Supp. 3d 352, 388 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019) (defendants were required to preserve relevant Facebook post and related text messages that were posted or sent after litigation hold was put in place).

## 2. Reasonable Steps to Preserve the Video

"Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake*, 220 F.R.D. at 218.  It is clear from the record that DOCCS breached its duty to preserve the Video.  Indeed, DOCCS acted negligently in losing the Video. "In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 418–19 (S.D.N.Y. 2010) (internal quotations and alterations omitted).  Furthermore, "[o]nce the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake*, 220 F.R.D. at 220.

DSS Urbanski and Sergeant Torres both testified that the Video should have been given to the watch commander's officer and made part of the "use of force file" connected to this incident, where it would have been maintained at least until the conclusion of the OSI investigation. (Torres Dep. at 106:18–25, 107:2–8; Urbanski Dep. at 61:10–13; *see also* Urbanski Decl. ¶ 7 (UOF/UI files are maintained "for the present year plus two additional . . . years.")).  Nevertheless, the Video is inexplicably missing.  The OAG submitted several declarations from DOCCS's personnel describing their search for the Video, none of whom provided any explanation for what may have happened to the Video. (*See generally* Docket No. 72-6).  Under these circumstances, it is clear that DOCCS and Sergeant Torres breached their

duty to preserve the Video, both by failing to conform to DOCCS's policy for maintaining evidence relating to UOF/UIs and for losing the Video after the duty to preserve attached. *See Thomas*, 2016 WL 1718368, at *12.

### 3. The Video Cannot be Replaced

The Video cannot be replaced, nor can a copy of the Video be obtained.  Pursuant to the undersigned's March 31, 2021 Order, the OAG directed DOCCS to perform a comprehensive search for the Video and provide an affidavit setting forth the details of that search.  The OAG provided declarations from Eileen Vives, DOCCS's Assistant Deputy Chief Investigator, Kevin Kortright, Associate Counsel for DOCCS, and Urbanski, all of whom explained that despite their best efforts, they were unable to locate the Video. (*See* Docket No. 72-6).  DSS Urbanski also testified that although he believed Michael Bloomingdale, who works in DOCCS's Bureau of Labor Relations, sent a copy of the Video to the New York State Correctional Officers & Police Benevolent Association ("Union"), the Union does not have a copy of the Video. (Urbanski Decl. ¶ 13).  Therefore, it is clear from the instant record that the Video cannot be found or replaced.  Accordingly, the threshold requirements of Rule 37 are satisfied.

### E. Prejudice

Rule 37(e)(1) "permits the imposition of sanctions only when there is 'prejudice to another party from loss of the information.'" *Lokai*, 2018 WL 1512055, at *12 (quoting *Leidig*, 2017 WL 6512353, at *12).  Sanctions pursuant to Rule 37(e)(2) similarly require a finding of prejudice.[18] *See Ungar*, 329 F.R.D. at 13.  However, the precise definition of prejudice for the

---

[18] Notably, "while the moving party ordinarily has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence," Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other . . . The rule leaves judges with discretion to determine how to best assess prejudice in particular cases." *Karsch*, 2019 WL 2708125, at *20 (internal quotations omitted); Fed. R. Civ. P. 37(e), Advisory Committee Note, 2015 Amendment.

purposes of Rule 37(e) is not clear. *See id.*; *accord Karsch*, 2019 WL 2708125, at *20. The Advisory Committee Note to the 2015 Amendment merely provides that "[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e)(1), Advisory Committee Note, 2015 Amendment. In *Ungar*, the court hypothesized two possible interpretations of prejudice in this context. 329 F.R.D. at 16. First, prejudice "may be taken to mean merely that the evidence is probative, similar to the concept of relevance under Fed. R. Evid. 401." *Id.* Second, "prejudice may require proof that the evidence was not only probative, but it would affirmatively support the movant's claim." *Id.*

Under the common-law, the movant must establish relevance by showing that "the destroyed evidence would have been favorable to" its case. *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017) (quoting *In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 643 F. Supp. 2d 482, 495 (S.D.N.Y. 2009)). This is a more demanding standard. *See, e.g.*, *Taylor*, 293 F.R.D. at 613. However, under Rule 37(e), proof of the more demanding showing of prejudice required at common-law "is not categorically necessary in all instances." *Ungar*, 329 F.R.D. at 16. This conclusion is supported by the dual purpose of spoliation sanctions, which are intended to both "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of the evidence," and "deter parties from engaging in spoliation." *Id.* (quoting *West*, 167 F.3d at 779). The *Ungar* court therefore reasoned that, "even without affirmative proof as to whether the evidence would have been advantageous to the movant," a spoliation sanction can still serve to deter future misconduct. *Id.* (collecting cases). Nevertheless, many courts contemplating prejudice under Rule 37(e) have required the movant to show that the destroyed evidence would have been in

their favor. *See id.* ("Courts in this Circuit generally require some proof of prejudice in the latter [more demanding] sense before sanctions will issue."); *see, e.g.*, *Ottoson*, 268 F. Supp. 3d at 580 (discussing "relevance" and "prejudice" in tandem and holding that both are satisfied by a showing that the evidence was favorable to the movant); *Karsch*, 2019 WL 2708125, at *20 (requiring a showing that "the existing evidence plausibly 'suggests' that the spoliated ESI could support the moving party's case") (quoting *Coan v. Dunne*, 602 B.R. 429, 439 (Bankr. D. Conn. 2019)).

The Court need not resolve this split in the case law because the Court finds that the Video would likely have been favorable to Plaintiff's claim against Sergeant Torres. As discussed *supra*, Section III(A), Plaintiff alleges that Sergeant Torres "deliberately denied [him] prompt medical care," in violation of his Eight Amendment rights. (Am. Compl. ¶ 61). The conclusion that Sergeant Torres was deliberately indifferent to Plaintiff's need for medical care rests on the supposition that Sergeant Torres was aware of Plaintiff's need for such care. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (a prison official acts with deliberate indifference to a medical need when he or she "*knows of* and disregards an excessive risk to inmate health or safety") (emphasis added).

Sergeant Torres testified that he did not believe Plaintiff was injured when he arrived at the RMU. (Torres Dep. at 42:5–8). He further testified that despite witnessing Plaintiff "slid[e] out of [a] chair . . . onto the floor," Plaintiff maintained the ability to move his arms and legs while lying on the ground. (*Id.* at 53:19–21, 66:13–15). However, the record suggests that the Video would show that Plaintiff was unable to ambulate while in the RMU. Sergeant Torres testified that Plaintiff slid out of his chair in "slow motion" onto the floor. (*Id.* at 59:23–60:7). While Plaintiff was on the floor, Nurse Pagliaro examined Plaintiff's feet and legs, (*id.* at 53:24–

54:3), which Plaintiff could not feel, (Stanbro Dep. at 95:9–11; *see also* Urbanski Dep. at 49:14–19). Furthermore, DSS Urbanski was informed, *while Plaintiff was in the RMU*, that Plaintiff was injured and "could not move." (Urbanski Dep. at 49:14–19). Indeed, DSS Urbanski, who viewed the Video, testified that it demonstrated that Plaintiff "could not move his lower extremities." (*Id.* at 63:14–18).

Consequently, the Video is likely to show that Plaintiff was paralyzed while in the RMU. Such evidence would thus have been favorable to Plaintiff's deliberate indifference claim against Sergeant Torres, as it tends to show that: (1) Sergeant Torres knew or should have known that Plaintiff required prompt medical attention; and (2) Sergeant Torres' statements that Plaintiff did not appear injured and was able to move his lower extremities were incredible. Accordingly, the Court finds that the absence of the Video is prejudicial to Plaintiff. *See Karsch*, 2019 WL 2708125, at *20.

Since the threshold requirements are satisfied and Plaintiff has suffered prejudice under Rule 37(e), the Court is empowered to order sanctions "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). However, Plaintiff specifically seeks an adverse inference, which requires the additional finding that DOCCS acted with an intent to deprive Plaintiff of the Video's use in the instant litigation. *See* Fed. R. Civ. P. 37(e)(2).

## F. Intent to Deprive

Rule 37(e)(2) "reserves the harshest discovery sanctions, such as adverse inference instructions, . . . only for cases in which the court can find that the spoliating party acted with the intent to deprive another party of the information's use in the litigation." *Moody*, 271 F. Supp. 3d at 431 (internal quotations and alterations omitted). "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive

another party of evidence." *Charlestown Capital Advisors*, 2020 WL 5849096, at *2 (quoting *Leidig*, 2017 WL 6512353, at *11); *see also Lokai Holdings*, 2018 WL 1512055, at *16 (declining to find an intent to deprive "on the basis of suspicion alone," where spoliating party intentionally deleted relevant e-mails, but the record did not indicate that the spoliating party deleted such e-mails to intentionally deprive its adversary of their use in litigation).  Courts are "divided with respect to the appropriate standard of proof to apply to a claim of spoliation;" some courts require a showing of intent to deprive by a preponderance of the evidence, while others require clear and convincing evidence. *Resnik v. Coulson*, 17-CV-676 (PKC)(SMG), 2019 WL 2256762, at *6 (E.D.N.Y. Jan. 4, 2019) (quoting *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 498 (S.D.N.Y. 2016)).

The Court does not need to resolve this conflict because the record does not establish that DOCCS possessed an intent to deprive Plaintiff of evidence under any standard.  Indeed, Plaintiff concedes that neither DOCCS nor any of its officers or agents "willfully destroyed the videotape" or "otherwise acted in bad faith in connection with their failure to preserve the videotape." (Pl. Br. at 16).  Furthermore, the Court finds upon an independent review of the record, that there is no direct or circumstantial evidence that DOCCS had the requisite intent to warrant an adverse-inference instruction under Rule 37(e)(2).  While DOCCS's inability to explain what happened to the Video is troubling, the Court cannot conclude on the instant record that the Video's absence is the result of an intent to deprive.  Such a finding would be mere surmise and conjecture.

**G.  Appropriate Sanction**

The Court is authorized to "order measures no greater than necessary to cure the prejudice" Plaintiff suffers as a result of the Video's absence. Fed. R. Civ. P. 37(e)(1).  In

exercising this discretion, the Court concludes that Plaintiff is entitled to adduce evidence at trial regarding: (1) the creation of the Video; (2) DOCCS's obligation to preserve the Video; (3) the absence of the Video; and (4) the Video's likely relevance to Plaintiff's deliberate indifference claim against Sergeant Torres.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for spoliation sanctions is granted in part and denied in part.  Plaintiff's Motion for sanctions against Officers Leonardo, Landry, Deal and Palou is denied.  Plaintiff's request for an adverse-inference instruction with respect to Sergeant Torres' conduct is denied.  However, Plaintiff is entitled to present evidence at trial concerning the loss and likely relevance of the Video, as outlined herein.  The Clerk is respectfully requested to terminate the pending Motion in case numbers 19 Civ. 10857, Docket No. 69, and 20 Civ. 1591, Docket No. 71.

Dated:     August 27, 2021
           White Plains, New York

                                        **SO ORDERED:**


                                        _____
                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge

- 32 -